Case 1:15-cv-21740-MGC   Document 36   Entered on FLSD Docket 10/13/2015   Page 1 of 83

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 15-CV-21740-CIV-COOKE/TORRES**

| | |
|---|---|
| NANCY WRIGLEY, On Behalf of Herself and All Others Similarly Situated, | ) )  **CLASS ACTION** |
| Plaintiffs, | ) |
| v. | ) **DEMAND FOR JURY TRIAL** |
| MASTEC, INC., JOSE R. MAS, and GEORGE PITA, | ) ) |
| Defendants. | ) |

**AMENDED CLASS ACTION COMPLAINT**

Lead Plaintiffs Charles T. McCarter, Charles Kitchner, and David Scrimm ("Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants[1], allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MasTec, Inc., ("MasTec" or the "Company"), analysts' reports and advisories about the Company, interviews with former employees and other potential witnesses with relevant information, and information readily

---

1 Defendants refer to MasTec, Inc., Jose R. Mas ("Mas"), and George L. Pita ("Pita").

1

obtainable on the Internet. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased or otherwise acquired MasTec common stock between May 1, 2014 and August 17, 2015 both dates inclusive (the "Class Period"). Lead Plaintiffs seek to pursue remedies against MasTec, and certain of its officers and directors, for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      MasTec, Inc., a long-term infrastructure construction company, provides engineering, building, installation, maintenance, and upgrade services for energy, utility, and communications infrastructure primarily in the United States. It operates in five segments: Communications, Oil and Gas, Electrical Transmission (the "electrical transmission segment"), Power Generation and Industrial. The Company builds pipelines for natural gas, crude oil, and refined product transportation; underground and overhead distribution systems comprising trenches, conduits, and cable and power lines that provide wireless and wireline communications; electrical power generation, transmission, and distribution systems; power generation infrastructure, including renewable energy; heavy industrial plants; and compressor and pump stations, and treatment plants. It also installs electrical and other energy distribution and transmission systems, power generation facilities, buried and aerial fiber optic cables, coaxial cables, copper lines, and satellite dishes in various environments.

3.      MasTec generates the majority of its revenue from long-term contracts. In order to properly reflect the magnitude and timing of expenses, revenue and income in MasTec's financial

statements, the Company utilizes the "percentage–of-completion" accounting method, which recognizes income on long-term production or construction-type projects as work on the contract progresses. When using percentage-of-completion accounting in the manner employed by MasTec, recognition of revenues and profits is related to costs incurred in providing the services required under the contract, requiring the accurate tracking and measurement of costs incurred to date and accurate estimates of costs to complete a project. The measurement of progress on a project is, therefore, integral to determining the appropriate amounts of revenue and profits the Company reports in its publicly filed financial statements.

4.      MasTec was required to reasonably and reliably estimate total costs for all projects that utilized the percentage-of-completion method of accounting for revenue and income recognition. At the end of each accounting period, the percentage to which each of the Company's contracts was complete needed to be computed based on production costs incurred to date as a percentage of total estimated production costs. This percentage then needed to be multiplied by the contract's total value to calculate the sales revenue and associated income to be recognized in the period.

5.      To the detriment of unsuspecting investors, throughout the Class Period, Defendants manipulated revenues and profits by recklessly or knowingly condoning and encouraging the process of underbidding on contracts, altering cost-to-complete estimates and improperly allocating costs to unrelated projects. Former MasTec employees state that the MasTec Defendants routinely approved falsification of cost estimates. These practices provided Defendants with cover to defer or avoid recording losses on certain projects that were unprofitable when actual costs exceeded "estimated" costs.

6. MasTec's manipulations resulted in a revenue timing scheme, whereby such practices allowed MasTec in order to pull forward revenue and profits in certain quarters, only to be unwound when the contracts were complete and the Company could no longer continue to manipulate reported costs.

7. Indeed, MasTec was not equipped to properly determine the cost-to-complete estimates for its long-term contracts.  MasTec's former employees advised while they provided their supervisors with monthly updates on cost-to-complete estimates, such estimates were often not used for purposes of recording revenue and income. Former employees also met with their supervisors, who advised executives throughout the Class Period that the cost-to-complete estimates being used by the Company to record revenue and income were wildly inaccurate for a multitude of reasons.  Thus, although information concerning the actual costs was available, Defendants turned a blind eye to actual costs, in reckless disregard thereof and of the concomitant fact that MasTec did not have the accounting systems or internal controls in place to assure that its financial statements were accurate. Although the Company's financials could not be relied upon, Defendants nevertheless affirmatively misrepresented that MasTec had adequate internal controls.

8. As a result of the accounting manipulations, MasTec distorted its earnings during the Class Period. Defendants' accounting errors caused MasTec's financial statements to be restated for the first three quarters of 2014, evidencing the materiality of the violations. For example, in the first quarter of 2014, MasTec's net income was overstated by $3.9 million, or over 24%.

9. Indeed, MasTec's restatement of its Class Period financial statements, as reflected in the delayed filing of its 2014 Annual Report Form 10-K ("10-K") filed with the Securities Exchange Commission ("SEC") on July 31, 2015, is an *admission* that the financial statements

4

originally issued were materially false when filed. Pursuant to Generally Accepted Accounting Principles ("GAAP"), as set forth in FASB[2] Accounting Standards Codification Section ("ASC") 250, the restatement announced by MasTec constituted a correction of material errors due to an oversight or misuse of facts which existed at the time the original financial statements were issued.

10.     Moreover, since changes to accounting estimates do not give rise to restatements, the restatement of MasTec's financial statements issued during the Class Period is NOT merely an acknowledgment that the Company decided to use a new, methodology for estimating costs and/or revenues on the transactions at issue. Instead, pursuant to ASC 250, *Accounting Changes and Error Corrections*:

> A change in accounting estimate shall be accounted for in the period of change if the change affects that period only or in the period of change and future periods if the change affects both. <u>A change in accounting estimate shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods or by reporting pro forma amounts for prior periods.</u>

(ASC 250-10-45-17).

11.     Rather, the restatement is an admission by MasTec that the financial statements it issued during the Class Period were incorrect based on information known to Defendants at the time and that the Company's previously issued financial results and its public statements regarding those results, including the Company's statements in its management discussion and analysis section included in the Company press releases and quarterly reports filed with the SEC ("Form 10-Q") were materially false and misleading.

12.     Throughout the Class Period, MasTec lacked adequate internal controls, including over financial reporting, and senior management exhibited a total disregard for the material accuracy of its published financial statements.  Indeed, MasTec's restatement of previously-issued

---

[2] Referring to the Financial Accounting Standards Board, the entity recognized by the SEC and the American Institute of Certified Public Accountants (the "AICPA") as being responsible for promulgating GAAP.

quarterly financial statements included an express acknowledgement that MasTec had a material weakness[3] in its system of internal controls for the year ended December 31, 2014.

13.     As detailed herein, several MasTec employees raised concerns to Defendants regarding the manipulation of cost-to-complete estimates and associated revenue, lack of internal controls with respect to accounting, and the financial errors that were being made and reflected in MasTec's financial statements. Nonetheless, even though these issues were well known to MasTec and the Individual Defendants, the Company recklessly continued to publish materially false and misleading financial statements in violation of GAAP, the Company's own internal accounting standards, and the federal securities laws.

14.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's financial performance. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) MasTec's cost-to-complete estimates were inaccurate, resulting in the misstatement of net income and profits in MasTec's financial statements for the first three Quarterly Periods of 2014; (2) MasTec's internal controls over financial reporting were ineffective throughout the Class Period; and (3) as a result of the foregoing, MasTec's public statements, including in Forms 10-Q first the first three quarters of 2014 as filed with the SEC, were materially false and misleading at all relevant times.

15.     The risk inherent in Defendants' complete lack of internal controls and accounting manipulations materialized partially on March 17, 2015, when, after the close of trading, the Company issued a press release disclosing that the Audit Committee was continuing an ongoing

---

[3] A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, that creates "a **reasonable possibility** that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." [*AS 5-Appendix A7*] (emphasis supplied).

investigation into its cost-to-complete estimates, requiring a further delay in the filing of its 2014 Form 10-K. In the press release, the Company stated, in part:

> MasTec, Inc. (NYSE: MTZ) today announced an update regarding its filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2014. The Audit Committee and its independent counsel are still conducting the previously disclosed independent internal investigation. As a result, the Company will not be able to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 by today's extended deadline pursuant to Securities and Exchange Commission rules. The Audit Committee has not reached any conclusions and is undertaking additional review of accounting estimates. The Company cannot predict the outcome of the Audit Committee's investigation, its ultimate scope or when it will be completed.

16.    As a result of this news, shares of MasTec fell $1.88, or over 9.5%, on unusually heavy volume, to close at $17.82 on March 18, 2015.

17.    On May 11, 2015, after the market closed, MasTec announced that not only would its 2014 Form 10-K be delayed, but its results for the first quarter of 2015 would also be delayed due to the continuation of the investigation into the accuracy of cost-to-complete estimates, stating:

> As previously disclosed, the independent accounting investigation by the Audit Committee of the Company's Board of Directors (the "Investigation") has delayed the filing of MasTec's 2014 Annual Report on Form 10-K, and will also delay the filing of the Company's 2015 first quarter report on Form 10-Q. The Audit Committee is working diligently to complete the Investigation, in order to permit the filing of the Company's 2014 Form 10-K and 2015 first quarter Form 10-Q as soon as possible. Because the Investigation has not been completed and no conclusions have been reached, the Company cannot provide further commentary regarding the status, expected timing or outcome of this matter.

18.    The market negatively reacted to the continued uncertainty surrounding the investigation and the potential accounting errors relating to MasTec's cost-to-complete estimates. As a result of this news, shares of MasTec fell over 12% from $18.45 as of the close of trading on May 11, 2015 to close at $16.19 on May 12, 2015.

19.    On July 30, 2015, the Company announced the restatement in a Form 8-K that stated:

As previously disclosed, the Audit Committee of the Board of Directors (the "Audit Committee") of MasTec, Inc. (the "Company"), with the assistance of independent counsel and accounting advisors, has been undertaking an independent investigation primarily with respect to cost to complete estimates regarding certain projects within a service line in the Company's Electrical Transmission segment accounted for under the percentage-of-completion method of accounting. The investigation arose as a result of concerns communicated to senior management through the Company's internal reporting system.

As more fully discussed below, the Company has concluded that certain accounting adjustments are appropriate with respect to interim periods during the Company's fiscal year ended December 31, 2014. In the aggregate, these interim period adjustments increase the Company's previously disclosed unaudited, preliminary net income attributable to MasTec, Inc. (" Net Income ") for the year ended December 31, 2014 by $0.3 million to $115.9 million 1. These adjustments reduce previously reported first quarter 2014 Net Income by ($3.9 million), or ($0.05) per fully diluted share, increase previously reported second quarter 2014 Net Income by $1.7 million, or $0.02 per fully diluted share, and increase previously reported third quarter 2014 Net Income by $3.7 million or $0.04 per fully diluted share. For the nine months ended September 30, 2014, these adjustments increase previously reported Net Income by $1.5 million, or $0.02 per fully diluted share. In addition, these adjustments reduce previously disclosed unaudited, preliminary fourth quarter 2014 Net Income by ($1.2 million), or ($0.01) per fully diluted share.

\*\*\*

As a result of the interim period adjustments described herein, on July 30, 2015, the Audit Committee, in consultation with its independent advisors and based on the recommendation of management, concluded that the Company's unaudited condensed consolidated financial statements as of and for the quarterly periods ended March 31, 2014, June 30, 2014 and September 30, 2014 should be restated. Accordingly, the Audit Committee determined that the Company's previously issued consolidated financial statements for those periods contained its quarterly reports on Form 10-Q should no longer be relied upon. Additionally, the Company's earnings press releases with respect to the 2014 interim periods and similar communications should no longer be relied upon to the extent that they relate to these interim period financial statements.

20.     Also in the Form 8-K, and as mentioned above, the Company admitted to having a

material weakness in its system of internal control over financial reporting and stated:

The Company currently expects that the 2014 Form 10-K will include a determination by management that the Company's disclosure controls and procedures were not effective and that a material weakness in internal control over financial reporting existed within a service line in its Electrical Transmission segment.

8

21.   In its 2014 Form 10-K filed on July 31, 2015, Defendants disclosed the material weakness:

> Management determined that a material weakness in internal control over financial reporting existed within a service line in the Company's Electrical Transmission segment due to the operational failure of the internal control process requiring adequate documentation of significant judgments made in determining cost-to-complete estimates under percentage-of-completion accounting. The review process failed to ensure that cost-to-complete estimates had sufficient supporting documentation. As a result, significant judgments were made and incorporated into the accounting records used to determine project revenue without sufficient documentation that clearly sets forth the rationale and factors used in making those judgments.

22.   On July 31, 2015, the Company filed its Form 10-K for the year ending 2014, reiterating the restatement results; however, the Company did not disclose the full extent of the problems with the Company's accounting with respect to its cost-to-complete estimates.

23.   On August 17, 2015, the market learned the full extent of the accounting manipulations related to the cost-to-complete estimates. MasTec announced its second quarter 2015 financial results, disclosing that there were additional downward revisions in its financial results (i.e., income) as a result of the misuse of cost-to-complete estimates for that quarter in its electrical transmission segment, causing it to miss Wall Street expectations by 120%.

24.   As a result of this news, shares of MasTec fell another 6.7% from $17.41 as of the close of the prior day of trading, on August 14, 2015 (the last day of trading for the week) to close at $16.24 on August 18, 2015.

25.   The Defendants were motivated to manipulate the cost-to-complete estimates because, among other things, revenues were generally lower in the first and fourth quarters of MasTec's fiscal year and, more specifically, individual performance ratings were based on the financial results of MasTec's business unites.  Throughout the Class Period, Defendants Mas and

Pita were eligible to receive performance based bonuses that were decided based on Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"), which is calculated using net income as the main metric – on of the metrics that was manipulated throughout the Class Period. The Individual Defendants directly benefited from the misconduct of those in the electrical transmission segment, reaping huge bonuses and compensation packages for manipulating cost-to-complete estimates, and, thereby, altering the timing of the recognition of revenue and income for the Company. Defendants' manipulations were also an attempt to meet Wall Street's expectations.  When the cost-to-complete manipulations unraveled, the Defendants missed Wall Street expectations by 120%.

26. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

27. The claims asserted herein arise under, and pursuant to, §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

28. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

29. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

30. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

### Plaintiffs

31.    Lead Plaintiff Charles T. McCarter purchased shares of MasTec common stock based on the Company's materially untrue and misleading financial statements at various times during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

32.    Lead Plaintiff  Charles Kitchner purchased shares of MasTec common stock based on the Company's materially untrue and misleading financial statements at various times during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

33.    Lead Plaintiff  David Scrimm purchased shares of MasTec common stock based on the Company's materially untrue and misleading financial statements at various times during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

34.    The Plaintiffs referenced above in ¶31-33 are referred to herein as the "Lead Plaintiffs."

### Defendants

35.    Defendant MasTec is a Florida corporation with its principal executive offices located at 800 S. Douglas Road, 12th Floor, Coral Gables, FL 33134. MasTec's common stock trades on the NYSE under the ticker symbol "MTZ."

36.     Defendant Jose R. Mas ("Mas") has served at all relevant times as the Company's Chief Executive Officer ("CEO").

37.     Defendant George L. Pita ("Pita") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

38.     The Defendants referenced above in ¶¶36-37 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

39.     MasTec,   Inc.,   headquartered   in   Coral   Gables,   Florida,   is an infrastructure engineering and construction company. The Company's activities include, the engineering,   building,   installation,   maintenance   and   upgrade   of   energy,   utility   and communications infrastructure, including electrical utility transmission and distribution, power generation, natural gas and petroleum pipelines, wireless, wireline and satellite communications, wind farms, solar farms and other renewable energy, industrial infrastructure and water and sewer systems. Its customers are primarily in the utility, communications and government industries. The Company's core services are the engineering, building, installing, maintaining and upgrading of infrastructures. MasTec has several segments that provide infrastructure construction services, including: EC Source ("the electrical transmission segment"), Globe Tec and Precision Pipeline, among others.

40.     In addition, the Company provides maintenance and upgrade support services that consist of maintenance of distribution facilities; and networks and infrastructure, including natural gas and petroleum pipelines, wireless, power generation, and electrical distribution and transmission infrastructure, as well as emergency services for accidents or storm damage, and

12

routine replacements and upgrades to overhauls. Its customers include public and private energy providers, pipeline operators, wireless service providers, satellite and broadband operators, local and long distance carriers, and government entities.

41.     The bulk, if not all, of MasTec's revenues are derived from its long-term contracts.

**Cost-to-Complete**

42.     In the construction and infrastructure business, there are primarily two forms of contracts, for long-term projects: "cost-plus" and "fixed price." Generally, cost-plus contracts provide that the contractor receives as payment its cost-to-complete the project, plus a pre-agreed-upon percentage of the total cost as profit. Fixed price contracts, however, into which MasTec primarily entered, typically provide that the contractor estimates the total cost of the project at the time the contract is executed, which, constitutes the price of the entire project, and agrees to perform a project for some amount of payment relative to that cost. Of the two types of contracts, fixed price presents the greater risk to the contractor because the contractor bears 100% of the risk for cost overruns on a project, which would, naturally, reduce any profit built into the agreed-upon contract price. If the contractor estimates too aggressively to win the bid award, i.e., understating the expected cost of a project - a technique known as "low-balling", the project can end up being completed by the contractor at a loss. When MasTec experiences significant cost overruns on fixed-price contracts, which is inevitable when the contract is low-balled, the Company's earnings are adversely affected, as occurred during the Class Period.

43.     In accounting for long-term construction projects, a company must choose between two generally accepted methods of revenue recognition: the percentage-of-completion method and the completed-contract method.

44.     In using the percentage-of-completion method, the company first estimates the total cost of contract performance and then compares the estimate with actual costs over the life of the contract. As work proceeds, the company records the revenue and income periodically based upon measurements of how much of the project has been completed to date, and what costs or task remain that should be recorded on the company's books. When, however, reasonably dependable estimates cannot be made, which makes profit predictions unreliable, the "completed-contract" method becomes preferable.  This accounting method recognizes revenue and expenses incurred on a contract at the time of completion.

45.     Under the percentage of completion method, the measurement of progress on a project is, therefore, integral to determining the appropriate amounts of revenue (and, often, related gross profit (or income)) to be recorded on a long-term, production-type, or construction-type contract.  In that regard, the ability to measure progress on such projects is similarly integral to determining which accounting method is appropriate.

46.     ASC 605-35, *Construction-Type and Production-Type Contracts* ("ASC 605-35") describes the circumstances in which each method can be used. It states the following:

> The use of the percentage-of-completion method depends on the ability to make reasonably dependable estimates, which … relates to estimates of the extent of progress toward completion, contract revenues, and contract costs.

> The percentage-of-completion method is considered preferable as an accounting policy in circumstances in which reasonably dependable estimates can be made…

> (ASC 605-35-25—56-57).

47.     Indeed, ASC 605-35-25-90, specifically, states that "[w]hen a lack of dependable estimates or inherent hazards cause forecasts to be doubtful, the completed-contracts method is preferable."

48.     Additionally, ASC 605 clarifies:

> Under the completed-contract method, income is recognized only when a contract is completed or substantially completed. Accordingly, during the period of performance, billings and costs are accumulated on the balance sheet, but no profit or income is recorded before completion or substantial completion of the work.

(ASC 605-35-25-88).

49. Once a particular method is chosen, the standard explains how the particular method affects financial reporting, stating, among other things:

> The percentage-of-completion method recognizes income as work on a contract progresses.

> Income recognized shall be that percentage of estimated total income, either:
> a. That incurred costs to date bear to estimated total costs after giving effect to estimates of costs to complete based on most recent information
> b. That may be indicated by such other measure of progress toward completion as may be appropriate having due regard to work performed.

(ASC 605-35-25—51-52).

50. During the Class Period, MasTec primarily utilized the percentage-of-completion method with respect to its long-term construction projects. MasTec's revenue and profits (i.e., income), therefore, depended upon its cost-to-complete estimates. As such, in order to use the percentage-of-completion accounting methodology, MasTec had an obligation to properly measure and estimates the costs for such projects, and communicate accurate accounting, as well as financial results to investors.

51. Cost-to-complete estimates require consideration of the original budget for each project, how much the company has already spent (as measured by purchase orders for equipment, labor costs and other expenses) and projections (estimates) of how much it will cost-to-complete the project based on the percentage of the project completed to date. In determining the percentage-of-completion, the costs to date may be divided by the estimated total cost-to-complete the job.

52.     MasTec described how the cost-to-complete estimates affect its net income, in its 2014 Form 10-K filed with the SEC on July 31, 2015, for the fiscal year ended December 31, 2014:

Revenue from fixed price contracts provides for a fixed amount of revenue for the entire project, subject to certain additions for changed scope or specifications. Revenue from these contracts, as well as for certain projects pursuant to master and other service agreements, is recognized using the percentage-of-completion method, under which the percentage of revenue to be recognized for a given project is measured by the percentage of costs incurred to date on the contract to the total estimated costs for the contract. The estimation process for revenue recognized under the percentage-of-completion method is based on the professional knowledge and experience of our engineers, project managers and financial professionals. Management reviews estimates of contract revenue and costs on an ongoing basis. Changes in job performance, job conditions and final contract settlements are factors that influence our assessment of total contract value and total estimated costs to complete those contracts and, therefore, our profit recognition. Changes in these factors may result in revisions to costs and income, and their effects are recognized in the period in which the revisions are determined, which could materially affect our results of operations in the period in which such changes are recognized.

53.     If the total estimated or expected costs exceed the agreed-upon contract price, the entire estimated loss must be taken as an immediate deduction from earnings rather than being deferred until completion of the contract.

54.     Specifically, according to ASC 605, "when the current estimates of total contract revenue and contract cost indicates a loss, a provision for the entire loss on the contract shall be made." (ASC 605-35-25-46).

55.     Paragraph 46 of ASC 605-35-25 also states that "[p]rovisions for losses shall be made in the period in which they become evident under the percentage-of-completion method or the completed-contract method." This rule is also applicable to a newly awarded contract. Thus, if a contractor deliberately underbids on a project in order to win the contract knowing with a reasonable degree of certainty that the contract costs will exceed the contract revenue, the

16

contractor is required to recognize this prospective loss in the period that the contractor first is obligated to perform the contract.

56.     Recognition of the loss must be reflected in both the income statement and on an entity's balance sheet. Typically, on a monthly basis, the contractor invoices the project owner and records an "Accounts Receivable" on the balance sheet at the time of invoicing.

57.     Additionally, where a contractor does not have a reasonable degree of certainty that a project will continue, an entity is precluded from utilizing the percentage-of-completion method of accounting and must use the completed-contracts method of accounting instead. Under the completed-contract method, no revenue or related costs are recognized until either the contract is fully completed or the contractor decides that the uncertainty of continuing is too great, and treats the uncompleted contract as terminated, and thus "completed." In either of these cases, the entity may not recognize revenue and associated costs during the period of "suspension," but only upon completion or termination. In that situation, upon completion or termination, only the revenue that has been or will be realized (i.e., collected) should be recognized. (See e.g., Accounting Research Bulletin No. ("ARB") 45, Long-Term Construction-Type Contracts ("ARB 45")).

58.     As shown below, MasTec distorted and misrepresented its financial results throughout the Class Period by routinely underbidding contracts, manipulating cost-to-complete estimates, and misallocating costs between projects to avoid booking known losses on its income statement. MasTec prematurely recognized revenue and income on long-term contracts in violation of GAAP by manipulating its application of the percentage-of-completion method of accounting.  Management pressured or turned a blind eye to this reality. Second, throughout the Class Period, MasTec lacked the internal controls necessary to estimate its project costs for purposes of determining percentage-of-completion accurately because its accounting system did

not work, employees were unable to properly track costs, projects were underbid and full of misallocated costs, and cost-to-complete estimates were continually manipulated. Because MasTec could not make reasonably dependable estimates of costs on its long-term projects, MasTec should have, instead, used the completed-contract method to account for such projects in at least its electrical transmission segment (if not throughout the Company) and defer recognizing revenue and income until the contracts were completed.

59.     Manipulation of the cost-to-complete estimates utilized in the electrical transmission segment caused MasTec's financial statements to be materially distorted, requiring a restatement and revisions of its revenues (and income), missing Wall Street's expectations.

**Altering Cost-to-Complete Estimates**

60.     Under the "percentage-of-completion accounting method," MasTec recognized revenues on its contracts using periodic estimates of the ratio of costs incurred to date as compared to the total estimated costs-to-complete the contracts. Former MasTec employees state that the Defendants routinely approved falsification of the cost estimates used to determine such.

61.     Confidential Witness Number 1 ("CW 1") worked in the electrical transmission segment from 2013 until CW 1 was laid off in July 2015.  CW 1 was hired as a financial analyst for the electrical transmission segment, in 2013. In November 2014, CW 1 became a director in the Project Management Office. As part of CW 1's job duties, CW 1 oversaw the functions of cost control and cost reporting, planning and scheduling and earned value reporting.  CW 1's job duties included creating cost-to-complete estimates. CW 1 reported to Cindy Glauner ("Glauner"), a senior financial analyst, and later reported to Jonathan Sharp, the Vice President of Project Development.  CW 1 prepared cost-to-complete estimates for each project on a monthly basis, and provided such estimates to CW 1's supervisor.

18

62.     CW 1 prepared cost-to-complete estimates for a project in Utah, also known as S2RB ("Utah project"); a project in Arizona, also known as Hang 2("Arizona project"); and a project in Iowa, also known as MVP3 &4("Iowa project"). CW 1 stated that the Company had over 300 cost codes. The initial budget for each construction project was kept in the Company's WIP reporting system. The WIP reports were kept in a software program called Timberline. The cost-to-complete estimates were reflected in excel spreadsheets, which circulated to management. CW 1 prepared the cost-to-complete estimates by the second day of each month.

63.     The Utah and Arizona projects were the two projects that were the subject of the restatement announced by the Company.

64.     To prepare the cost-to-complete estimates, CW 1 took into consideration the original budget for each project, how much the Company had already spent (as measured by purchase orders for equipment, labor costs and other expenses) and projected how much it would cost to complete the project based on the percentage of the project completed to date.

65.     CW 1's job duties included telling CW 1's managers whether they were on target with respect to the budget for each project. "They didn't like to hear me tell them [the project wasn't] going to make budget," CW 1 stated.

66.     CW 1 stated that the Company was understating its cost-to-complete estimates for both the Utah and Iowa projects mentioned above. CW 1 informed Rick Woolstenhulme ("Woolstenhulme"), the senior vice president, that the Company was underestimating its costs-to-complete. CW 1 stated that Woolstenhulme informed William Wright ("Wright"), the Chief Operating Officer ("COO") of the electrical transmission segment, about the underestimation.

67.     CW 1 stated that executives routinely underestimated costs-to-complete.  CW 1 sent models and percentages with accurate cost-to-complete numbers on a monthly basis to

19

executives, who routinely changed these numbers, most often reducing and, thereby, under-stating, expected cost to completion.

68.     In addition, CW 1 stated that, during the Class Period, backlog revenues were manipulated to increase revenue and margin forecast for 2015.

69.     CW 1 further stated that MasTec engaged in a scheme to manipulate the timing of revenue recognition whereby revenue and profits were moved forward to earlier phases of a project by ordering all of the materials too early when, indeed, those materials would not have been used until a much later phase of the contract. Such practice created the appearance, through consideration of purchase orders and invoices, that certain required costs for a project had been incurred prior to the material use or utility of such materials in the timeline of the project, allowing the Company to prematurely recognize revenue.

70.     Confidential Witness Number 5 ("CW 5") was a Manager of Project Control for the electrical transmission segment from August 2012 until December 23, 2014.  CW 5 reported to Mike Pickering ("Pickering") until October or November 2014, executive director of Project Management, who reported to Woolstenhulme. Beginning in October or November 2014, CW 5 reported to Rick Roton ("Roton"), Executive Vice President of Transmission.

71.     CW 5's job duties and responsibilities included balancing numbers for specific jobs and working on the revenue side of projects.

72.     CW 5 stated that CW 5 submitted cost-to-complete estimates to executives, who routinely altered the numbers on those reports without substantiating such changes or the originally-submitted estimates. CW 5 stated that these changes occurred for both the Utah project and the Iowa project, which were "grossly mishandled".

73.     CW 5 further stated that there were large delays on the aforementioned Iowa project, for which change orders should have been issued.  However, executives refused to issue change orders, making it look like the project was moving forward even though it was not.  CW 5 believed that the losses being incurred on the Iowa project were being carried over to the Utah project, and therefore, cost-to-complete estimates were not properly reflected in the accounting for these projects.  CW 5 also stated that some equipment was being billed to the Utah project even though it was actually sitting idle at the Iowa project.

74.     CW 5 believed that executives were overestimating what had been completed on projects and intentionally underestimating cost-to-complete estimates for both the Iowa and Utah projects.

75.     CW 5 believed that the President of the electrical transmission segment, Brian Bratton ("Bratton"), was responsible for altering numbers on reports.  CW 5 also stated that the electrical transmission segment's Controller, Christine Golden, and its Senior Vice-President, Brian Smaistrla, along with Roton were all aware that numbers were being altered.

76.     CW 5 said that the problems with the numbers were very obvious. CW 5 stated that CW 5's estimates were generally on target, and that those involved in changing the numbers did it knowingly.

77.     CW 5 stated that the financial information was shared with top executives.

**Improper Under-Bidding**

78.     CW 1 also stated that the projects had unrealistic budgets from the start. CW 1 stated that the executives manipulated the cost-to-complete estimates to artificially deflate the costs, thereby increasing revenue and profits for certain periods.

21

79.     Confidential Witness Number 3 ("CW 3") worked as a senior estimator for MasTec's electrical transmission segment from June 2010 until January 2013.  CW 3's duties included estimating costs for "large transmission jobs." CW 3's department consisted of 5-6 employees. CW 3 reported to Jeff Walter ("Walter"), Senior Vice-President until December 2012, at which point Jeff Walter was replaced with Randy Drivers ("Drivers").

80.     CW 3 estimated that CW 3 drafted 40-50 estimates for projects during CW 3's tenure within the Company, and that it was common practice at MasTec for CW 3's supervisors to slash project estimates in order to win the projects.

81.     CW 3 stated that Walter cut $100,000-$200,000 out of every job when arriving at bids in order to win the job, knowing that the project could not be completed according to the estimates.

82.     CW 3 further stated that both Walter and Drivers were not estimators and had no knowledge of what "proper proposal prices" should be.  CW 3 believed that Walter and Drivers were slashing cost estimates to reach yearly revenue and business goals, allowing them to receive large bonuses.  CW 3 believed that the executives' main goals were to obtain projects to hit forecasted [revenue] numbers, even though they knew that the jobs would actually lose money for the Company based on the improper cost estimates.

83.     Confidential Witness Number 4 ("CW 4") worked as Senior Program Manager for MasTec from July 2012 until June 2015.  During the Class Period, CW 4 reported to various marketing directors, including Mark Key, Alex Trother, Travis Flynn and Kevin Dion.  CW 4's job duties and responsibilities included reviewing project bids.

84.    CW 4 indicated that several of the projects that CW 4 reviewed the bids for were "set up for failure" due to having been "grossly" underbid.  For example, one project CW 4 managed was bid out at $209,000 but it actually cost $290,000 to complete.

85.    CW 4 believed that employees were under pressure to make quarterly projections in order to be financially rewarded.

**Shifting Costs between Projects**

86.    According to former employees, MasTec shifted "cost overruns" incurred on certain unprofitable long-term equipment sales contracts and construction projects, to other unrelated projects that could absorb the costs and mask the losses. This action allowed MasTec to continue to accrue contract revenues under the percentage-of-completion accounting method using falsified cost estimates (i.e., estimates that excluded the additional costs that would have indicated overruns).

**Iowa Project**

87.    The Iowa project began in the fall or winter of 2013. CW 1 stated that the equipment budget was understated. In addition, CW 1 stated that MasTec frontloaded the purchase of materials such that its cost-to-complete estimates would be artificially lower, thereby accelerating the timing of revenues and income.

**Arizona Project**

88.    The Arizona project began in the fall of 2013. CW 1 stated that as of February-March, 2014, the costs were overstated.  CW 1 stated that CW 1's cost-to-complete estimates were altered by executives.

89.    The Arizona project was one of two projects that were the subject of the restatement announced by the Company in July 2015.

**Utah Project**

90.     The Utah project began in the fall of 2012, and the costs were originally budgeted at $150 million. In 2013, the cost-to-complete estimates being utilized by MasTec for purposes of recognizing revenue and income were indicating total project costs of $160 million, while CW 1's projection was greater than $174 million.  CW 1 stated that by the fourth quarter of 2014, the cost-to-complete estimates being utilized for MasTec's financial reporting reflected total expected costs of $172 million when the actual costs had already exceeded $180 million.

91.     CW 1 stated that in MasTec's initial budgets and during the course of the construction project, the Company was not including enough estimated expense for equipment costs on the Utah project.

92.     In early 2014, CW 1 told the executives that the estimates made of the costs-to-complete were understated. CW 1 said the Company's underestimates of the costs-to-complete its Utah project eventually inflated the revenues. "I told them there were problems with the Utah project in February or March 2014," CW 1 recalled.

93.     The Utah project was one of two projects that were the subject of the restatement announced by the Company in July 2015.

**Lack of Internal Controls**

94.     MasTec's electrical transmission segment lacked the internal controls necessary to utilize percentage-of-completion accounting, and had no dedicated internal audit function. Divisional controllers reviewed cost estimates and other information developed by operations personnel, and then sent results to the corporate office.

95.     CW 1 stated that, in addition to executives routinely altering cost-to-complete numbers, the accounting system used to account for these numbers was not working properly.

Therefore, the actual costs put in the system were incorrect, causing the cost-to-complete estimates to be wildly inaccurate.

96.     Confidential Witness Number 2 ("CW 2") was hired as a financial analyst at MasTec in August 2013 and was employed there until August 2014. CW 2 worked in the Hanover and Columbia, Maryland offices. CW 2 was one of only two employees in the accounting office at those branches.  CW 2 reported to Gigi Bridgers, who reported to Todd Smith, based in MasTec's Atlanta offices.

97.     As part of CW 2's job duties, CW 2 reviewed project costs to ensure that all costs were recorded prior to the end of the project, reviewed the budgets of projects for accuracy, coordinated client billing upon completion of projects and reviewed the projects' finances to make sure that costs and revenues were in order to record margins and recognize revenue.

98.     CW 2 stated that MasTec employees often inputted the wrong costs into project budgets or would input incorrect financial information into project estimates because employees did not know how to properly account for their projects.  CW 2 stated that the cost errors were due to poor internal controls.

99.     CW 2 also stated that employees did not properly account for costs related to projects, including the purchase of items for employees' own personal use.

100.    CW 2 reported all of MasTec's numbers to the corporate accounting department which was rolled up into MasTec's financial statements on a quarterly basis.

101.    CW 4 stated that "numbers and financials were often lost in the shuffle." CW 4 further believed that in 2014, there were additional problems with MasTec's revenue projections in the Delaware, D.C., West Virginia, Maryland and Virginia based offices.

25

102. Confidential Witness Number 6 ("CW 6") was an Accounts Payable specialist for MasTec from May 2013 through December 2013 at MasTec's headquarters in Coral Gables, Florida and reported to Sylvia Berrocal.

103. CW 6 stated that the marketing department routinely failed to create proper purchase orders, and that the purchase orders did not match the invoices the Accounts Payable department was supposed to pay.

104. CW 6 believed that the lack of internal controls regarding the invoicing and purchase orders in the marketing department affected the Company's financials since the cost for projects was not being recorded properly.

105. As such, the Company's electrical transmission segment, the very division that the caused the restatement, was unable to accurately measure progress on its long-term projects, and therefore, under ASC 605-35, was precluded from utilizing percentage-of-completion accounting. Instead, ASC 605-35 required the electrical transmission segment to use the contract complete method of accounting.

**Complaints to Management**

106. CW 1 complained to management often regarding the improper cost-to-complete estimates and the lack of internal controls in the electrical transmission segment. CW 1 had been reporting higher cost-to-complete estimates and higher costs-at-completion on the project(s) for which CW1 was responsible for months leading up to CW 1's termination.

107. In February 2014, CW 1 told Glauner, Woolstenhulme, Pickering and Wright, that the Company was underestimating its cost-to-complete the Utah project—one of the two contracts that were the cause of the restatement. CW 1 advised that shortly after CW 1's complaints in February 2014, Glauner independently told the management team about the understated estimates

of the costs-to-complete the Utah project. CW 1 stated that Woolstenhulme initially discussed the matter with Wright in March 2014.

108.    In September 2014, Woolstenhulme reported the inaccurate cost-to-complete estimates on the Utah and Iowa projects to Wright. Around the same time, Woolstenhulme also called the Company's headquarters in Florida to notify them about the inaccurate cost-to-complete estimates.

109.    In November 2014, CW 1 also met with executives to discuss the altering of cost-to-complete estimates.

110.    CW 1 believes that CW 1 was laid off by MasTec in July 2015 because of CW 1's complaints about the cost-to-complete estimates.

111.    CW 3 was also let go after raising questions to management regarding the common practice of cutting estimates below the point at which the job could be completed when bidding for jobs.

112.    CW 4 brought the issue of underbidding to the attention of Senior Vice President of Operations, Bruce Budagher, in January of 2014.  Budagher said that "his hands were tied" because the contracts were signed and that they needed to complete the work to satisfy customers.

113.    CW 5 discussed concerns with management over the inadequate cost estimates, but CW 5's concerns were ignored.

114.    CW 6 routinely complained to CW 6's supervisor about the problems with the marketing department. CW 6 also recalls a meeting that took place at MasTec's headquarters and was attended by the Director of Finance, the Staff Accounting Director, Vice-President of Marketing and various Marketing Directors to discuss the problems with the purchase orders not matching invoices, further evidence of MasTec's knowledge of its lack of internal controls.

**Executives Were Motivated to Manipulate the Financials**

115.    MasTec employees were incentivized to underbid projects because they were under intense pressure to hit certain financial goals.  As a result, MasTec routinely underbid on potential projects (i.e., offered to perform projects at lower-than-expected costs) to ensure that the Company secured the project. Such practice, and the acceptance of such projects, might result in top-line revenue for the Company (and for the executives who landed the projects) but not necessarily net income.

116.    The Restatement proves that as a result of such underbidding and other practices described by former MasTec employees as set forth herein, several of MasTec's projects utilized inaccurate cost-to-complete estimates, which in turn resulted in net income being misstated in the first three quarters of 2014.

117.    When Defendants were made aware of the problems with the cost-to-complete estimates, Defendants turned a blind eye and ignored the problem, while the culture of securing revenue through large projects contributed to the misstatements.

118.    Throughout the Class Period the Individual Defendants were eligible and received compensation packages that were directly tied to the Company's net income. The Individual Defendants, Mas, the Company's Chief Executive Officer, and Pita, the Company's Chief Financial Officer, directly benefitted from the misconduct of MasTec's employees and the blind eye turned to such, reaping huge bonuses and compensation packages for reporting inaccurate financial results.

119.    The Individual Defendants directly benefitted from their misconduct, reaping huge bonuses and compensation packages for reporting inflated financial results.

120.    Throughout the Class Period Defendants Mas and Pita were eligible and received performance-based bonuses. For 2014, Defendants Pita and Mas would receive incentive awards equal to 2% of MasTec's Consolidated EBITDA if MasTec achieved "Consolidated EBITDA" of $336 million. Consolidated EBITDA is generally calculated by taking MasTec's consolidated net income (the very metric which Defendants distorted during the Class Period), determined in accordance with generally accepted accounting principles, and adding back any deductions for interest, depreciation, amortization, income taxes and certain other deductions and adjusting certain items of income or gain.

121.    Due to the cost-to-complete manipulations, the Company achieved the necessary level of Consolidated EBITDA for the Individual Defendants to receive their performance based rewards.

**GAAP Violations**

122.    At all relevant times during the Class Period, MasTec represented that its financial statements were prepared in accordance with GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. As set forth in FASB Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

29

123.    SEC Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

124.    Guidance surrounding the consideration and utilization of the percentage-of-completion method of accounting for long-term contracts was, prior to codification by the FASB in 2009 (in ASC 605-35), set forth in ARB 45 (as referenced briefly above), and Statement of Position ("SOP") 81-1 "Accounting for Performance of Construction-Type Contracts ("SOP" 81-1), also foundational to the current accounting standards as codified by the FASB in ASC 605 (which specifically referenced ARB 45), as introduced supra, and which form the foundation of presently-codified accounting literature on the topic (which can be found in ASC 605-35).

125.    Paragraph 3 of SOP 81-1 provides the following with respect to revenue recognition and its application to construction- and production-type contracts:

> The pervasive principle of realization and its exceptions and modifications are central factors underlying accounting for contracts. APB Statement 4 states:
>
> Revenue is generally recognized when both of the following conditions are met: (1) the earnings process is complete or virtually complete, and (2) an exchange has taken place. [Paragraph 150]
>
> Revenue is sometimes recognized on bases other than the realization rule. For example, on long-term construction contracts revenue may be recognized as construction progresses. This exception to the realization principle is based on the availability of evidence of the ultimate proceeds and the consensus that a better measure of periodic income results.  [Paragraph 152]
>
> The exception to the usual revenue realization rule for long-term construction-type contracts, for example, is justified in part because strict adherence to realization at the time of sale would produce results that are considered to be unreasonable. The judgment of the profession is that revenue should be recognized in this situation as construction progresses.  [Paragraph 174]
>
> (SOP 81-1, ¶5)

126. As discussed above, the FASB describes two generally accepted methods of accounting for long-term and construction-type contracts for financial reporting purposes. It states:

> Two accounting methods commonly followed by contractors are the percentage-of-completion method and the completed-contract method. The two methods should be used in specified circumstances and should not be used as acceptable alternatives for the same circumstances. Accordingly, identifying the circumstances in which either of the methods is preferable and the accounting that should be followed in the application of those methods are among the primary objectives of this Subtopic.

(ASC 605-35-05-5).

> In accounting for contracts, the basic accounting policy decision is the choice between two generally accepted methods: the percentage-of-completion method including units of delivery and the completed-contract method. The determination of which of the two methods is preferable is based on a careful evaluation of circumstances because the two methods should not be acceptable alternatives for the same circumstances.

(ASC 605-35-25-1).

127. Those methods are described therein, in the following manner:

> • The *percentage-of-completion method* recognizes income as work on a contract progresses; **recognition of revenues and profits generally is related to costs incurred in providing the services required under the contract**.

> • The *completed-contract method* recognizes income is recognized only when a contract is completed or substantially completed. Accordingly, during the period of performance, billings and costs are accumulated on the balance sheet, but no profit or income is recorded before completion or substantial completion of the work.

(ASC 605-35-25-88; emphasis added, in bold.).

128. In an attempt *not* to limit the pronouncement and its findings to what many would call "long-term" contracts, the FASB provides the following with respect to which types of contracts are covered thereby:

> Contracts consist of legally enforceable agreements in any form and include amendments, revisions, and extensions of such agreements. Performance will often extend over long periods, and the seller's right to receive payment depends on the seller's performance in accordance with the agreement. The service may consist of

designing, engineering, fabricating, constructing, or manufacturing related to the construction or the production of tangible assets.

(ASC 605-35-05-2).

129.     There are certain characteristics of a contract or type of contract that serve to render one of the methods preferable and, often, more appropriate in most situations.  As provided within the standards:

> The two methods should be used in specified circumstances and should not be used as acceptable alternatives for the same circumstances. Accordingly, identifying the circumstances in which either of the methods is preferable and the accounting that should be followed in the application of those methods are among the primary objectives of this Subtopic.

(ASC 605-35-05-5).

130.     SOP 81-1 provides that companies may use the "percentage-of-completion method" to recognize revenue as work on contracts progresses toward completion *so long as the company can reasonably estimate* the extent of progress toward completion, the amount of contract revenues and the amount of contract costs. When reasonably dependable estimates cannot be made or when inherent hazards make estimates doubtful, revenue is to be deferred until the contract is completed. *See* SOP 81-1. In order to determine the amount earned on a contract for a period prior to completion, a company must determine the difference between total estimated contract revenue and total estimated contract cost. *See* SOP 81-1, ¶¶.22-.25, .79. When current estimates indicate an overall loss on a contract, a provision for the entire loss should be made in the period in which they become evident. SOP 81-1, ¶.85.

131.     The FASB codified standards state, further, the following with respect to when, and why, the percentage-of-completion method is appropriate:

> The use of the percentage-of-completion method **depends on the ability to make reasonably dependable estimates**. For the purposes of this Subtopic, relates to estimates of the extent of progress toward completion, contract revenues, and contract costs.

**The percentage-of-completion method is considered preferable as an accounting policy in circumstances in which reasonably dependable estimates can be made** and in which all the following conditions exist:

- Contracts executed by the parties normally include provisions that clearly specify the enforceable rights regarding goods or services to be provided and received by the parties, the consideration to be exchanged, and the manner and terms of settlement.

- The buyer can be expected to satisfy his obligations under the contract.

- The contractor can be expected to perform his contractual obligations.

(ASC 605-35-25- 56 through 57; emphasis added).

132.   ASC 605 also states the following with respect to the proper application of

percentage-of-completion accounting to contracts:

The percentage-of-completion method shall be applied to individual contracts or profit centers, as appropriate, based on all of the following considerations:

a.      Normally, a contractor will be able to estimate total contract revenue and total contract cost in single amounts. Those amounts should normally be used as the basis for accounting for contracts under the percentage-of-completion method.

b.      For some contracts, on which some level of profit is assured, a contractor may only be able to estimate total contract revenue and total contract cost in ranges of amounts. If, based on the information arising in estimating the ranges of amounts and all other pertinent data, the contractor can determine the amounts in the ranges that are most likely to occur, those amounts shall be used in accounting for the contract under the percentage-of-completion method. If the most likely amounts cannot be determined, the lowest probable level of profit in the range shall be used in accounting for the contract until the results can be estimated more precisely.

c.      However, in some circumstances, estimating the final outcome may be impractical except to assure that no loss will be incurred. In those circumstances, a contractor shall use a zero estimate of profit; equal amounts of revenue and cost shall be recognized until results can be estimated more precisely. A contractor shall use this basis only if the bases in (a) or (b) are clearly not appropriate.

(ASC 605-35-25-60).

133.   MasTec violated its own policy for revenue recognition, as disclosed in the 2014

Q1 10-Q financial statement:

Revenues are derived from projects performed under master and other service agreements as well as from fixed price contracts for specific projects or jobs requiring the construction and installation of an entire infrastructure system or

specified units within an entire infrastructure system. Revenue and related costs for master and other service agreements billed on a time and materials basis are recognized as the services are rendered. The Company also performs services under master and other service agreements on a fixed fee basis, under which MasTec furnishes specified units of service for a fixed price per unit of service and revenue is recognized as the services are rendered. Revenues from fixed price contracts provide for a fixed amount of revenue for the entire project, subject to certain additions for changed scope or specifications. Revenues from these contracts are recognized using the percentage-of-completion method. Under this method, the percentage of revenue to be recognized for a given project is measured by the percentage of costs incurred to date on the contract to the total estimated costs for the contract. Such contracts provide that the customer accept completion of progress to date and compensate the Company for services rendered, which may be measured in terms of costs incurred, units installed, hours expended or some other measure of progress.

The Company may incur costs subject to change orders, whether approved or unapproved by the customer, and/or claims related to certain contracts. Management determines the probability that such costs will be recovered based upon evidence such as engineering studies and legal opinions, past practices with the customer, specific discussions, correspondence or preliminary negotiations with the customer. The Company treats project costs as a cost of contract performance in the period incurred if it is not probable that the costs will be recovered, or defers costs and/or recognizes revenue up to the amount of the related cost if it is probable that the contract price will be adjusted and can be reliably estimated. As of March 31, 2014 and December 31, 2013, the Company had approximately $163 million and $79 million, respectively, of change orders and/or claims that had been included as contract price adjustments on certain contracts that were in the process of being negotiated in the normal course of business, including arbitration and other proceedings. These contract price adjustments represent management's best estimate of additional contract revenues that have been earned and that management believes are probable of collection. The amounts ultimately realized upon final acceptance by its customers could be higher or lower than such estimated amounts, which are primarily expected to be billed and collected within one year. The $84 million increase in change orders and/or claims since December 31, 2013 is primarily due to a project in our Oil and Gas segment, which amounts have been approved in principle subsequent to March 31, 2014.

134.  During the relevant timeframe, the Company expressly utilized the percentage-of-completion methodology when accounting for long-term production projects.

135.  Contrary to the Company's representations, GAAP and SEC rules, MasTec improperly recognized revenue utilizing the percentage-of-completion method on long-term

contracts during the Class Period when it was unable to make reasonably determinable estimates of costs at completion and/or determine the costs it had incurred on such contracts. Indeed. MasTec not only manipulated its cost-to-complete estimates, but, as it has now admitted, it was unable to properly estimate costs due to material internal control deficiencies pervasive during the Class Period. As a result of such deficiencies, particularly in the electrical transmission segment, the Company should have utilized the completed-contract method of accounting, including with respect to certain of its projects, such as the Utah and Arizona projects discussed herein, among others.

136.    Language from within SOP 81-1 provides the following with respect to how the costs incurred by a company in performing a long-term, production-type, or construction-type contract are directly related to recorded revenues and gross profit:

> The percentage-of-completion method recognizes the legal and economic results of contract performance on a timely basis. Financial statements based on the percentage-of-completion method present the economic substance of a company's transactions and events more clearly and more timely than financial statements based on the completed-contract method, and **they present more accurately the relationships between gross profit from contracts and related period costs**…

(SOP 81-1, ¶22; emphasis added.).

137.    The FASB asserts, further, that "the percentage of completion method recognizes income as work on a contract progresses,"[4] while also providing the following:

> The basic presumption should be that each contract is the profit center for revenue recognition, cost accumulation, and income measurement. That presumption may be overcome only if a contract or a series of contracts meets the conditions described for combining or segmenting contracts. A group of contracts (combining), and a phase or segment of a single contract or of a group of contracts (segmenting) may be used as a profit center in some circumstances. Since there are numerous practical implications of combining and segmenting contracts, evaluation of the circumstances, contract terms, and management intent are essential in determining contracts that may be accounted for on those bases.

---

[4] ASC-605-35-25-51.

(ASC 605-35-25-4).

138.    To that end, the standard also states the following:

Estimating the revenue on a contract is an involved process that is affected by a variety of uncertainties that depend on the outcome of a series of future events. The estimates must be periodically revised throughout the life of the contract as events occur and as uncertainties are resolved. The major factors that must be considered in determining total estimated revenue include all of the following:

a.    The basic contract price

b.    Contract options

c.    Change orders

d.    Claims

e.    Contract provisions for penalties and incentive payments, including award fees and performance incentives.

All those factors and other special contract provisions shall be evaluated throughout the life of a contract in estimating total contract revenue to recognize revenues in the periods in which they are earned under the percentage-of-completion method of accounting.

(ASC 605-35-25-15).

139.    Additionally, ASC 605 outlines how the percentage-of-completion method recognizes income, costs, and gross profits, providing the following, in relevant part:

Income recognized shall be that percentage of estimated total income, either:

a.    That incurred costs to date bear to estimated total costs after giving effect to estimates of costs to complete based on most recent information

b.    That may be indicated by such other measure of progress toward completion as may be appropriate having due regard to work performed.

Costs as here used might exclude, especially during the early stages of a contract, all or a portion of the cost of such items as materials and subcontracts if it appears that such an exclusion would result in a more meaningful periodic allocation of income.

140.    Allocating contract costs and revenues to accounting periods on the basis of cash receipts and payments or the basis of contract billings and costs incurred is not a generally accepted method of accounting for financial reporting purposes. (ASC 605-35-25- 52 through 54).

141. The measurement of progress on a project is, therefore, integral to determining the appropriate amounts of revenue (and, often, related gross profit) to record on a long-term, production-type, or construction-type contract. A number of "input" and "output" approaches that may be employed to measure contract progress are provided within Subtopics ASC 605-35-25-70 through -78 of the FASB codification.

142. In summary, those paragraphs demonstrate that the primary driver towards determining and recording revenue on these types of contracts is *the relationship between costs incurred to date on a project and the total estimated costs to complete the project – be it measured by hours worked to date, efforts-expended to date, or a simple ratio of costs incurred to total estimated costs*.

143. The FASB also speaks directly to the relationship between the measurement of progress and the company's ability to accurately record and depict associated revenue and/or gross profit. As set forth therein, in relevant part:

> Total estimated gross profit on a contract, the difference between total estimated contract revenue and total estimated contract cost, must be determined before the amount earned on the contract for a period can be determined. **The portion of total revenue earned or the total amount of gross profit earned to date is determined by the measurement of the extent of progress toward completion using one of the methods discussed in paragraphs .44 to .51 of [SOP 81].** The computation of income earned for a period involves a determination of the portion of total estimated contract revenue that has been earned to date (earned revenue) and **the portion of total estimated contract cost related to that revenue** (cost of earned revenue).

(ASC 605-35-25-82; emphasis added.).

144. As set forth above, the ability to make reasonably dependable estimates about the expected costs of a project are integral to the concept, as well as the use of, percentage-of-completion accounting. That concept is reiterated within ASC 605-35-25-59. That paragraph provides, in relevant part:

For entities engaged on a continuing basis in the production and delivery of goods or services under contractual arrangements and for whom contracting represents a significant part of their operations, the presumption is that they have the ability to make estimates that are sufficiently dependable to justify the use of the percentage-of-completion method of accounting. Persuasive evidence to the contrary is necessary to overcome that presumption. **The ability to produce reasonably dependable estimates is an essential element of the contracting business. Accordingly, entities with significant contracting operations generally have the ability to produce reasonably dependable estimates and for such entities the percentage-of-completion method of accounting is preferable in most circumstances.**

(Emphasis added, in bold.).

145.    To that end, the standard also asserts that, when reasonably dependable estimates cannot be made, the percentage-of-completion method of accounting may not be appropriate. The FASB provides, in relevant part:

An entity using the percentage-of-completion method as its basic accounting policy should use the completed-contract method for a single contract or a group of contracts for which reasonably dependable estimates cannot be made or for which inherent hazards make estimates doubtful.

(ASC 605-35-25-61).

146.    Further, if it becomes likely that a penalty will be incurred by the contractor, then such should be added to the total estimated costs of the project. If adding such costs to the total estimated cost of the project results in the contractor estimating that the entire contract will now be a loss, the loss on the entire contract must be accrued at the time that such estimate is made.

147.    FASB provides the following, in relevant part, with respect to contract losses and an entity's obligation to record such in a timely fashion:

For a contract on which a loss is anticipated, GAAP requires recognition of the entire anticipated loss as soon as the loss becomes evident. An entity without the ability to update and revise estimates continually with a degree of confidence could not meet that essential requirement of GAAP.

When the current estimates of total contract revenue and contract cost indicate a loss, a provision for the entire loss on the contract shall be made. Provisions for

losses shall be made in the period in which they become evident under either the percentage-of-completion method or the completed-contract method.

Losses on cost-type contracts, although less frequent, may arise if, for example, a contract provides for guaranteed maximum reimbursable costs or target penalties. In recognizing losses for accounting purposes, the contractor's normal cost accounting methods should be used in determining the total cost overrun on the contract, and losses should include provisions for performance penalties.

(ASC 605-35-25- 45 through 47).

148.    In summary, the standard states the following:

When the current estimates of total contract revenue and contract cost indicate a loss, a provision for the entire loss on the contract should be made. Provisions for losses should be made in the period in which they become evident under either the percentage-of-completion method or the completed-contract method.

(ASC 605-35-25-46).

149.    As set forth above, the moment at which reliable estimates about the total expected costs to be incurred on a long-term project indicate that those costs, in total, will exceed the expected or agreed-upon contract revenue, an accrual (or loss "provision") must be recorded. This requirement is discussed further in ASC 605-35-25-85, as excerpted below:

Adjustments to the original estimates of the total contract revenue, total contract cost, or extent of progress toward completion are often required as work progresses under the contract and as experience is gained, even though the scope of the work required under the contract may not change. The nature of accounting for contracts is such that refinements of the estimating process for changing conditions and new developments are continuous and characteristic of the process. Additional information that enhances and refines the estimating process is often obtained after the balance sheet date but before the financial statements are issued or are available to be issued (as discussed in Section [ASC] 855-10-25); except as indicated in paragraph [ASC] 605-35-50-10, such information should result in an adjustment of the unissued financial statements.

(ASC 605-35-25-85).

150.    The representations that MasTec's financial statements were prepared in accordance with GAAP were materially false and misleading because the Defendants knew, or

recklessly ignored that the Company improperly utilized the percentage-of-completion method of accounting, causing the Company to materially distort its income and profits during the Class Period. These practices, which were either sanctioned or ignored by high level management, were a material breach of GAAP. In the aggregate, these failures and errors materially distorted MasTec's actual financial performance during the Class Period, as the Company has now admitted.

**Management's Responsibility For its Financial Statements and Internal Controls**

151. In addition to the Defendants' violation of GAAP, the Defendants did not have proper internal controls, despite its statements to the contrary, in violation of SEC regulations.

152. The SEC requires public companies to adhere to, among other things, rules and regulations regarding financial and non-financial reporting and disclosures. These rules are set forth in the Securities Act of 1933 and the Securities Exchange Act of 1934 and regulations promulgated thereunder, as well as later regulations such as the Sarbanes Oxley Act of 2002 ("SOX"). Specifically, Regulation S-X sets forth the form and content requirements for financial statements to be filed with the SEC. As a public company bound by this regulation, MasTec is required to file annual and quarterly reports with the SEC on Forms 10-K and 10-Q,[5] which includes its financial statements prepared in conformity with GAAP. Management's responsibility to prepare accurate and reliable financial statements in conformity with GAAP is acknowledged in a set of standards known as Generally Accepted Auditing Standards ("GAAS").[6] GAAS outlines

---

[5] Section 13(a) of the Exchange Act and Rule 13a-1 lays out these requirements for all issuers with securities registered under Section 12 of the Exchange Act.

[6] As a result of the passage of the SOX, auditing standards to be used in the performance of, and reporting on, audits of the financial statements of public companies were thereafter established by the Public Company Accounting Oversight Board ("PCAOB"). The PCAOB initially adopted, as its interim standards, the AICPA Codification of Statements on Auditing Standards that were in existence on April 16, 2003. Sections of the Codification are referenced with the prefix "AU."

the responsibilities of independent auditors, but also explains that management is responsible for

its own financial reporting:

> **The financial statements are management's responsibility**. The auditor's responsibility is to express an opinion on the financial statements. *Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control* that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, *the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility*. [Emphasis added; footnote omitted.][7]

153.    In addition, the SEC requires that registrants are required to maintain accurate books and records, as well as an adequate system of internal controls, to ensure that their financial statements are prepared in accordance with GAAP, as well as to certify, in accordance with SOX, the veracity of financial statements filed with the SEC.[8]

154.    MasTec was required to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with GAAP. Section 13(b)(2) of the Securities and Exchange Act of 1934 entitled *Periodical and Other Reports* states the following with respect to books and records:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

---

[7] AU § 110.03.

[8] Section 13(b)(2) of the Securities and Exchange Act of 1934, *Periodical and Other Reports*.

155.     The Securities and Exchange Act of 1934 also provides that, with respect to internal controls, an entity must:

B.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—

i.     transactions are executed in accordance with management's general or specific authorization;

ii.     transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

iii.     access to assets is permitted only in accordance with management's general or specific authorization; and

iv.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

156.     A system of internal control is intended to help management[9] achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. Furthermore, SEC rules that: "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record or account …"[10]

157.     As described herein, MasTec identified and disclosed in its Form 10-K for the year ended December 31, 2014 filed on July 31, 2015, a material weakness in its internal controls for the period covered thereby. The Company disclosed, specifically, the following:

---

[9] Accounting literature defines management as "persons who are responsible for achieving the objectives of the entity and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policy making functions. Persons without formal titles also may be members of management." *See* ASC 850-10-20.

[10] §13(b)(5) of the Securities and Exchange Act of 1934.

Management determined that a material weakness in internal control over financial reporting existed within a service line in the Company's Electrical Transmission segment due to the operational failure of the internal control process requiring adequate documentation of significant judgments made in determining cost-to-complete estimates under percentage-of-completion accounting. The review process failed to ensure that cost-to-complete estimates had sufficient supporting documentation. As a result, significant judgments were made and incorporated into the accounting records used to determine project revenue without sufficient documentation that clearly sets forth the rationale and factors used in making those judgments.

158.    PCAOB Auditing Standard No. ("AS") 5, *An Audit of Internal Control Over Financial Reporting That is Integrated with An Audit of Financial Statements* ("AS 5") states that a company's internal controls are not considered to be effective if one or more material weaknesses exist.[11]

159.    MasTec's management assessed the effectiveness of its internal control over financial reporting throughout the Class Period, as required by SOX. In making its assessment of internal control over financial reporting, and reporting on such in its public filings, MasTec's management should have used the criteria established by the Committee of Sponsoring Organizations of the Treadway Commission Report, *Internal Control – Integrated Framework* (1992) ("COSO Report").[12] The COSO Report, borrowing from GAAS, defines fair presentation as having the following attributes:

- The accounting principles selected and applied have general acceptance,

- The accounting principles are appropriate in the circumstances,

- The financial statements are informative of matters that may affect their use, understanding, and interpretation,

---

[11] AS 5 ¶3

[12] The COSO report was originally issued in September 1992 as a four-volume set. An *Addendum to Reporting to External Parties* was issued in May 1994. On May 14, 2013 COSO released an updated version of the entire framework. Unless otherwise noted, all references to the COSO report refer to the 1992 issuance.

* * *

- The financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements. [Footnote omitted.][13]

160.    The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives.[14] The five components include the Control environment, Risk assessment, Control activities, Information and communication and Monitoring. MasTec clearly had a poor control environment and violated the monitoring components of COSO. Ongoing monitoring includes regular management and supervisory activities as well as specific review processes and procedures to ensure internal controls are designed and operating effectively.

161.    A control environment, often referred to as the "tone at the top," describes the atmosphere in which people carry out their daily responsibilities. The Board of Directors and Chief Executive Officer sets the "tone at the top" that establishes a positive control environment and affects the integrity and ethics of employees within the Company. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business. Senior managers, in turn, assign responsibility for establishment of more specific internal control policies and procedures to personnel responsible for the unit's functions. As such, the key management of an organization with respect to an effective internal control system includes not only the CEO, CFO, and the controller or chief accounting officer, but also senior managers and managers at various segments and divisions.

162.    COSO identified several components of the control environment:

---

[13] COSO Report, Risk Assessment, pg. 35.

[14] COSO Report, Executive Summary.

44

Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors. [15]

163. MasTec had a poor control environment whereby it was clear that upper management lacked the requisite amount of integrity, ethical values and competence required from employees of a public Company. Employees' complaints about the manipulation of cost-to-complete estimates and lack of internal controls were widespread throughout the Company, and were likewise all ignored. Managers were paid based on obtaining contracts, and pressure to hit Wall Street's expectations came down from top executives. This type of behavior shows that management exhibited total disregard for the accuracy of its published financial statements and that its control environment was not conducive to providing a foundation for accurate and faithful financial reporting.

164. In connection with the manipulation of cost-to-complete estimates, there was clearly a lack of effective monitoring by management to ensure the cost-to-complete estimates were utilized properly to ensure accounting in accordance with GAAP.

165. By failing to ensure that the cost-to-complete estimates were accurate and allowing a culture to exist whereby project managers or executives could override or ignore the cost estimates being supplied by those individuals charged with performing and creating such, MasTec's management failed to use accounting principles that were appropriate in the circumstances; and thus, issued financial statements that were not fairly presented with respect to GAAP.

---

[15] COSO Report, Executive Summary.

**MATERIALLY FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE PERIOD**

166.    On the first day of the Class Period, May 1, 2014, MasTec announced the fiscal 2014 first quarter results through a press release. The press release stated:

MasTec, Inc. (NYSE: MTZ) today announced 2014 first quarter financial results. Despite the impact of severe winter weather disruptions, 2014 first quarter revenue increased 5% to $964 million from $919 million in the prior year quarter. The quarterly revenue increase was primarily driven by a 19% increase in the Oil and Gas segment and a 5% increase in Communications, reflecting a 27% increase in wireless projects. Net income from continuing operations was $16.2 million, or $0.19 per diluted share, compared to $19.3 million, or $0.23 per diluted share for the first quarter of 2013.

\*\*\*

Jose R. Mas, MasTec's Chief Executive Officer, commented, "Despite a slow start to the year due to wide spread and severe winter weather disruptions, we continue to see excellent long-term momentum in the markets that we serve. We expect another record year in 2014 and continue to be excited about growth opportunities in 2015 and beyond."

George Pita, MasTec's Executive Vice President and CFO, added, "First quarter results were in line with our expectations despite the adverse weather conditions that impacted much of the U.S. This decreased work productivity and delayed the billings and collections process negatively impacting financial performance and cash flow on a year-over-year basis. As these factors normalize, we expect improved performance in the second quarter, as well as strong financial performance in the second half of 2014."

167.    On the same day, the Company filed with the SEC its Form 10-Q for the quarter ended March 31, 2014, which reiterated the Company's previously announced inflated quarterly financial results, was signed by Defendants Mas and Pita, and contained Sarbanes-Oxley required certifications ("SOX Certifications") signed by Defendants Mas and Pita.  The SOX Certifications stated:

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

46

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

168.    The Form 10-Q also stated:

We believe that our accounting estimates pertaining to: revenues and costs derived from fixed price contracts under the percentage-of-completion method; allowances for doubtful accounts; fair value estimates in connection with business acquisitions, in particular, estimated values of net assets acquired and estimated liabilities for future earn-out obligations; valuation of goodwill and indefinite-lived intangible assets; income taxes; legal contingencies; and self-insurance contingencies are the most critical in the preparation of our consolidated financial statements as they are important to the portrayal of our financial condition and as they require significant or complex judgment and estimates on the part of management. We frequently review our accounting policies and critical accounting measurements with the Audit Committee of the Board of Directors.

169.    These statements were false and misleading because net income for the first quarter of 2014 was overstated by 32%, due to the fact that MasTec's cost-to-complete estimates were inaccurate, which caused revenue and net income to be misstated.  Defendants knew or recklessly disregarded the fact that MasTec's reported financial statements were materially distorted due to the continuing practice of under-bidding jobs, misallocating costs and intentionally altering continuing cost-to-complete estimates, which led to the aforementioned misstatements of revenue and income.  As a result, expenses for the period were understated and net income, accordingly was overstated by 32%.  In addition to the manipulation of the Company's cost-to-complete estimates, the Company failed to disclose its pervasive inadequate internal controls over financial reporting and that MasTec could not ensure that its financial statements were prepared in

accordance with GAAP, which also led to the issuance of materially false and misleading financial statements.

170.    While Defendants admitted in these disclosures that their cost-to-complete estimates under the percentage-of-completion methodology were "the most critical in the preparation of our consolidated financial statements" and despite Defendants' acknowledging that they "are important to the portrayal of our financial condition," they omitted to tell the investing public that MasTec's cost-to-complete estimates were wildly inaccurate and did not properly portray MasTec's financial results.

171.    Defendants misled the market, claiming that inclement weather was the cause of the lower financial results.  However, while construction companies typically have cyclical results due to weather, MasTec's first quarter results were extremely lower than its typical cycles. Defendants announced a net income of $16.1 million in Q1 2014(which was actually$12.2 million after the restatement), compared to $19.3 million in Q1 2013.  Defendant Mas's statements that inclement weather caused lower results was misleading because CW 1 stated that the inclement weather was insignificant compared to the unwinding of the financial improprieties.

172.    Indeed, analysts were focused on the weather, taking note of the positive financial results reported.  On May 2, 2014, analyst Vishal Shah of Deutsche Bank issued a report titled, "Weather drag But Solid Outlook."  In the report, Shah formed the opinion based on the financial results that, despite a slow quarter which was based on the cold weather months, the Company was still seeing significant growth.

173.    On that same day, Liam D. Burke of Janney Capital Markets echoed the Company's positive reported financials and issued a report titled, "A solid start in a Seasonally Tough

Quarter." Also on May 2, 2014, Josh A. Wangler of Wunderlich Securities stated in a report "[r]evenues come in well above expectations even with weather issues."

174. MasTec's stock price rose from $39.58 on April 30, 2014 to $40.23 on May 1, 2014, the day that the Company announced inflated financials.

175. Throughout the Class Period, Defendants violated their own Code of Business Conduct and Ethics, which provided the following, in relevant part:

> The Company has high standards for achieving its operating and financial goals. These results must be achieved with high ethical standards for accounting and financial reporting methods. Accounting and financial reporting practices must be fair and proper, in accordance with generally accepted accounting principles (GAAP), and must involve management's best judgments where necessary.

> Any action, activity, behavior or practice that might lead to fraudulent financial reporting is strictly prohibited. While difficult to give an all-inclusive list of actions, activities, behaviors or practices that may lead to fraudulent financial reporting, such list generally includes any intentional or reckless conduct, whether by act or omission, which results in misleading financial statements. The Company expects clear, open and frequent communication among all directors, officers and employees on all financial and operating matters to help reduce the risk of problems in the accounting and financial reporting areas as well as to help achieve operating goals.

> The disclosures the Company makes in reports and documents that the Company files with, or submits to, the SEC as well as in other public communications made by the Company, must be full, fair, accurate, timely and (importantly) understandable to the public.

> The Chief Executive Officer or Chief Financial Officer of the Company is responsible for authorizing the release of information to the public.

176. These statements were false and misleading because MasTec's cost-to-complete estimates were inaccurate during the Class Period, which caused revenue and net income to be misstated and, eventually, restated. Defendants knew or recklessly disregarded the fact that MasTec's reported financial statements were materially distorted due to the continuing practice of

under-bidding jobs, misallocating costs and intentionally altering continuing cost-to-complete estimates, which led to the aforementioned misstatements of revenue and income. In addition to the manipulation of the Company's cost-to-complete estimates, the Company failed to disclose its pervasive inadequate internal controls over financial reporting and that MasTec could not ensure that its financial statements were prepared in accordance with GAAP, which also led to the issuance of materially false and misleading financial statements.

177.   On August 11, 2014 MasTec announced the fiscal 2014 second quarter results through a press release.  The press release stated:

> MasTec, Inc. (NYSE: MTZ) today announced 2014 second quarter financial results in-line with guidance issued in June 2014.Second quarter 2014 revenue increased 13% to $1.1 billion from $978 million for the prior year quarter. The quarterly revenue increase was driven by a 23% increase in the Oil & Gas segment, a 49% increase in the Power Generation segment and a 6% increase in the Communications segment, reflecting lower wireless project revenue growth levels as indicated in the Company's June 2014 guidance. Net income from continuing operations was $32.1 million, or $0.37 per diluted share compared to $35.5 million, or $0.42 per diluted share for the second quarter of 2013.
>
> ***
>
> Jose R. Mas, MasTec's Chief Executive Officer, commented, "We had a challenging second quarter, primarily because of slowdown in revenue growth of wireless projects. Our guidance for the second half of 2014 reflects reduced levels of expected wireless project revenue, when compared to prior year, and we have taken and will continue to take steps to mitigate the impact of these reduced revenue levels. We anticipate a return to a more normalized level of wireless project revenue in 2015."
>
> Mr. Mas concluded, "We see unprecedented bidding opportunity in multiple markets. We continue to see excellent growth opportunities in oil & gas, electrical transmission, wireless, power generation and 1-gigabit fiber expansion. . . .In short, we are well positioned for growth in numerous markets throughout North America and expect 2015 to be a strong year for both revenue growth and profit margin expansion."
>
> George Pita, MasTec's Executive Vice President and CFO, added, "We improved cash flow from operations during the second quarter, and expect strong cash flow from operations during the second half of the year.

178.    On the same day, the Company filed with the SEC its Form 10-Q for the quarter ended June 30, 2014, which reiterated the Company's previously announced inflated quarterly financial results, was signed by Defendants Mas and Pita, and contained their signed SOX Certifications, as stated in ¶167.

179.    The Form 10-Q also stated:

> We believe that our accounting estimates pertaining to: revenues and costs derived from fixed price contracts under the percentage-of-completion method; allowances for doubtful accounts; fair value estimates in connection with business acquisitions, in particular, estimated values of net assets acquired and estimated liabilities for future earn-out obligations; valuation of goodwill and indefinite-lived intangible assets; income taxes; legal contingencies; and self-insurance contingencies are the most critical in the preparation of our consolidated financial statements as they are important to the portrayal of our financial condition and as they require significant or complex judgment and estimates on the part of management. We frequently review our accounting policies and critical accounting measurements with the Audit Committee of the Board of Directors.

180.    Defendants knew or turned a blind eye to the fact that the financial results were materially distorted, due to MasTec's cost-to-complete estimates being wither ignored or manipulated throughout the Class Period, which caused revenue and net income to be misstated. In addition to the manipulation of the Company's cost-to-complete estimates, the Company failed to disclose its pervasive inadequate internal controls over financial reporting and that MasTec could not ensure that its financial statements were prepared in accordance with GAAP, which also led to the issuance of materially false and misleading financial statements.

181.    While Defendants admitted in these disclosures that MasTec's cost-to-complete estimates under the percentage-of-completion methodology were "the most critical in the preparation of our consolidated financial statements" and despite Defendants' acknowledging that they "are important to the portrayal of our financial condition" they omitted to tell the investing

public that MasTec's cost-to-complete estimates were wildly inaccurate and did not properly portray MasTec's financial results.

182.    On the news of distorted financial results, MasTec's stock price rose from $26.86 on August 8, 2014 (the last day of trading for the week) to $28.07 on August 11, 2014, when the Company's 2014 second quarter results were announced.

183.    On October 30, 2014, MasTec announced the fiscal 2014 third quarter results through a press release.  The press release stated:

> MasTec, Inc. (NYSE: MTZ) today announced 2014 third quarter financial results. Third quarter 2014 revenue increased 3.2% to $1.31 billion from $1.27 billion for the prior year quarter.  The quarterly revenue increase was driven by a 7.4% increase in the Oil & Gas segment, an 11.6% increase in the Electrical Transmission segment and a 34.4% increase in the Power Generation and Industrial segment, partially offset by a 7.0% decrease in the Communications segment, which reflects previously announced expected lower wireless project revenue. Third quarter 2014 net income from continuing operations was $45.7 million, or $0.53 per diluted share, compared to $49.9 million, or $0.59 per diluted share, for the third quarter of 2013.
>
> ***
>
> Jose R. Mas, MasTec's Chief Executive Officer, commented, "We had a good quarter, with strong double-digit growth in Power Generation and Electrical Transmission and high single-digit growth in Oil & Gas, which counterbalanced the anticipated and previously announced reduction in wireless project spending.  We remain very encouraged by the long term outlook in our businesses. The recently completed acquisition of WesTower will be an important part of MasTec's future expansion in the wireless market. We also see strong bidding opportunities in Oil & Gas, Electrical Transmission and 1-gigabit fiber expansion.   We are well positioned for growth in numerous markets throughout North America and expect 2015 to be an excellent year for MasTec and its stakeholders."
>
> ***
>
> George Pita, MasTec's Executive Vice President and CFO, added, "We expect strong cash flow from operations during the fourth quarter, due to the seasonality of our operations and the initiation of working capital reduction initiatives at our recently acquired.

184.    On the same day, the Company filed with the SEC its Form 10-Q for the quarter ended September 30, 2014, which reiterated the Company's previously announced inflated

quarterly financial results, was signed by Defendants Mas and Pita, and contained their signed

SOX Certifications, as stated in ¶167.

185.   The Form 10-Q also stated:

We believe that our accounting estimates pertaining to: revenues and costs derived from fixed price contracts under the percentage-of-completion method; allowances for doubtful accounts; fair value estimates in connection with business acquisitions, in particular, estimated values of net assets acquired and estimated liabilities for future earn-out obligations; valuation of goodwill and indefinite-lived intangible assets; income taxes; legal contingencies; and self-insurance contingencies are the most critical in the preparation of our consolidated financial statements as they are important to the portrayal of our financial condition and as they require significant or complex judgment and estimates on the part of management. We frequently review our accounting policies and critical accounting measurements with the Audit Committee of the Board of Directors.

186.   Defendants knew or turned a blind eye to the fact that the financial results were

materially distorted, due MasTec's cost-to-complete estimates having been manipulated

throughout the Class Period, which caused revenue and net income to be misstated.  In addition to

the manipulation of the Company's cost-to-complete estimates, the Company failed to disclose its

pervasive inadequate internal controls over financial reporting and that MasTec could not ensure

that its financial statements were prepared in accordance with GAAP, which also led to the

issuance of materially false and misleading financial statements.

187.   While Defendants admitted in these disclosures that their cost-to-complete

estimates under the percentage-of-completion methodology were "the most critical in the

preparation of our consolidated financial statements" and despite Defendants' acknowledging that

they "are important to the portrayal of our financial condition" they omitted to tell the investing

public that MasTec's cost-to-complete estimates were wildly inaccurate and did not properly

portray MasTec's financial results.

188. On Feb 26, 2015, MasTec announce the fiscal 2014 fourth quarter and annual results through a press release. The press release stated:

> MasTec, Inc. (NYSE: MTZ) today announced 2014 fourth quarter and full year financial results. Fourth quarter 2014 revenue increased 6.7% to $1.24 billion from $1.16 billion for the prior year fourth quarter. The quarterly revenue increase was driven by higher revenue levels in the Communications, Electrical Transmission and Power Generation and Industrial segments. Fourth quarter 2014 net income from continuing operations was $28 million or $0.33 per diluted share, compared to $43 million or $0.50 per diluted share in the fourth quarter of 2013.
>
> ***
>
> Jose Mas, MasTec's Chief Executive Officer, commented, "As we look into 2015 and beyond, we believe that we are strongly positioned to take advantage of a growing number of opportunities in the markets we serve, including oil & gas, transmission, wireless, fulfillment services and 1-gigabit expansion."
>
> George Pita, MasTec's Executive Vice President and Chief Financial Officer noted, "We experienced strong cash flow from operations of $241 million during our 2014 fourth quarter due to the seasonality of our operations and working capital initiatives."

189. Defendants knew or turned a blind eye to the fact that the financial results were materially distorted, due to the fact that MasTec's cost-to-complete estimates were manipulated throughout the Class Period, which caused revenue and net income to be misstated. In addition to the manipulation of the Company's cost-to-complete estimates, the Company failed to disclose its pervasive inadequate internal controls over financial reporting and that MasTec could not ensure that its financial statements were prepared in accordance with GAAP, which also led to the issuance of materially false and misleading financial statements.

190. While Defendants admitted in these disclosures that their cost-to-complete estimates under the percentage-of-completion methodology were "the most critical in the preparation of our consolidated financial statements" and despite Defendants' acknowledging that they "are important to the portrayal of our financial condition" they omitted to tell the investing

public that MasTec's cost-to-complete estimates were wildly inaccurate and did not properly portray MasTec's financial state.

191.    In the same  February 26, 2015, press release the Company stated, in part:

The Audit Committee of the Company's Board of Directors, with the assistance of independent counsel, is undertaking an independent review primarily to determine whether certain cost to complete estimates, currently believed to be in the range of zero to $13 million, which were recognized during the Company's third quarter of 2014, should have been recognized during the second quarter of 2014….[T]he Company expects to extend until March 17, 2015 the filing date of its Annual Report on Form 10-K for the year ended December 31, 2014, as permitted by Securities and Exchange Commission rules.

192.    The Company bolstered its manipulated financial results to offset the news that the Company was conducting an investigation into internal controls and whether cost-to-complete estimates were being prepared accurately and utilized properly. However, the statements were misleading because by this time, the Company was aware that the cost-to-complete estimates had been manipulated for each of the quarters in 2014, causing materially distorted results.

**The Risk of Distorted Financial Results Begins to Materialize**

193.    On March 17, 2015, after the close of trading, the Company issued a press release, announcing a further delay in filing its 2014 Form 10-K. In the press release, the Company stated, in part:

MasTec, Inc. (NYSE: MTZ) today announced an update regarding its filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2014. The Audit Committee and its independent counsel are still conducting the previously disclosed independent internal investigation. As a result, the Company will not be able to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 by today's extended deadline pursuant to Securities and Exchange Commission rules.

The Audit Committee has not reached any conclusions and is undertaking additional review of accounting estimates. The Company cannot predict the outcome of the Audit Committee's investigation, its ultimate scope or when it will be completed.

194.    At this point the market partially understood the risk associated with the problems with the Company's cost-to-complete estimates and the possible distorting of financial results caused by the manipulation of cost-to-complete estimates and the lack of internal controls. The market learned for the first time that the investigation was extensive and the Company could not file its Annual 10-K with the SEC. As a result of this news and partial materialization of the risk, shares of MasTec fell $1.88, or over 9.5%, on unusually heavy volume, to close at $17.82 on March 18, 2015.  However, the market was still not fully informed of the extent the manipulated cost-to-complete estimates would have on MasTec's financial statements.

195.    Several news outlets including Bloomberg, Market Watch and Motley Fool reiterated the markets concern regarding the delayed filing and ongoing investigation.  Motley Fool stated, "[h]ere we are, three weeks later, and the company is further delaying the annual report. Mr. Market is clearly spooked by this. Since the earnings call, the stock has fallen more than 20% including today's big drop."

196.    On May 11, 2015, after the market closed, MasTec announced preliminary first quarter 2015 results through a press release.  The press release also announced further delay in the filing of the 2014 Form 10-K, as well as announcing for the first time that the Company's Form 10-K for the first quarter of 2015 would also be delayed, all as a result of the continuation of the investigation into the accuracy of cost-to-complete estimates and the possible inaccuracy of previously-filed financial statements in reports filed with the SEC. The press release stated:

> MasTec, Inc. (NYSE: MTZ) today announced preliminary first quarter 2015 financial results. First quarter revenue increased 4.0% to $1.0 billion from $964 million in the prior year, driven by increases in the Power Generation and Industrial segment, the Electrical Transmission segment and the Communications segment, partially offset by the expected decrease in the Oil and Gas segment. First quarter 2015 net loss from continuing operations was $6.9 million, or $0.08 per diluted

share, compared to net income from continuing operations of $16.2 million, or $0.19 per diluted share, for the first quarter of 2014. First quarter 2015 results include approximately $0.12 per diluted share for non-operating and non-core charges not included in prior year results, comprising WesTower acquisition integration costs, Audit Committee investigation related costs and a project loss related to a non-controlled joint venture. First quarter results also include approximately $0.12 per diluted share in losses related to a Canadian wind farm project.

First quarter 2015 adjusted net income from continuing operations, a non-GAAP measure, was $5.6 million compared to $18.2 million in 2014. First quarter 2015 continuing operations adjusted diluted earnings per share, a non-GAAP measure, was $0.07, compared to $0.21 last year.  First quarter 2015 continuing operations adjusted EBITDA, also a non-GAAP measure, was $63 million compared to $75 million in 2014. Included in first quarter 2015 continuing operations adjusted EBITDA is approximately $16 million in losses related to a Canadian wind farm project.

Adjusted net income from continuing operations, continuing operations adjusted diluted earnings per share and continuing operations adjusted EBITDA, all non-GAAP measures, exclude the impact of discontinued operations, WesTower acquisition integration costs, Audit Committee investigation related costs, project losses related to a non-controlled joint venture and non-cash stock based compensation. Reconciliations of these and other non-GAAP measures to GAAP-reported measures are attached.

Jose R. Mas, MasTec's Chief Executive Officer, commented, "We had a difficult start to 2015.  Results in the quarter were negatively impacted by adverse weather, a weaker Canadian dollar, the impact of lower commodity prices and a very difficult Canadian wind farm project.  Despite these challenges for 2015, we are very encouraged about our growth prospects for 2016 and beyond. We are seeing increasing opportunities in oil and gas, fiber deployment, electrical transmission, customer fulfillment, and in the deployment of wireless networks.  In fact, while our Oil and Gas backlog is at record levels, we expect this segment's backlog to more than double over the next few quarters."

George Pita, MasTec's Executive Vice President and CFO, added, "We experienced strong cash flow from operations of $117 million during the first quarter of 2015, an increase of approximately $138 million compared to last year. This strong cash flow allowed us to substantially complete our $100 million share repurchase program during the quarter, with no significant change in our overall leverage levels. We continue to expect strong cash flow from operations during 2015 and have ample financial resources and liquidity to manage our operations and pursue growth opportunities in the markets we serve."

During the first quarter of 2015, the Company repurchased approximately 4.7 million shares of its common stock in the open market at a cost of approximately $91 million. In April 2015, the Company completed its $100 million stock repurchase plan, with approximately 5.2 million total shares repurchased under the plan.

As previously disclosed, the independent accounting investigation by the Audit Committee of the Company's Board of Directors (the "Investigation") has delayed the filing of MasTec's 2014 Annual Report on Form 10-K, and will also delay the filing of the Company's 2015 first quarter report on Form 10-Q. The Audit Committee is working diligently to complete the Investigation, in order to permit the filing of the Company's 2014 Form 10-K and 2015 first quarter Form 10-Q as soon as possible. Because the Investigation has not been completed and no conclusions have been reached, the Company cannot provide further commentary regarding the status, expected timing or outcome of this matter. In addition, all financial results described in this press release should be considered preliminary. The preliminary information has been prepared by the Company's management and has not undergone the complete review by the Company's outside auditors that is customary for the release of interim results. The preliminary information represents the Company's good faith belief as to the Company's results for the periods presented, but it is pending any impact from the Investigation and investors are cautioned that such information is neither final nor complete and should not be relied on as such.

The Company is updating full year 2015 guidance and providing second quarter 2015 guidance. The Company currently estimates fiscal year 2015 revenue of approximately $4.4 billion. 2015 continuing operations adjusted EBITDA, a non-GAAP measure, is estimated at approximately $425 million, with continuing operations adjusted diluted earnings per share, also a non-GAAP measure, estimated at $1.45.

Additionally, for the second quarter of 2015, the Company expects revenue of approximately $1.0 billion. Second quarter 2015 continuing operations adjusted EBITDA, a non-GAAP measure, is estimated at $94 to $99 million with continuing operations adjusted diluted earnings per share, a non-GAAP measure, estimated at $0.27 to $0.30.

197.   At this point the market partially understood the risk associated with the problems with the Company's cost-to-complete estimates and the possible distorting of financial results caused by the manipulation of cost-to-complete estimates and the lack of internal controls. The

market learned for the first time that the investigation was so extensive that the Company could not file both its Form 10-K and its first quarter 2015 Form 10-Q with the SEC.  As a result of this news and partial materialization of the risk, shares of MasTec fell over 12% from $18.45, on May 11, 2015 to close at $16.19 on May 12, 2015.

198.   However, the market was still not fully informed of the extent the manipulated cost-to-complete estimates would have on MasTec's financial statements because of Defendants attempt to cover up MasTec's problems with false positive news.

199.   Defendants misled the market by claiming that inclement weather was the cause of the lower financial results.  However, while construction companies typically have cyclical results due to weather, MasTec's first quarter results were extremely low, when compared to its typical cycles.  Defendants announced a net income of $6.9 million in Q1 2015, compared to $19.3 million in Q1 2013 and $16.2 million in Q1 2014. Defendant Mas's statements that inclement weather caused lower results was misleading because CW 1 stated that the inclement weather was insignificant compared to the unwinding of the financial improprieties.

200.   Defendants also misled the market by communicating to the market estimates for the second quarter of 2015 that were false and could not be accurate because of continued problems with MasTec's lack of internal controls and inaccurate cost-to-complete estimates.  As a result Defendants missed their second quarter of 2015 estimates of continuing operations adjusted EBITDA by $23 million to $28 million, or an approximate miss of 25%, and continuing operations adjusted diluted earnings per share by $0.17 to $0.20 or an approximate miss of 66%.

201.   On May 12, 2015, Tahira Afzal an analyst for KeyBanc Capital markets reiterated Defendants' false and misleading positive statements by stating, "to the positive, management indicated the potential to double its Oil & Gas backlog over the next two quarters and also

reiterated its positive outlook for its two other core divisions, namely, Electrical Transmission and Communications."

202. Also on May 12, 2015, William Bremer an analyst for Maxim Group reiterated Defendants excuse for poor performance by stating, "1Q15 results were negatively impacted by adverse weather conditions."

203. Also on May 12, 2015, Jason A. Wangler an analyst for Wunderlich Securities mirrored the market's concern over the investigation in to the cost-to-complete estimates and stated, "One should notice that these are preliminary results as the company still has not been able to finalize its audit/investigation of the 2014 numbers disclosed some time ago and therefore is still not able to file its quarterly results. This has continued to drag out and we think causes some investor concern that exacerbates the 1Q15 miss as well as another round of 2015 guidance reductions. We have lowered our figures to account for the information."

204. On July 30, 2015, MasTec issued a press release announcing that, as a result of the Company's investigation, the Company had restated its financial statements for the quarters included in the year ended December 31, 2014. The Company stated:

MasTec, Inc. (NYSE: MTZ) today announced it will be filing its 2014 Annual Report on Form 10-K on July 31, 2015. The Audit Committee established and observed a process that the Company followed in the preparation of its 2014 Form 10-K, including a detailed review of percentage-of-completion accounting at the Company's Electrical Transmission segment and a detailed review of accounting judgments, estimates and entries over a multi-year period across the balance of the Company's segments selected to further test the reliability of the previously issued financial statements.

The Company has concluded that certain accounting adjustments are appropriate with respect to interim periods during the Company's fiscal year ended December 31, 2014. In the aggregate, these interim period adjustments increase the Company's previously disclosed unaudited, preliminary net income attributable to

MasTec, Inc. ("Net Income") for the year ended December 31, 2014 by $0.3 million to an aggregate of $115.9 million.

These adjustments reduce previously reported first quarter 2014 Net Income by $3.9 million, or $0.05 per fully diluted share, increase previously reported second quarter 2014 Net Income by $1.7 million, or $0.02 per fully diluted share, and increase previously reported third quarter 2014 Net Income by $3.7 million or $0.04 per fully diluted share. For the nine months ended September 30, 2014, these adjustments increase previously reported Net Income by $1.5 million, or $0.02 per fully diluted share. In addition, the previously mentioned adjustments will decrease previously disclosed preliminary, unaudited fourth quarter 2014 Net Income by $1.2 million, or $0.01 per fully diluted share. Additional details regarding these restatements and the status of the Audit Committee's ongoing investigation are contained in the Company's Current Report on Form 8-K filed today with the Securities and Exchange Commission.

Accordingly, the Audit Committee determined that the Company's previously issued consolidated financial statements for those 2014 interim periods contained in its quarterly reports on Form 10-Q should no longer be relied upon. Additionally, the Company's earnings press releases with respect to the 2014 interim periods and similar communications should no longer be relied upon to the extent that they relate to these interim period financial statements. The 2014 Form 10-K will include restated financial statements and other related disclosures for each of the 2014 interim periods described above.

The Company also announced that it expects to file its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2015 not later than August 10, 2015 and expects that final reported net loss attributable to MasTec, Inc. will be reduced by approximately $0.5 million as compared to the Company's previously disclosed unaudited, preliminary net loss attributable to MasTec, Inc.

205.    The next day, the Company filed its Annual Report Form 10-K with the SEC, reiterating its financial results and restatement above. The 10-K was signed by Defendants Mas and Pita, and contained the required SOX Certifications also signed by these Inndividual Defendants.  The Company disclosed in its Form 10-K:

As described in more detail in Note 2- Independent Investigation of the Audit Committee and Related Restatements in the notes to the audited consolidated financial statements, the Audit Committee of the Board of Directors (the "Audit Committee") of MasTec, Inc. ("we," "our," "us," "the Company" or "MasTec"), with the assistance of independent counsel and accounting advisors, has been

61

undertaking an independent investigation primarily with respect to cost-to-complete estimates regarding certain projects within a service line in the Company's Electrical Transmission segment accounted for under the percentage-of-completion method of accounting.

The Audit Committee established and observed a process that the Company followed in the preparation of this Annual Report on Form 10-K for the fiscal year ended December 31, 2014(this "2014 Form 10-K"), including a detailed review of percentage-of-completion accounting at the Company's Electrical Transmission segment and a detailed review of selected accounting judgments, estimates and entries over a multi-year period across the balance of the Company's segments selected to further test the reliability of the previously issued financial statements. The Company has concluded that certain accounting adjustments are appropriate with respect to interim periods during the Company's fiscal year ended December 31, 2014. In the aggregate, for the nine month period ended September 30, 2014, these interim period adjustments increased the Company's previously reported unaudited net income attributable to

MasTec, Inc. ("Net Income") by $1.5 million to $94.8 million. The investigation arose as a result of concerns communicated to senior management through the Company's internal reporting system. The Company believes the appropriate accounting adjustments have been determined; however, the Audit Committee's independent investigation is ongoing and has not reached any findings or conclusions with respect to the underlying causes of these adjustments.

As a result, we concluded that the Company's condensed unaudited consolidated financial statements as of and for the quarterly periods ended March 31, 2014, June 30, 2014 and September 30, 2014 should be restated. In this 2014 Form 10-K, we have provided restated financial statements for each of the affected 2014 interim periods and related disclosures in Note 2- Independent Investigation of the Audit Committee and Related Restatements in the notes to the audited consolidated financial statements included in this 2014 Form 10-K, which is incorporated by reference. The financial information that has been previously filed or otherwise reported for these periods is superseded by the information in this 2014 Form 10-K. We believe that presenting all of the restated information regarding the 2014 interim periods in this 2014 Form 10-K allows investors to review all pertinent data in a single presentation. We have not filed and do not intend to file amendments to our Quarterly reports on Form 10-Q for the quarterly periods ended March 31, 2014, June 30, 2014 and September 30, 2014.

Management determined that a material weakness in internal control over financial reporting existed within a service line in the Company's Electrical Transmission segment due to the operational failure of the internal control process requiring adequate documentation of significant judgments made in determining cost-to-complete estimates under percentage-of-completion accounting. The review process failed to ensure that cost-to-complete estimates had sufficient supporting

documentation. As a result, significant judgments were made and incorporated into the accounting records used to determine project revenue without sufficient documentation that clearly sets forth the rationale and factors used in making those judgments.

206. These statements were false and misleading because Defendants did not disclose the full extent of what Defendants knew with respect to the problems with cost-to-complete estimates in the electrical transmission segment, and the full impact of such upon previously-reported revenue and net income.

207. The Company also reported in its Form 10-K the following:

**We may not accurately estimate the costs associated with services provided under fixed price contracts, which could impair our financial performance.**

We derive a significant portion of our revenue from fixed-price master service and other service agreements. Under these contracts, we typically set the price of our services on a per unit or aggregate basis and assume the risk that costs associated with our performance may be greater than anticipated. In addition to master or other service agreements, we enter into contracts for specific projects or jobs that may require the installation or construction of an entire infrastructure system or specified units within an infrastructure system. Under those agreements, we contractually agree to a price per unit. Profitability will be reduced if the actual costs to complete each unit exceed original estimates. We are also required to immediately recognize the full amount of any expected losses on these projects if estimated costs to complete the remaining units for the projects exceed the revenue to be earned on such units. Our profitability is therefore dependent upon our ability to accurately estimate the costs associated with our services. A variety of factors affect these costs, such as lower than anticipated productivity, conditions at work sites differing materially from those anticipated at the time we bid on the contract and higher costs of materials and labor. These variations, along with other risks inherent in performing fixed price contracts, may cause actual project revenue and profits to differ from original estimates. As a result, if actual costs exceed our estimates, certain agreements or projects could have lower margins than anticipated, or losses, which could reduce our profitability, cash flows and liquidity.

**We recognize revenue from installation/construction fixed price contracts, as well as for certain projects pursuant to master and other service agreements, using the percentage-of-completion method; therefore, variations of actual results from our assumptions may reduce our profitability.**

We recognize revenue from installation/construction fixed price contracts, as well as for certain projects pursuant to master and other service agreements, using the

percentage-of-completion method, measured by the percentage of costs incurred to date to total estimated costs for each contract. The cumulative amount of revenue recorded on a contract at a specified point in time is the percentage of total estimated revenue that incurred costs to date bear to estimated total contract costs. The percentage-of-completion method, therefore, relies on estimates of total expected contract costs. Contract revenue and total cost estimates are reviewed and revised periodically as the work progresses. Adjustments are reflected in contract revenue in the fiscal period in which such estimates are revised. Estimates are based on management's reasonable assumptions, judgment and experience, but are subject to the risks inherent in estimates, including unanticipated delays or technical complications.

Variation of actual results from estimates on a large project or on a number of smaller projects could be material. We immediately recognize the full amount of an estimated loss on a contract when our estimates indicate such a loss. Such adjustments and accrued losses could result in reduced profitability, which could negatively impact our liquidity and results of operations. See discussion of a material weakness in our internal control over financial reporting in Part II - Item 9A. "Controls and Procedures" of this 2014 Form 10-K.

**The market price of our common stock has been, and may continue to be, highly volatile.**

The market price of our common stock on the New York Stock Exchange has been volatile in recent years. We may continue to experience significant volatility in the market price of our common stock. Numerous factors could have a significant effect on the price of our common stock, including:

• announcements of fluctuations in our operating results or the operating results of one of our competitors;
• market conditions in our customers' industries;
• capital spending plans of our significant customers;
• global and domestic energy prices;
• announcements by us or one of our competitors of new or terminated customers or new, amended or terminated contracts;
• announcements of acquisitions by us or one of our competitors;
• changes in recommendations or earnings estimates by securities analysts; and
• future sales of our common stock or other securities, including any shares issued in connection with business acquisitions or earn-out obligations for any past or future acquisitions.

208.    These statements were misleading because Defendants failed to disclose that

MasTec was underbidding on projects, misallocating costs between projects, and altering cost-to-

complete estimates in order to accelerate revenue and profits (i.e., income) on projects. MasTec failed to immediately recognize the full amount of its expected losses on its projects knowing that it was required to do so on certain projects. MasTec also knew that it could not accurately portray its profitability due to its inability to properly assess costs on its projects. The Company further failed to disclose that the reason the market price of its common stock was so volatile, and would continue to be volatile was because of the manipulation of its cost-to-complete estimates and its complete lack of internal controls.

209.    In its Form 10-K filed with the SEC, MasTec admitted that its senior executives routinely review revenue and cost-to-complete estimates by segment, stressing the importance of these metrics on its financial results:

**Financial Performance Metrics**

Our senior management team regularly reviews certain key financial performance metrics within our business, including:

• revenue and profitability on an overall basis, by reportable segment and for selected projects;

• revenue by customer and by contract type;

• costs of revenue, excluding depreciation and amortization; general and administrative expenses; depreciation and amortization; other expenses or income; interest expense, net; and provision for income taxes;

• earnings from continuing operations before interest, taxes, depreciation and amortization ("EBITDA") and Adjusted EBITDA, which is EBITDA excluding non-cash stock-based compensation expense, acquisition integration costs, legal settlement charges and losses on debt extinguishment. See discussion of non-U.S. GAAP financial measures following the "Comparison of Fiscal Year Results" below;

• days sales outstanding, net of billings in excess of costs and earnings; and days payable outstanding;

• interest and debt service coverage ratios; and

• liquidity and cash flows.

\*\*\*

Measuring these key performance indicators is an important tool used by management to make informed and timely operational decisions, which we believe can help us improve our performance.

210.    The Company further materially misstated that its cost-to-complete estimates were utilized in its application of percentage-of-completion accounting in accordance with GAAP. MasTec further misled the market by claiming that its electrical transmission segment had certain change orders which had impacted its revenues and profits, when actually, the manipulation of its cost-to-complete estimates was the cause of the material misstatement of its revenues and profits:

**Critical Accounting Estimates**

This discussion and analysis of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with U.S. GAAP. The preparation of these consolidated financial statements requires the use of estimates and assumptions that affect the amounts reported in our consolidated financial statements and the accompanying notes. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis of making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources.
Given that management estimates, by their nature, involve judgments regarding future uncertainties, actual results may differ from these estimates if conditions change or if certain key assumptions used in making these estimates ultimately prove to be inaccurate.

Our accounting policies and critical accounting estimates are reviewed periodically by the Audit Committee of the Board of Directors. Refer to Note 1- Business, Basis of Presentation and Significant Accounting Policies in the notes to the audited consolidated financial statements, which is incorporated by reference, for discussion of our significant accounting policies.

We believe that our accounting estimates pertaining to: revenue and cost recognition for percentage-of-completion projects, including related project profit or loss, which we define as project revenue less project costs of revenue, including depreciation; allowances for doubtful accounts; fair value estimates in connection with business acquisitions, in particular, estimated values of net assets acquired and estimated liabilities for future earn-out obligations; valuations of goodwill and indefinite-lived intangible assets; income taxes; self-insurance liabilities; and litigation and other contingencies are the most critical in the preparation of our

66

consolidated financial statements as they are important to the portrayal of our financial condition and require significant or complex judgment and estimates on the part of management.

**Revenue Recognition for Percentage-of-Completion Projects**

Revenue from fixed price contracts provides for a fixed amount of revenue for the entire project, subject to certain additions for changed scope or specifications. Revenue from these contracts, as well as for certain projects pursuant to master and other service agreements, is recognized using the percentage-of-completion method, under which the percentage of revenue to be recognized for a given project is measured by the percentage of costs incurred to date on the contract to the total estimated costs for the contract. The estimation process for revenue recognized under the percentage-of-completion method is based on the professional knowledge and experience of our engineers, project managers and financial professionals. Management reviews estimates of contract revenue and costs on an ongoing basis. Changes in job performance, job conditions and final contract settlements are factors that influence our assessment of total contract value and total estimated costs to complete those contracts and, therefore, our profit recognition. Changes in these factors may result in revisions to costs and income, and their effects are recognized in the period in which the revisions are determined, which could materially affect our results of operations in the period in which such changes are recognized. For the year ended December 31, 2014, project profit was affected by less than 5% as a result of changes in contract estimates included in projects that were in process as of December 31, 2013. Provisions for losses on uncompleted contracts are made in the period in which such losses are determined to be probable and the amount can be reasonably estimated. The majority of fixed price contracts are generally completed within one year. We may incur costs subject to change orders, whether approved or unapproved by the customer, and/or claims related to certain contracts. We determine the probability that such costs will be recovered based upon engineering studies and legal opinions, past practices with the customer, specific discussions, correspondence or preliminary negotiations with the customer. We treat project costs as a cost of contract performance in the period incurred if it is not probable that the costs will be recovered, or we defer the cost and/or recognize revenue up to the amount of the related cost if it is probable that the contract price will be adjusted and can be reliably estimated. As of December 31, 2014, we had approximately$87 million of change orders and/or claims that had been included in contract price adjustments on certain contracts that were in the process of being resolved in the normal course of business, including through negotiation, arbitration and other proceedings. These contract price adjustments, which are included within costs and earnings in excess of billings or billed accounts receivable, as appropriate, represent management's best estimate of contract revenue that has been or will be earned and that we believe is probable of collection. For the year ended December 31, 2014, revenue related to unapproved change orders totaled $29 million, for which a significant portion of the related change orders were in the process of resolution or had subsequently been resolved. As of December 31, 2014,

outstanding change orders were primarily derived from contracts in the Electrical Transmission segment. We actively engage in substantive meetings with these customers to complete the final approval process, and expect these processes to be completed within one year. The amounts ultimately realized upon final acceptance by our customers could be higher or lower than such estimated amounts.

211.    Analysts mirrored Defendants' upbeat attitude towards the restatement.

212.    On July 31, 2015, Jason A. Wangler an analyst for Wunderlich Securities echoed the Company by stating, "MTZ had to delay multiple filings due to an investigation that has shown a few small moving parts financially but ultimately turned out to be in line with the company's comments that they were only minor recognition adjustments. With these filings hitting and the 2Q15 report coming soon, MTZ should become current soon, which should unlock multiple avenues for the company to utilize its cash flows, allow it to focus on operations, and remove an overhang for investors."

213.    Also on July 31, 2015, Matt Duncan an analyst for Stephens, Inc. repeated the Company's statements by stating, "MTZ has been going through an Audit Committee review for the past 7 months. We now know the target of the review was its Electrical Transmission segment. Given the size of the restatements (a $282,000 increase in 2014 net income and a $500,000 reduction in the 1Q15 net loss), the review now seems to have been totally unnecessary."

214.    On August 10, 2015, the Company announced that it would release delayed financial results for the second quarter of 2015 due to the restatement and investigation.  The Company stated:

MasTec, Inc., a Florida corporation ("MasTec"), is filing this Notification of Late Filing on Form 12b-25 with respect to its Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015 (the "Form 10-Q").

As previously announced, MasTec recently concluded that certain accounting adjustments were appropriate with respect to interim periods during its fiscal year ended December 31, 2014. Consequently, due to complexity and resource

68

requirements involved in MasTec's preparation and recent filing of its Annual Report on Form 10-K for the year ended December 31, 2014 and its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2015, MasTec will not be able, without unreasonable effort or expense, to timely file the Form 10-Q by the deadline prescribed by Securities and Exchange Commission rules. MasTec expects to file the Form 10-Q not later than August 17, 2015, as permitted by Rule 12b-25.

215.    This statement was false and misleading because Defendants did not disclose the full extent of what Defendants knew with respect to the problems with cost-to-complete estimates in the electrical transmission segment, and the impact of such upon previously-reported revenue and net income.  At this time Defendants knew that the electrical transmission segment had serious problems as a result of the manipulation of cost-to-complete estimates and widespread lack of internal controls.

216.    On August 17, 2015, the full extent of the risk of the inaccurate financials a lack of internal controls was realized when MasTec announced its second quarter 2015 results.  The Company disclosed that due to the problems with the cost-to-complete estimates in the electrical transmission segment the financials were negatively affected. The press release stated:

MasTec, Inc. (NYSE: MTZ) today announced 2015 second quarter financial results and updated its guidance for the balance of the year.

Second quarter 2015 revenue decreased 3.7% to $1.07 billion from $1.1 billion in the prior year quarter.  The quarterly revenue change was primarily composed of revenue declines in the Electrical Transmission and Communications segments, partially offset by revenue increases in the Oil & Gas and Power Generation & Industrial segments. Second quarter 2015 net loss from continuing operations was $3.8 million, or $0.05 per diluted share, compared to net income from continuing operations of $33.7 million, or $0.39 per diluted share, for the second quarter of 2014. Second quarter 2015 results include approximately $0.14 per diluted share for non-operating and non-core charges not included in prior year results, composed primarily of WesTower acquisition integration costs, Audit Committee investigation related costs and the nonrecurring impact of an income tax law change in Alberta, Canada.

Second quarter 2015 adjusted net income from continuing operations, a non-GAAP measure, was $8.1 million compared to $36.4 million in 2014. Second quarter 2015 continuing operations adjusted diluted earnings per share, a non-GAAP measure, was $0.10, compared to $0.42 last year.  Second quarter 2015 continuing operations adjusted EBITDA, also a non-GAAP measure, was $71.0 million compared to $108.4 million in 2014.

Adjusted net income from continuing operations, continuing operations adjusted diluted earnings per share and continuing operations adjusted EBITDA, non-GAAP measures, exclude, as applicable, WesTower acquisition integration costs, Audit Committee investigation related costs, losses in a non-controlled joint venture, the nonrecurring impact of income tax law changes in Alberta, Canada, and non-cash stock-based compensation expense. Reconciliations of these and other non-GAAP measures to GAAP-reported measures are attached.

Jose R. Mas, MasTec's Chief Executive Officer, commented, "In the second quarter our business was challenged by the adverse impact of rain and flooding across multiple segments, as well as significant disruptions within our Electrical Transmission segment.  While we are not pleased with our current performance, we are very encouraged by the business outlook in multiple segments, especially in Oil & Gas, Wireless and Fiber network upgrades."

George Pita, MasTec's Executive Vice President and CFO, added, "We are pleased to resume a normal financial reporting schedule, and want to thank our dedicated staff who worked tirelessly during this difficult and disruptive period. The integrity of our corporate governance and financial reporting is of paramount importance to us and we are working to improve our control processes to correct the issues that gave rise to the previously reported interim period 2014 adjustments.  While we are disappointed that these adjustments were necessary, we are very pleased that, as initially expected, they did not materially affect our full year 2014 results."

217.    On August 18, 2015, Defendants Mas and Pita participated in the Q2 2015 earnings call.  On the earnings call Defendants' admitted that the cause of the bad performance of the electrical transmission segment and the missed guidance was due to the inaccurate cost to complete estimates and the audit committee investigation pertaining thereto:

**<George L. Pita>**:…As previously disclosed in our recent SEC filings, the process established and observed by our Audit Committee included a detailed review of percentage of completion accounting at our Electrical Transmission segment, as well as a detailed review of selected accounting judgments, estimates and entries

70

over a multi-year period across the balance of the company's segments in order to assess the reliability of our previously issued financial statements.

This has been an exhaustive, time consuming and detailed process for our company, as well as a huge distraction from the operations and management of our business, particularly in our Electrical Transmission segment. The integrity of our corporate governance and financial reporting continues to be of paramount importance to us and we are working to improve our control processes to correct the issues that gave rise to the previously reported interim 2014 adjustments. While we are disappointed the interim adjustments were necessary, we are pleased that as we initially indicated in February when our 2014 10-K filing was delayed, completion of the process and external audit did not negatively or materially impact our previously disclosed unaudited annual 2014 results. We are now current with all our reporting requirements.

<center>***</center>

[T]he Audit Committee process caused significant disruption to our managements' focus on operations and marketing with the Electrical Transmission Group being the most affected.

<center>***</center>

**<Q - Matt Duncan>**: So José, I want to start by talking about the issues in the Electrical segment. So if I'm hearing you guys correctly, it sounds like you're pretty confident that most of the issue there is really tied to the distraction from the accounting review. So can you talk a little bit more in detail about sort of how your people were distracted, what it did to your ability to win awards, and how quickly do you think you can get that segment sort of back on track?

**<A - José Ramón Mas>**: Sure, Matt. There is no question in my mind that the entire segment was extremely involved in the investigation. Numerous people from all over the organization had to play a significant role during the investigation, which unquestionably took from their focus their time, their attention to the business, and I think it's reflected in the results of the business.

I think that's behind us. There's no question that we've struggled on some jobs. We're hoping that as everybody refocuses on the business, things get better, life resumes to normal, jobs improve, and our win and our success rate going forward gets a lot better. We've got a lot of bids outstanding in that group right now. We feel really good about a couple of them. And it's hard to put into words the frustration that I know they felt, and they did a great job in getting through it. But no question, it was an enormous amount of time, effort and distraction for both them and the company as a whole.

<center>***</center>

**<Q - Chad Dillard>**: Good morning. So, I just wanted to go back to the Electrical Transmission segment. So, if you back out the underperforming projects, can you talk about what the margins would look like? And then also I know you mentioned

<center>71</center>

that one of those projects would be rolling off in September, but I just want to get a sense for the other ones just in terms of timing for project roll off?

**<A - José Ramón Mas>**: Well, I think to [indiscernible] (48:40) margin drag on a couple of projects, and then you have significantly lower revenues than what we're anticipating. So, as we look at the back half of the year, I think we have a very moderated look on what our revenues are going to be relative to our original expectations. And based on that revenue level, which is challenging relative to our overall cost basis, we expect EBITDA margins to either be breakeven or slightly positive, which I think is a reflection of where the business is at those revenue levels.

218.    The market finally understood the impact of the cost-to-complete manipulations on the resulting financial statements.

219.    Defendants missed their Q2 2015 estimates of continuing operations adjusted EBITDA by \$23 million to \$28 million or an approximate miss of 25% and continuing operations adjusted diluted earnings per share by \$0.17 to \$0.20 or an approximate miss of 66%.

220.    As a result of this news, shares of MasTec fell 6.7% from \$17.41, on August 14, 2015(the last day of trading for the week) to close at \$16.24 on August 18, 2015.

221.    Analysts were extremely disappointed in these results.

222.    On August 18, 2015, Adam R. Thalimer ("Thalimer") and Paul Betz ("Betz"), analysts for BB&T Capital markets acknowledged that the previous disclosures for the electrical transmission segment did not provide enough color as to what was actually happening at MasTec. Thalimer and Betz reported that Defendants missed their guidance for the second quarter of 2015 and that the results for the electrical transmission segment were worse than expected.

223.    Also on August 18, 2015, Vishal Shah and Chad Dillard analysts for Deutsche Bank reiterated the problems with the cost-to-complete estimates and the investigation and stated: "[s]eeing headwinds in Electric Transmission – cost of completion increased for 2 projects

(however segment will be breakeven for remainder of 2015), award push outs, and focus on audit review reduced focus on booking new business."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

224. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of a Class consisting of all those who purchased or otherwise acquired MasTec securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have, or had, a controlling interest.

225. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the MasTec Class Period, securities of MasTec were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MasTec, or their transfer agents, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

226. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

227. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

73

228.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MasTec;

- whether the Individual Defendants, caused MasTec to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of MasTec securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

229.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

230.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

74

- MasTec securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiffs and members of the Class purchased and/or sold MasTec securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

231. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

232. Alternatively, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of
### The Exchange Act and Rule 10b-5 Against
### MasTec and the Individual Defendants

233. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

234. This Count is asserted against MasTec and the Individual Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

235.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MasTec securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire MasTec securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

236.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for MasTec securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about MasTec's finances and business prospects.

237.    By virtue of their positions at MasTec and/or work on the MasTec audits, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members

of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

238. The Individual Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit by meeting certain financial metrics to receive huge bonus packages.

239. Information showing that Defendants acted knowingly, or with reckless disregard for the truth, is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of MasTec, the Individual Defendants had knowledge of the details of MasTec's internal affairs and financial statements.

240. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to, and did, directly or indirectly control the content of the statements of MasTec. As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to MasTec's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of MasTec securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning MasTec's business and financial condition which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased or

77

otherwise acquired MasTec securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

241.    During the Class Period, MasTec securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of MasTec securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, nor would they have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of MasTec securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of MasTec securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

242.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

243.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against The Individual Defendants

244.    Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

245.    During the Class Period, the Individual Defendants participated in the operation and management of MasTec, and conducted and participated, directly and indirectly, in the conduct of MasTec's business affairs. Because of their senior positions, they knew the adverse non-public information about MasTec's misstatement of income and expenses and false financial statements.

246.    As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to MasTec's financial condition and results of operations, and to promptly correct any public statements issued by MasTec which had become materially false or misleading.

247.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which MasTec disseminated in the marketplace during the Class Period concerning MasTec's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MasTec to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of MasTec within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of MasTec securities.

248.     Defendants Mas and Pita were authorized to, and did, participate in the release of the financial statements and signed off on the statements as correct, despite the statements containing materially false and misleading statements, thus qualifying them as control person(s) under §20(a).

249.     Each of the Individual Defendants, therefore, acted as a controlling person of MasTec. By reason of their senior management positions and/or being directors of MasTec, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, MasTec to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of MasTec and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

250.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MasTec.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.


Dated:   October 13, 2015


Respectfully submitted,


/s/ *Leigh Handelman Smollar*

**POMERANTZ LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
Mark Bryan Goldstein
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603

80

Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com
lsmollar@pomlaw.com
mbgoldstein@pomlaw.com

**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
migross@pomlaw.com
jalieberman@pomlaw.com

**POMERANTZ LLP**
Jayne A. Goldstein
Florida Bar No. 144088
1792 Bell Tower Lane, Suite 203
Weston, FL 33326
Telephone: (954) 315-3454
Facsimile: (954) 315-3455
jagoldstein@pomlaw.com

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Kara M. Wolke
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
(310) 201-9150
rprongay@glancylaw.com

**THE ROSEN LAW FIRM**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
pkim@rosenlegal.com

*Lead Counsel for Lead Plaintiffs and the Class*

81

**SAXENA WHITE, P.A.**
Lester Rene Hooker
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
(561) 394-3399
lhooker@saxenawhite.com

*Liaison Counsel for Lead Plaintiffs and the Class*

<u>**Certificate of Service**</u>

I hereby certify that a true and correct copy of the foregoing was served by electronic mail on October 13, 2015 on all counsel or parties of record on the Service List below.

*/s/ Jayne A. Goldstein*

On October 13, 2015, I caused to be served the following document:

**AMENDED CLASS ACTION COMPLAINT**

By posting the document to the ECF Website of the United States District Court for the Southern District of Florida, for receipt electronically by the parties as listed on the attached Court's ECF Service List.

*Mailing Information for a Case* 1:15-cv-21740-MGC Wrigley v. Mastec, Inc. et al

The following are those who are currently on the list to receive e-mail notices for this case:

Mark Richard Cheskin -  mark.cheskin@hoganlovells.com, elena.rodriguez@hoganlovells.com

Daniel Eduardo Gonzalez - Daniel.Gonzalez@HoganLovells.com, alicia.santiesteban@hoganlovells.com

Jayne Arnold Goldstein -  jagoldstein@pomlaw.com

Lester Rene Hooker -  lhooker@saxenawhite.com, e-file@saxenawhite.com

Clayton Paul Solomon -  cpsolomon@hhlaw.com, clayton.solomon@hoganlovells.com, jason.mays@hoganlovells.com

Robert V. Prongay -  rprongay@glancylaw.com, info@glancylaw.com

Jeremy A. Lieberman  - jalieberman@pomlaw.com

Mark Bryan Goldstein -  mbgoldstein@pomlaw.com

Leigh Handelman Smollar  - lsmollar@pomlaw.com

Kara M. Wolke – kwolke@glancylaw.com