**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:15-cv-21740-COOKE/TORRES

NANCY WRIGLEY, individually and on
behalf of all others similarly situated,

Plaintiff,

v.

MASTEC, INC., JOSÉ R. MAS, and
GEORGE L. PITA,

Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS
AND INCORPORATED MEMORANDUM OF LAW**

HOGAN LOVELLS US LLP
600 Brickell Avenue
Suite 2700
Miami, FL 33131
United States
Telephone:   (305) 459 6500
Facsimile: (305) 459 6550

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

SUMMARY OF ARGUMENT ...............................................................................1

STATEMENT OF FACTS ..................................................................................3

     A.    The Parties ....................................................................................3

     B.    MasTec's February 26, 2015, Disclosure Regarding the Audit Committee Investigation of Percentage-of-Completion Practices ..............................................4

     C.    MasTec Postpones the Filing of Its 2014 Annual Report Until the Conlcusion of the Audit Committee's Investigation....................................................6

     D.    MasTec's May 11, 2015 Preliminary, Unaudited Earnings Announcement and Updated Guidance.............................................................................7

     E.    The Reinstatement of 2014 Financial Results ........................................8

     F.    MasTec's Quarterly Reports for the First and Second Quarters of 2015 ................9

APPLICABLE LEGAL STANDARDS ...................................................................10

ARGUMENT ................................................................................................10

     I.    THE AMENDED COMPLAINT FAILS TO ALLEGE FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER ...................................................10

          A.    The Amended Complaint Improperly Lumps All Defendants Together ..............................................................................11

          B.    The Amended Complaint Fails to Raise a Strong Inference of Scienter With Respect to Any Individual Defendant .........................12

               1.    The Amended Complaint Alleges No Facts From Which Knowledge of Fraud Can Be Inferred ...............................12

               2.    The Lead Plaintiffs' Other Miscellaneous Theories Do Not Raise a Strong Ingerence of Scienter ...............................13

               3.    The Facts Alleged in the Amended Complaint Support a Compelling Inference Against Scienter.......................16

i

     C.    The Amended Complaint Fails to Raise a Strong Inference of Scienter With Respect to the Company ................................................ 18

II.    THE AMENDED COMPLAINT FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT ....................................................................................... 18

     A.    The Defendants' Statements Were Not Materially False or Misleading .............................................................................................. 19

     B.    Defendants' Forward-Looking Statements Are Not Actionable ................................................................................................ 21

III.    THE AMENDED COMPLAINT FAILS TO ALLEGE LOSS CAUSATION ................ 23

IV.    THE AMENDED COMPLAINT FAILS TO ALLEGE A CLAIM FOR CONTROL PERSON LIABILITY ....................................................................... 25

V.    THE LEAD PLAINTIFFS SHOULD NOT BE GRANTED LEAVE TO AMEND ........ 25

CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................19

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ..................................................10, 15

*Carley Capital Grp. v. Deloitte & Touche, L.L.P.*,
    27 F. Supp. 2d 1324 (N.D. Ga. 1998) ............................................15

*Druskin v. Answerthink, Inc.*,
    299 F. Supp. 2d 1307 (S.D. Fla. 2004) ..........................................20

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005)..................................................................23, 25

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
    595 F. Supp. 2d 1253 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010) ................15, 17

*Ehlert v. Singer*,
    245 F.3d 1313 (11th Cir. 2001) ......................................................22

*FindWhat Investor Group v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ........................................23, 24, 25

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ......................................................12

*Greebel v. FTP Software, Inc.*,
    194 F.3d 186 (1st Cir. 1999)...........................................................17

*Glassman v. Computervision Corp.*,
90 F.3d 617 (1st Cir.1996) ..............................................................20

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ..................................................21, 22

*Hubbard v. BankAtlantic Bancorp, Inc.*,
    625 F. Supp. 2d 1267 (S.D. Fla. 2008) ..........................................13

*IBEW Local 595 Pension and Money Purchase Pension Plans v. The ADT Corp.*,
    Case No. 14-80566-WPD (S.D. Fla. June 4, 2015) ........................16

*Indiana Elec. Workers' Pension Trust IBEW v. Shaw Grp., Inc.,*
    537 F.3d 527 (5th Cir. 2008) ...........................................................................14

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997)......................................................................19, 21

*In re Comshare, Inc. Sec. Litig.,*
    183 F.3d 542 (6th Cir. 1999) ...........................................................................15

*In re First Union Corp. Sec. Litig.,*
    128 F. Supp. 2d 871 (W.D.N.C. 2001) .............................................................20

*In re Jiangbo Pharm., Inc. Sec. Litig.,*
    884 F. Supp. 2d 1243 (S.D. Fla. 2012), *aff'd,* 781 F.3d 1296 (11th Cir. 2015)......................14

*In re S1 Corp. Sec. Litig.,*
    173 F. Supp. 2d 1334 (N.D. Ga. 2001) ............................................................19

*In re Smith Gardner Sec. Litig.,*
    214 F. Supp. 2d 1291 (S.D. Fla. 2002) ............................................................14

*In re Unicapital Corp. Sec. Litig.,*
    149 F. Supp. 2d 1353 (S.D. Fla. 2001) ............................................................21

*In re Winn-Dixie Stores, Inc. Sec. Litig.,*
    531 F. Supp. 2d 1334 (M.D. Fla. 2007) ...........................................................19

*Lanfear v. Home Depot, Inc.,*
    679 F.3d 1267 (11th Cir. 2012) .........................................................................6

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011) ...........................................................................................19

*Meyer v. Greene,*
    710 F.3d 1189 (11th Cir. 2013) .......................................................................23

*Mizzaro v. Home Depot, Inc.,*
    544 F.3d 1230 (11th Cir. 2008) ...............................................10, 11, 12, 16, 18, 25

*Oxford Asset Mgmt., Ltd. v. Jaharis,*
    297 F.3d 1182 (11th Cir. 2002) .......................................................................19

*Parnes v. Gateway 2000, Inc.,*
    122 F.3d 539 (8th Cir. 1997) ...........................................................................20

*Plumbers & Pipefitters Local Union 7119 Pension Fund v. Zimmer Holdings, Inc.,*
    673 F. Supp. 2d 718 (S.D. Ind. 2009), *aff'd,* 679 F.3d 952 (7th Cir. 2012) ...........................17

iv

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt. Corp.*,
    2015 WL 4063932 (S.D. Fla. June 30, 2015) ........................................................17

*Ricker v. Zoo Entm't, Inc.*,
    534 F. App'x 495 (6th Cir. 2013) ........................................................14

*Robbins v. Kroger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ........................................................23

*SC Indus. v. Northway, Inc.*,
    426 U.S. 438 (1976) ........................................................19

*Staehr v. Miller*,
    2010 WL 11030716 (S.D. Fla. 2010) ........................................................16

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999) ........................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................11, 16

*Waterford Twp. v. BankUnited Fin. Corp.*,
    2010 WL 1332574 (S.D. Fla. 2010) ........................................................12

*Ziemba v. Cascade Int'l, Inc.*,
    256 F.3d 1194 (11th Cir. 2001) ........................................................11, 13

**STATUTES**

15 U.S.C.A. § 78t(a) ........................................................25

15 U.S.C.A. § 78u-4(b)(1) ........................................................10

15 U.S.C.A. § 78u-4(b)(2) ........................................................10, 11

15 U.S.C.A. § 78u-4(b)(3) ........................................................25

15 U.S.C.A. § 78u-4(b)(4) ........................................................23

15 U.S.C.A. § 78u-5(c) ........................................................21, 22

15 U.S.C.A. § 78u-5(i)(1) ........................................................21

**RULES**

Fed. R. Civ. P. 9(b) ........................................................10

Fed. R. Civ. P. 10(b) ........................................................18, 19, 23

Fed. R. Civ. P. 12(b)(6)..............................................................................................................1

**OTHER AUTHORITIES**

Private Securities Litigation Reform Act of 1995 ........................................1, 3, 10, 19, 21, 22, 25

Exchange Act § 20(a)................................................................................................................25

MasTec, Inc. ("MasTec" or the "Company"), José R. Mas, and George L. Pita (Mas and Pita together, the "Individual Defendants") move to dismiss the Amended Class Action Complaint (the "Amended Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and state:

## SUMMARY OF ARGUMENT

Congress enacted the PSLRA for the express purpose of promptly disposing of abusive securities class actions such as this one. Although the Amended Complaint is long, repetitive, and abundant with speculation, the facts are straightforward. Prior to the filing of this action, MasTec learned through its internal reporting channels of a potential accounting concern regarding the application of its percentage-of-completion accounting methodology in one of its business segments. As a result, MasTec announced on February 26, 2015, that the Audit Committee of the Company's Board of Directors, through independent counsel, was conducting a review of these practices, primarily to determine whether certain estimates under this accounting methodology were recognized during the Company's third quarter of 2014, but should have instead been recognized during the second quarter of 2014.

The results of that investigation were not alarming: As a result of accounting adjustments in its Electrical Transmission segment and several other minor adjustments, and after adding the results from the fourth quarter (the filing of which had been postponed pending the Audit Committee's independent review), the Company's net income across the fiscal year 2014 had been off by only $282,000—an amount representing less than 0.0025% of the Company's net income of $115.9 million for the year. Thus, after the Audit Committee finished its review, the Company announced that it would restate its financial statements over this period to reflect a minor decrease in the Company's previously reported net income for the first quarter of 2014,

1

and an increase in the Company's previously reported net income for the two subsequent quarters. The net result of the Company's restatement was an overall *increase* in the Company's 2014 reported net income for the first three quarters of 2014—*and* an increase in the Company's stock price the day after the results of the Audit Committee's investigation were announced.

Before the Audit Committee even completed its investigation, the original Complaint was filed in this action alleging, without any supporting facts, that the Defendants engaged in a fraudulent scheme to misstate the Company's financial results. Subsequently, the Lead Plaintiffs filed the Amended Complaint relying on unnamed "former employees" who purportedly advised executives at the Company—but tellingly not the Individual Defendants—of their concerns regarding the Company's percentage-of-completion accounting practices. Although the market reacted favorably to the report of the Audit Committee's findings, and although a later decline in the Company's stock price followed an unrelated yet disappointing earnings announcement and forecast—largely relating to substantial losses on one project—the Lead Plaintiffs nevertheless allege that the Company's accounting practices somehow resulted in an inflated stock price that ultimately collapsed when the "truth" about the Company's practices was "revealed."

As described below, the Amended Complaint ignores that: (1) the stock price decline upon which the Amended Complaint is predicated largely occurred after the announcement of 2015 earnings information and forecast, which was entirely unrelated to the Lead Plaintiffs' fraud allegations; (2) the Audit Committee found that only a minor restatement was necessary, and that restatement resulted in a net increase in 2014 net income; and (3) the Company's stock price *rose* the day after the results of the investigation were announced. In any event, although the Amended Complaint seeks to improperly capitalize on a fully disclosed reporting inaccuracy

that had no discernible effect on MasTec's share price, it fails to state a claim for multiple reasons:

- *Absence of Scienter*.  The Amended Complaint alleges no facts that suggest, much less raise a "strong inference," that any Defendant acted with fraudulent intent.  The usual indicia of scienter (*e.g.*, suspicious stock sales) are lacking, no facts are alleged indicating knowledge of wrongdoing by any Defendant, and a far more plausible non-fraudulent explanation of events exists—namely that the Company timely discovered, and corrected, an accounting adjustment of minor consequence.

- *No Actionable Misstatements*.  The alleged misstatements were not material to MasTec investors—as evidenced by the increase in the Company's stock price upon announcement of the Restatement.  Moreover, the Company's forward-looking statements are protected by the PSLRA's safe-harbor.

- *Failure to Allege Loss Causation*.  The Amended Complaint alleges no facts establishing a causal connection between the alleged misstatements and the alleged loss.  Rather, the stock price decline upon which the Amended Complaint is based resulted not from the revelation of "fraud," but instead from announcements by the Company of disappointing earnings news and forecast attributable to other factors such as substantial losses on one project, decreasing oil prices, and lower levels of wireless project activities.

In short, the Amended Complaint fails every test under the PSLRA.  And because the Lead Plaintiffs cannot cure the deficiencies in their pleading, the Amended Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

### A.    The Parties

MasTec is a publicly-held infrastructure company with approximately 15,500 employees spread across 460 locations (as of December 31, 2014).  *See* MasTec Form 10-K (2014), filed with the SEC on July 31, 2015, attached as Ex. A at 5 (the "2014 Form 10-K").[1]  Although the Company operates in five separate business segments, the allegations of the Amended Complaint

---

[1] All citations to publicly-available Company announcements and SEC filings, except those in footnotes, are hyperlinked for the convenience of the Court and the parties.

relate almost entirely to MasTec's Electrical Transmission segment, which accounted for

approximately 10% of the Company's annual revenue of $4.6 billion in 2014. *Id*. at 6.

Defendant José R. Mas is the Company's Chief Executive Officer. *Id.* at 110. Defendant

George L. Pita is the Company's Chief Financial Officer. *Id.*

### B.   MasTec's February 26, 2015, Disclosure Regarding the Audit Committee Investigation of Percentage-of-Completion Practices

The Amended Complaint focuses on the Company's percentage-of-completion

accounting practices. As the Company explained this practice to investors in its public filings:

> The Company . . . performs services under master and other service agreements on a fixed fee basis, under which MasTec furnishes specified units of service for a fixed price per unit of service and revenue is recognized as the services are rendered. Revenues from fixed price contracts provide for a fixed amount of revenue for the entire project, subject to certain additions for changed scope or specifications. Revenues from these contracts are recognized *using the percentage-of-completion method*. Under this method, the percentage of revenue to be recognized for a given project is measured by the percentage of costs incurred to date on the contract to the total estimated costs for the contract. . . .

*See* MasTec Form 10-Q (First Quarter, 2014) (emphasis added), filed with the SEC on May 1,

2014, attached as Ex. B at 8; *See* Am. Compl. ¶ 133. As the Company also explained, the

percentage-of-completion approach necessarily uses estimates that, in hindsight, may not prove

entirely accurate:

> The Company treats project costs as a cost of contract performance in the period incurred if it is not probable that the costs will be recovered, or defers costs and/or recognizes revenue up to the amount of the related cost if it is probable that the contract price will be adjusted and can be reliably estimated. . . . *The amounts ultimately realized upon final acceptance by its customers could be higher or lower than such estimated amounts, which are primarily expected to be billed and collected within one year.*

*Id.* at 9 (emphasis added).

In essence, under GAAP, the percentage-of-completion method allows a company such

as MasTec to recognize as income that percentage of total income that the company estimates

matches the estimated percentage of completion of a project.  Since the method relies upon

estimates, the amounts actually realized could be higher or lower depending on the degree of

difficulties that a project faces, among other factors.  A degree of uncertainty is therefore

inherent in this accounting methodology, but this is nevertheless consistent with GAAP, as the

Financial Accounting Standards Board specifically notes that "frequent revision of estimates

does not indicate that the estimates are unreliable for the purpose for which they are used."  *See*

Fin. Standards Accounting Bd., Accounting Standards Codification 605-35-25-64, *Revenue*

*Recognition:  Construction-Type and Production-Type Contracts* (2015), *available at*

https://law.resource.org/pub/us/code/bean/fasb.html/fasb.605.2011.html.  To the contrary, the

estimates may be "reasonably dependable," even though "results may differ widely from original

estimates because of the nature of the business."  *Id.*

      In early 2015, the Company decided that it would review the application of its

percentage-of-completion accounting practices in its Electrical Transmission segment.

Consequently, on February 26, 2015, MasTec disclosed in a Form 8-K filed with the SEC that

"the Audit Committee of the Company's Board of Directors, with the assistance of independent

counsel, [would be] undertaking an independent review primarily to determine whether certain

cost to complete estimates . . . recognized during the Company's third quarter of 2014 [ ] should

have been recognized during the second quarter of 2014."  *See* February 26, 2015 Form 8-K,

attached as Ex. C at 2; Am. Compl. ¶ 191.  The Company further disclosed that it believed the

potential inaccuracies to be in the range of "zero to $13 million" and that it would postpone the

filing of its Annual Report for the year ending December 31, 2014.  *Id.*

      In the same press release in which MasTec announced the Audit Committee's

independent review, the Company updated its guidance for the first quarter and full year of 2015,

revealing to the market its lowered expectations for the year.[2]  *See* Ex. C.  Despite these disclosures, MasTec's stock price *increased* the following day, from an opening price of $20.74 on February 26, 2015, to a closing price of $22.07 on February 27, 2015.[3]  *See* MasTec Closing Stock Price Table, attached as **Ex. F**.

### C.  MasTec Postpones the Filing of Its 2014 Annual Report Until the Conclusion of the Audit Committee's Investigation

The Audit Committee's independent review continued into the summer of 2015.  *See* March 17, 2015 Press Release, attached as Ex. G at 1; Am. Compl. ¶ 15; May 12, 2015 Form 12b-25, attached as Ex. H at 2.  As a result, the Company postponed the filing of its 2014 Annual Report, and also postponed the filing of its first quarterly report for 2015.  *See id.  See also* May 11, 2015 Form 8-K, attached as Ex. I at 2; Am. Compl. ¶ 17.

In the interim, on May 7, 2015, well before the completion of the Audit Committee's review and after waiting until MasTec's stock price gradually declined to $18.07 per share, the original Complaint was filed alleging, without any supporting facts, that Defendants engaged in securities fraud.

---

[2] For example, on October 30, 2014, MasTec announced preliminary financial performance estimates for 2015.  It announced expected revenue of between $5.2 and $5.4 billion (an increase of 13-17% over expected 2014 revenue), with continuing operations adjusted EBITDA of "approximately 10% of revenue."  *See* October 30, 2014 Press Release, *available at* http://www.sec.gov/Archives/edgar/data/15615/000119312514390034/d813342dex991.htm, attached as **Ex. D**.  On February 26, 2015, however, the Company revised its revenue estimate downward to between $4.6 and $4.8 billion, with expected adjusted EBITDA between $450 and $480 million.  *See* February 26, 2015 Press Release, *available at* http://www.sec.gov/Archives/edgar/data/15615/000119312515066544/d879854dex991.htm, attached as **Ex. E**.

[3] Public records, including publicly reported stock prices, may be judicially noticed.  *See Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1282 n.17 (11th Cir. 2012).

**D.     MasTec's May 11, 2015 Preliminary, Unaudited Earnings Announcement and Updated Guidance**

The following week, on May 11, 2015, MasTec issued another earnings press release in which it announced preliminary, unaudited results for the first quarter of 2015.  *See* May 11, 2015 Press Release, attached as Ex. J at 1; Am. Compl. ¶ 17.  The Company's performance over this quarter was notably worse than expectations and the first quarter of 2014:  The Company experienced a loss of $6.9 million in net income from continuing operations (Company-wide), compared to net income of $16.2 million in the same quarter the previous year.  *Id.*  The Company would explain that this performance was the result of various factors, including adverse weather, a weaker Canadian dollar, the impact of lower commodity prices, and difficulties with certain projects—in particular, a "troubled wind project in Canada" (in the Company's Power Generation and Industrial Segment) that experienced $16 million in losses alone.  *Id.  See also* MasTec Form 10-Q (First Quarter 2015), filed with the SEC on August 7, 2015 attached as Ex. K at 35.

In that same May 11, 2015, press release, the Company also provided guidance for the second quarter of 2015 and further lowered its guidance for the full 2015 year.[4]  Ex. J at 2.  Consistent with the Company's prior practice, the press release explained that its "forward-looking statements" were "based on management's current expectations," and included a page-long disclosure that listed dozens of risks, uncertainties, and assumptions underlying these expectations.  The Company stated for example, that its financial results could be affected by

---

[4] The Company had already revised its forecast for the full year 2015*, see supra* note 1, but it further lowered its estimates to $4.4 billion in revenue (from $4.6 to $4.8 billion), with continuing operations adjusted EBITDA of $425 million (from $450 to $480 million).  *See* **Ex. J**.

"geographic, weather, and operational factors," as well as "uncertainties related to the previously disclosed independent internal investigation regarding certain accounting matters . . . ." *Id.*[5]

### E.   The Restatement of 2014 Financial Results

On July 30, 2015, the Company filed with the SEC a Form 8-K announcing that, based on the results of the Audit Committee's independent review, certain adjustments were appropriate with respect to interim periods during the fiscal year ending December 31, 2014.  *See* July 31, 2015 Form 8-K, attached as Ex. L at 1; Am. Compl. ¶ 19.   Accordingly, when the Company filed its 2014 Form 10-K the next day, it restated the consolidated financial statements for each of the following interim periods (dollar amounts in thousands):

| Period | Previously Reported Net Income | Adjustments | Restated Net Income |
|--------|-------------------------------|-------------|---------------------|
| Q1 2014 | $16,023 | $ (3,926) | $12,097 |
| Q2 2014 | $32,050 | $ 1,675 | $33,725 |
| Q3 2014 | $45,271 | $ 3,715 | $48,986 |

Ex. A at 61 (pages 61 through 72, the "Restatement").  Notably, in the aggregate, the interim period adjustments resulted in an *increase*—not a decrease—in the net income attributable to the Company for these three quarters.  Taking into account the Company's fourth quarter earnings, the Company's net income increased by $282,000 for the year ending December 31, 2014.  *Id.*

The Company also stated, based on the results of its internal investigation, that there was a "material weakness" in the internal controls within a single segment of the Company—namely, its Electrical Transmission segment.  *Id.* at 3.  Specifically, the Company determined that the

---

[5] This disclosure described these "uncertainties" as including, without limitation: "the time needed to complete the investigation; whether the investigation will lead to the discovery of accounting errors; whether the investigation will require changes or corrections to previously reported financial information; whether the investigation will discover any material weakness in internal control over financial reporting or discover other adverse facts; unanticipated material issues that could delay the completion of the investigation or the release band filing of the Company's financial results and periodic financial reports; and possible regulatory action or private party litigation and other facts, many of which are beyond our control."  **Ex. J**.

controls and procedures for assuring the adequacy of documentation for significant judgments in cost-to-complete estimates were not effective in that service line. *Id.* The Company's stock price *increased* immediately following announcement of the results of the Audit Committee's investigation. *See* **Ex. F**.

### F.     MasTec's Quarterly Reports for the First and Second Quarters of 2015

Following the Restatement, the Company resumed the filing of quarterly reports with the SEC. Thus, on August 7, 2015, the Company filed its Form 10-Q for the first quarter of 2015. *See* Ex. K.

Ten days later, on August 17, 2015, the Company filed its Form 10-Q for the second quarter of 2015. *See* MasTec Form 10-Q (Second Quarter, 2015), filed with the SEC on August 17, 2015, attached as Ex. M; Am. Compl. ¶ 216. In the press release accompanying the filing, the Company announced that it experienced a net loss from continuing operations of $3.8 million. *See* August 17, 2015 Press Release, attached as Ex. N at 1; Am. Compl. ¶ 216. Defendant Mas explained that this loss was the result of "the adverse impact of rain and flooding across multiple segments, as well as significant disruptions within [the Company's] Electrical Transmission segment." *Id.* In the 10-Q, the Company attributed these "significant disruptions" not to the Restatement or any deficiencies in, or changes to, the Company's accounting practices, but instead to the fact that "[m]anagement's attention has been diverted from its business operations and marketing due to the Audit Committee independent investigation . . . ." Ex. M at 36. *See also* Am. Compl. ¶ 217. Although the Company's stock price previously had risen in response to the July 30 disclosure of the Audit Committee's findings, it now declined in response to this new disappointing earnings news—earnings news unrelated to any alleged accounting "fraud." *See* **Ex. F**.

## APPLICABLE LEGAL STANDARDS

To state a claim for securities fraud, plaintiffs must allege: (1) a material misstatement or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the misstatement; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).  Such allegations must meet the heightened pleading standard of Rule 9(b), which requires that "the circumstances constituting fraud . . . be stated with particularity."  Fed. R Civ. P. 9(b).

Further, the PSLRA requires that securities class action plaintiffs must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind."  15 U.S.C.A. § 78u-4(b)(2) (emphasis added).   Additionally, plaintiffs are required to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, . . . [to] state with particularity all facts on which that belief is formed."  15 U.S.C.A. § 78u-4(b)(1).

## ARGUMENT

### I.   THE AMENDED COMPLAINT FAILS TO ALLEGE FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

To establish scienter in the Eleventh Circuit, it is "well-established that § 10b and Rule 10b-5 require a showing of either an 'intent to deceive, manipulate, or defraud,'" or "'severe recklessness.'"  *Mizzaro*, 544 F.3d at 1238 (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999)).  "Severe recklessness," the minimum standard that plaintiffs must plead, is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of

10

ordinary care [such that] . . . the defendant must have been aware of [the fraud]." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

Under these stringent standards, the facts alleged by the Lead Plaintiffs, taken together, must give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). As the Supreme Court has explained:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give the requisite "'strong inference'" of scienter, a court must consider plausible non-culpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

*Id*. at 323-24. Because the Lead Plaintiffs fail this balancing test, the Amended Complaint must be dismissed.

### A.      The Amended Complaint Improperly Lumps All Defendants Together

As an initial matter, the Lead Plaintiffs must allege a mental state embracing intent to deceive, manipulate, or defraud on a defendant-by-defendant basis, and with respect to each alleged violation. 15 U.S.C.A § 78u-4(b)(2); *Mizzaro*, 544 F.3d at 1238. But instead of pleading specific and individualized allegations of fraud, the Amended Complaint lumps together Mas, Pita, and the Company—including all of the Company's business segments and middle managers—into the single defined term, "Defendants," *see e.g.*, Am. Compl. ¶¶ 13, 61, 235, and repeatedly makes generalized references to the Company's "management," "supervisors," and "executives," *see e.g.*, *id*. ¶¶ 7, 28, 67, 74. This group pleading approach alone demonstrates the Lead Plaintiffs' failure to allege scienter with respect to any Individual Defendant and warrants dismissal of the Amended Complaint. *See Mizzaro*, 544 F.3d at 1238.

11

**B.    The Amended Complaint Fails to Raise a Strong Inference of Scienter
With Respect to Any Individual Defendant**

**1.    The Amended Complaint Alleges No Facts From Which
Knowledge of Fraud Can Be Inferred**

The Amended Complaint repeatedly alleges that the "Defendants" (collectively)

"knew," "sanctioned," or "ignored" the fact that the Company's reported earnings were

"materially distorted."  *See* Am. Compl. ¶¶ 150, 169, 176, 180, 186, 189, 215, 237, 245.  The

only support offered for this conclusory assertion is the contention that "confidential witnesses"

allegedly shared their concerns with unnamed "supervisors" in MasTec's Electrical and

Transmission segment, who allegedly "advised" unnamed "executives" of those concerns.  *See*

*e.g.*, *id.*  ¶ 7.  *See also Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006)

(affirming dismissal of plaintiffs' complaint where plaintiffs alleged defendants attended

monthly operations meetings at which they endorsed fraudulent practices, but failed to allege

details relating to "what was said at the meetings, to whom it was said, or in what context").  The

Lead Plaintiffs, however, cannot rely upon these broad assertions to "fill in the factual gaps" in

their pleading.  *See Waterford Twp. v. BankUnited Fin. Corp.*, 2010 WL 1332574, *14 (S.D. Fla.

2010) (Cooke, J.) (granting defendants' motion to dismiss, because the plaintiffs "offer[ed] broad

assertions regarding defendants' knowledge base and attendance at meetings," and then "ask[ed]

[the] Court to fill in the factual gaps with conjecture and speculation").

First, there is no allegation that any of the witnesses, all of whom appear to have worked

in MasTec's Electrical Transmission segment, ever personally spoke to, met, or even once

emailed either of the Individual Defendants.  *See Mizzaro*, 544 F.3d at 1247-48 ("[None] of the

confidential witnesses say that any one of the individual defendants ever discussed the alleged

fraud or even knew about it.  Indeed, none of the confidential witnesses even claims to know or have so much as ever met any of the . . . individual defendants.").

Second, the allegations regarding confidential witnesses in the Amended Complaint do not provide enough information to draw any conclusions about the Individual Defendants' state of mind.  Rather, the Amended Complaint alleges only that "financial information was shared with top executives," *see*, *e.g.*, Am. Compl. ¶ 77, that the witnesses "believed" that "executives" were involved in manipulating accounting estimates and pressuring employees to meet projections, *see*, *e.g., id.*  ¶¶ 74, 75, and that the witnesses "complained to management" about various issues, *see*, *e.g., id.*  ¶ 106, 107, among other similar claims.  *See Ziemba*, 256 F.3d at 1210 ("Plaintiffs have pointed to no 'tips,' letters, or conversations raising inferences that C&L knew of any fraud.").  *See also Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1289-90 (S.D. Fla. 2008) (reasoning that, without a description of discussions, emails or memoranda to or from the individual defendants regarding the alleged fraud, the complaint was comprised only of conclusory allegations).

### 2.    The Lead Plaintiffs' Other Miscellaneous Theories Do Not Raise a Strong Inference of Scienter

Lacking any true basis to claim that Mas or Pita had actual knowledge of the alleged improprieties described in the Amended Complaint, the Lead Plaintiffs offer up the usual hodgepodge of theories of scienter and ask the Court to *infer* that Mas and Pita each acted with a culpable state of mind.  None of these miscellaneous theories suffice to satisfy the Lead Plaintiffs' pleading burden.

<u>General Access to Information</u>.  The Amended Complaint simply assumes that the Individual Defendants must have known about the accounting issues that led to the accounting adjustments because of their positions within the Company.  But merely having the potential

13

ability to access information, standing alone, is insufficient to demonstrate that any of the

Individual Defendants acted with scienter.  *See In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d

1291, 1303 (S.D. Fla. 2002) ("[M]ere allegations that Defendants held senior management

positions, had access to inside information, and therefore, must have known of the falsity of

certain statements is insufficient to plead scienter.").  *See also Indiana Elec. Workers' Pension*

*Trust IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 536-38 (5th Cir. 2008) (reversing district court's

denial of motion to dismiss because complaint alleging misstatements stemming from

manipulation of percentage of completion accounting, about which the defendants "must have

known," failed to allege facts sufficient to form a strong inference of scienter); *In re Jiangbo*

*Pharm., Inc. Sec. Litig.*, 884 F. Supp. 2d 1243, 1262 (S.D. Fla. 2012) (Cooke, J.) (finding no

scienter where plaintiffs alleged the defendant CFO was involved in "day-to-day operations and

therefore must have known that [the company's] cash balance amounts were [overstated]") *aff'd*,

781 F.3d 1296 (11th Cir. 2015).

    *Alleged Violations of GAAP*.  The Amended Complaint describes three types of alleged

GAAP violations that allegedly support an inference of scienter against the Individual

Defendants: (1) "Improper Under-Bidding," *see* Am. Compl. ¶¶ 78-85; (2) "Shifting Costs

between Projects," *see id.* ¶¶ 86-93; and (3) "Lack of Internal Controls," *see id.* ¶¶ 94-105.  But

"[v]iolations of GAAP, without more, may establish negligence but do not establish scienter . . .

."  *In re Smith Gardner Sec. Litig.*, 214 F. Supp. at 1302. [6]

    *Material Weakness*.  Similarly, the mere existence of a "material weakness" does not

establish scienter.  *See Ricker v. Zoo Entm't, Inc.*, 534 F. App'x 495, 500 (6th Cir. 2013)

---

[6] Even though the Lead Plaintiffs include conclusory allegations about purported underbidding
on projects, shifting costs, and lack of internal controls, they fail to include any facts showing
how these alleged activities materially impacted MasTec's financial disclosures or that they were
done with the necessary scienter to survive a motion to dismiss.

(although defendant acknowledged in its Form 10-Q a material weakness in its internal controls over financial reporting, plaintiffs' allegations related to miscalculated revenue in one account, and did not suggest the presence of "multiple, obvious red flags").

*Accounting Restatement*.  Scienter also is not established by merely pointing to the occurrence of a restatement.  *See Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1272 (M.D. Fla. 2009) ("The restatement provides no inference of scienter, and certainly provides no cogent and compelling inference.") *aff'd*, 594 F.3d 783 (11th Cir. 2010).  A restatement means only that, after issuing a financial statement, the company learned that these materials can no longer be relied upon.  *See In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) ("Plaintiffs' claim that a subsequent revelation of the falsehood of previous statements implies scienter lacks merit, since '[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.'" (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999))).

*Incentive Compensation*.  Finally, the Lead Plaintiffs' claim that Mas and Pita stood to profit from a "scheme" to inflate the Company's revenues because of incentive compensation likewise does not support an inference of scienter.  As the Eleventh Circuit observed in *Bryant v. Avado Brands, Inc.*:

> A good argument can be made that the "motive and opportunity" standard lowers the bar for securities fraud cases . . . . Greed is a ubiquitous motive, and corporate insiders and upper management always have opportunity to lie and manipulate. Furthermore, allowing private securities class actions to proceed to discovery upon bare allegations of motive and opportunity would upset the delicate balance of providing a remedy for genuine fraud while preventing abusive strike suits that the Reform Act sought to achieve. . . .

187 F.3d at 1286 (citing *Carley Capital Grp. v. Deloitte & Touche, L.L.P.*, 27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998)).

15

3.     **The Facts Alleged in the Amended Complaint Support a Compelling Inference Against Scienter**

In *Tellabs*, the Supreme Court made clear that courts must consider whether the facts suggest a non-culpable explanation for events.  Here, the facts alleged in the Complaint and in judicially-noticeable materials significantly cut against an inference that any Defendant acted with scienter.  For example, conspicuously absent from the Amended Complaint is any factual allegation that an individual defendant sold any stock during the class period—an omission that courts often have found weighs against an inference of scienter.  *See*, *e.g., Mizzaro*, 544 F.3d at 1253 ("[T]he amended complaint says nothing about suspicious stock transactions by any of the individual defendants, an omission that weighs against inferring scienter").

Instead, the documents cited in the Amended Complaint actually show that the Company made stock repurchases during the class period—an utterly illogical occurrence if the alleged fraudulent scheme existed.  *See* Ex. A at 26-27.  A corporation repurchases its stock because it believes that stock is underpriced by the market; a company would not repurchase its stock if it believed it to be artificially overpriced.  *See Staehr v. Miller*, 2010 WL 11030716, *7 (S.D. Fla. 2010) (Jordan, J.) (rejecting plaintiffs' argument that defendants' repurchase was done "to halt the stock's slide," and explaining that the decision "articulates a motive that is more plausible than one of deceit: amidst market instability, based on the information before them, [the defendants] believed that investing in [the company] was a good business decision when it was possible to maintain a positive balance sheet.  This explanation is consistent with the typical motive for a corporation to repurchase its own stock: the corporation believes that the stock is undervalued." (internal citations omitted)).  *See also IBEW Local 595 Pension and Money Purchase Pension Plans v. The ADT Corp.*, Case No. 14-80566-WPD, ECF No. 114 (S.D. Fla. June 4, 2015) (Order Granting Defendants' Motion to Dismiss) (Dimitrouleas, J.) ("Instead of

16

selling stock, [the defendant company] bought its own stock during the relevant period.  '[S]tock repurchase programs actually *negate* a finding of scienter.'" (quoting *Plumbers & Pipefitters Local Union 7119 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 749 (S.D. Ind. 2009), *aff'd*, 679 F.3d 952 (7th Cir. 2012))).

Significantly, the miniscule impact of the alleged improprieties on the Company's earnings in comparison to the Company's overall revenues weighs against an inference of scienter: When the results of the Audit Committee's investigation were released in July 2015, they showed that the Company had actually *understated* its revenues in two out of three quarters under review but that the total amount of the Restatement increased net income for those three quarters.[7]  A "strong inference" of scienter cannot possibly be made under these circumstances. *See Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt. Corp.*, 2015 WL 4063932, *22 (S.D. Fla. June 30, 2015) ("Because the Court cannot determine whether the size of the restatement is significant, this allegation does not support a finding that [the defendant] acted with scienter."); *Greebel v. FTP Software, Inc.*, 194 F.3d 186, 206 (1st Cir. 1999) (concluding that improperly recorded revenue that raised overall revenue by up to 4% for the quarter did not support a strong inference of scienter, because "[s]eeing fraud" under such circumstances "require[d] too great of an inferential leap").

---

[7] The Eleventh Circuit has explained the rationale for looking at annual revenues instead of net income as follows:

> Because net income can vary so widely period to period, using it as a baseline for comparison provides the court no real standard on which to judge the significance of the accounting error.  This pleading strategy—picking the metric that will yield the highest percentage values—adds nothing to the inference of scienter that the shareholders attempt to create.

*Goodman Life Income Trust*, 594 F.3d at 791-92.  Notably, net income is the metric of choice by the Lead Plaintiffs in the Amended Complaint—for precisely the reason highlighted in *Goodman*.

Rather, the only cogent inference that can be made is that MasTec had a robust system in place to identify potential accounting issues, and that, when it learned of potential issues in its percentage-of-completion estimates, it took them very seriously: Outside counsel was hired to conduct an independent investigation and the Company elected not to release further financial statements or its 2014 Annual Report until the results of the investigation were known.  The Lead Plaintiffs' alternative theory—that the Individual Defendants risked their careers and their reputations to pursue a fraudulent scheme that provided them no discernible benefit and that had no meaningful impact on the Company's financial condition, all the while overseeing a repurchase of the Company's stock—is not plausible, much less cogent.

### C.   The Amended Complaint Fails to Raise a Strong Inference of Scienter With Respect to the Company

When examining the corporate state of mind, courts "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)."  *Mizzaro*, 544 F. 3d at 1254.  Here, there are no allegations that any person other than Mas or Pita was responsible for the statements at issue.  As a result, a failure to allege a "strong inference" of scienter as to Mas or Pita is fatal to the Lead Plaintiffs' claim against the Company.  *Id.*  The Lead Plaintiffs' § 10(b) claim should therefore be dismissed in its entirety.

## II.   THE AMENDED COMPLAINT FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT

The Amended Complaint also fails allege an actionable misstatement.  The accounting issues that led to the Restatement and that the Lead Plaintiffs allege as the basis of their fraud claims were not material for purposes of the federal securities laws.  Further, to the extent the Lead

Plaintiffs are challenging the Company's earning guidance or other forward-looking statements, the PSLRA safe-harbor precludes any such claim.

### A.   The Defendants' Statements Were Not Materially False or Misleading

To ultimately prevail on a § 10(b) claim, "a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  In other words, "[i]t is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."  *Basic Inc.*, 485 U.S. at 238.  For federal securities law purposes, a misrepresentation or omission is "material" only if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *SC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Thus, for purposes of the Amended Complaint, an allegedly concealed fact is immaterial if its disclosure would not meaningfully affect the Company's stock price.  *See*, *e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).

Although the issue of materiality is a mixed question of law and fact, and is therefore usually decided by the trier of fact, if the alleged omission's lack of importance "is so plain that reasonable minds cannot differ thereabout," then "it is proper for the court to pronounce the omission immaterial as a matter of law."  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002).  *See also In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1343, 1347 (M.D. Fla. 2007) (granting defendants' motion to dismiss because "[e]ach and every statement alleged to be fraudulent by Plaintiff [was] either (1) a forward looking statement protected by the PSLRA's safe harbor or (2) clearly immaterial corporate puffery"); *In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d 1334, 1355-56 (N.D. Ga. 2001) (same).

With this context, courts often hold that dismissal is appropriate where the alleged misstatements or omissions are clearly insignificant given the scale of the defendant's business. In *Druskin v. Answerthink, Inc.*, for example, the plaintiffs alleged GAAP violations arising from the defendant corporation's failure to disclose material related party transactions.  299 F. Supp. 2d 1307, 1328 (S.D. Fla. 2004).  The transactions at issue, however, totaled $1.7 million, which amounted to just 0.67 % of the corporation's $260 million in annual revenue.  *Id.* at 1329.  The Court held that the plaintiffs' complaint did not adequately allege materiality because the amount of business was "*de minimis* when compared to the overall revenue reported during the Class Period." *Id.*

Similarly, and of particular relevance here, courts often hold alleged misstatements to be immaterial where they concern accounting errors that are insignificant when placed in context. For example, *In re First Union Corp. Securities Litigation* is a case that involved an alleged misstatement of earnings of $79 million.  128 F. Supp. 2d 871, 895 (W.D.N.C. 2001).  In that case, the district court dismissed the complaint for failure to state a claim, holding that "as a matter of law, the alleged misstatement . . . cannot be material" because it amounted "to a mere 2.1 percent of operating earnings and 2.8 percent of earnings after such charges." *Id.  See also Parnes v. Gateway 2000 Inc.*, 122 F.3d 539, 547 (8th Cir.1997) ("[T]he district court concluded, and we agree, that the Defendants' alleged overstatement of assets by $6.8 million was immaterial as a matter of law.  Taken in context, this amount represented only 2% of [the company's] total assets.").  *See also Glassman v. Computervision Corp.,* 90 F.3d 617, 633 (1st Cir. 1996) (finding a 3% to 9% drop in quarterly revenue immaterial as a matter of law).

Here, the Lead Plaintiffs allege that MasTec overstated net income by a miniscule amount in a single quarter, and that the net result of the Restatement, taking into account the

20

fourth quarter, was an increase in net income of $282,000.  Such a minor accounting correction hardly would be significant to MasTec's investors.  Indeed, the absence of a significant price decline after announcement of the Restatement demonstrates its lack of materiality.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1425 ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock.").

### B.  Defendants' Forward-Looking Statements Are Not Actionable

Although the Amended Complaint is not a model of clarity, it appears to challenge various forward-looking statements and estimates concerning MasTec's future prospects.  *See*, *e.g.*, Am. Compl. ¶ 200.  These types of claims are not actionable.

The PSLRA created a "safe harbor" for forward-looking statements such as management plans and objectives for future operations, statements of future economic performance, and assumptions underlying both.  15 U.S.C.A. § 78u-5(i)(1).  The statutory safe-harbor renders such statements non-actionable if they are accompanied by "meaningful" cautionary language—that is, language that advises investors of "risks of a significance similar to that actually realized."  15 U.S.C.A. § 78u-5(c); *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999).  Additionally, the Eleventh Circuit has adopted a "more lenient (*i.e.*, easily satisfied)" standard for meaningful cautionary language than courts in other jurisdictions.  *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1375 n.35 (S.D. Fla. 2001) (citing *Ivax*).  Under this more lenient standard, there need be no "direct connection between the disclaimer and the events that subsequently lead to the company's decline."  *Id.* at 1374.  Rather, it is sufficient if there is "some correlation between the disclaimer and the subsequent events."  *Id.*

Here, Defendants provided extensive disclaimers, cautions, and warnings in connection with the Company's forward-looking statements.  They did so in MasTec's periodic SEC filings

on Forms 10-K and 10-Q, as well as the accompanying press releases.  MasTec's Form 10-Q

filings, for example, stated among other warnings:

- The Company's "preparation of financial statements in conformity with U.S. GAAP requires the use of estimates and assumptions."

- One "key estimate" of MasTec is "the recognition of revenue, in particular, on long-term construction contracts, or other projects accounted for under the percentage-of-completion method, for which the recorded amounts require estimates of costs to complete projects."

- "While management believes that such estimates are fair when considered in conjunction with the consolidated financial position and results of operations taken as a whole, actual results could differ from those estimates and such differences could be material."

- "As management estimates, by their nature, involve judgments regarding future uncertainties, actual results may differ from these estimates . . . if certain key assumptions used in making these estimates ultimately prove to be incorrect."

- The Form 10-Q also bluntly cautioned that it "contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995."  Words such as "expects," "could," "may," "estimates" and "variations of these words and negatives thereof and similar expressions are intended to identify forward-looking statements."

*See*, *e.g.*, Ex. B at 7-8.

These warnings "[t]old the reader in detail what kind of misfortunes could befall the

company and what the effect could be," and constituted meaningful cautionary language, not

"mere boilerplate."  *Harris*, 182 F.3d at 807.   Further, these warnings were not only "of a

similar significance to the risks actually realized," but were also closely related to the events that

actually befell the Company.  *See Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001).

MasTec's forward-looking statements also are inactionable for the independent reason

that a predictive statement can give rise to liability only if a plaintiff alleges particular facts

demonstrating the defendant's actual knowledge that the forward-looking statement was false

when made.  *See* 15 U.S.C.A. § 78u-5(c).  The Amended Complaint includes nothing of the sort.

22

### III.    THE AMENDED COMPLAINT FAILS TO ALLEGE LOSS CAUSATION

The Amended Complaint fails to allege any facts from which it reasonably can be inferred that Defendants' supposed fraud regarding cost-to-complete estimates caused any actionable loss.  "To show loss causation in a § 10(b) claim, a plaintiff must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value."  *Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (citing *Robbins v. Kroger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)); 15 U.S.C. § 78u-4(b)(4).  This loss causation requirement ensures that the federal securities laws "do not 'becom[e] a system of investor insurance that reimburses investors for any decline in the value of their investments."  *Meyer*, 710 F.3d at 1196 (quoting *Robbins*, 116 F.3d at 1447).

To plead loss causation, plaintiffs must allege facts demonstrating that the decline in stock price (the plaintiffs' alleged loss) was caused by the publication of a corrective disclosure that revealed the "truth" about a previous misstatement.  *Dura*, 544 U.S. at 345.  Plaintiffs cannot simply allege a price decline following an announcement of negative information; the stock price drop must follow a "corrective" event that reveals the falsity of a prior statement and causes a substantial amount of the ensuing price drop.  *Meyer*, 710 F.3d at 1196-97 (citing *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1311-12 (11th Cir. 2011)).

Here, the Amended Complaint alleges that the Company made false statements that required correction by failing to disclose that: (1) its cost-to-complete estimates were inaccurate; (2) its internal controls were ineffective; and (3) as a result of these alleged omissions, its public statements in the first three quarters of 2014 were inaccurate.  Am. Compl. ¶ 14.  The Lead Plaintiffs then point to three separate occasions when the Company's stock price declined following an announcement by the Company:  March 17, May 11, and August 17, 2015.  Am. Compl. ¶¶ 15, 17, 23.  But none of these announcements constitute a corrective disclosure.

23

To begin, both the March 17 and May 11 disclosures were soon followed by an increase in the Company's stock price, thereby negating any inference of loss causation.  *See* **Ex. F**. More fundamentally, neither announcement revealed any fraud regarding cost-to-complete estimates, internal controls or any other matters.  Instead, on March 17, the Company simply announced that the filing of its 2014 10-K would be delayed because of the *previously announced* Audit Committee investigation.  *See* Ex. G at 1.  Similarly, the Company's May 11 announcement reported a further delay in release of the 10-K, and explained that the investigation had "not been completed and no conclusions had been reached."  *See* Ex. J at 2. The May 11 announcement also reported a sizeable decline in the Company's revenue compared to the same quarter in 2014, mainly due to a $16 million loss on one of its projects.  *See id.* at 1. None of these announcements "corrected" any prior disclosures regarding accounting matters.[8]

Nor does the Company's August 17 disclosure provide any basis upon which to infer loss causation.  Although the Lead Plaintiffs assert that the market learned the "full extent of the accounting manipulations related to cost-to-complete estimates" on that date, the Company reported the *previously disclosed* Restatement and the results of the Audit Committee investigation—information already fully known to and digested by the market.  *See* Am. Compl. ¶ 23;  *FindWhat*, 658 F.3d at n.28 ("[B]ecause a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory").  Although the Company's stock price declined following the August 17 announcement, that decline was hardly surprising given that the Company also was reporting

_____

[8] Further, in both the February 26, 2015 press release in which MasTec announced the Audit Committee's independent review, and the May 11, 2015 press release in which MasTec announced preliminary financial results for the first quarter of 2015, MasTec *also* announced downward adjustments of its guidance for the full year 2015.  The Lead Plaintiffs have not alleged (and have no way of showing) that any fluctuation in the stock price at the time of these disclosures was not merely the result of the market reacting to these lowered expectations.

24

disappointing earnings resulting from weather and other disruptions, as well as reduced guidance for the remainder of 2015.  *See* Ex. N.  Thus, because the Lead Plaintiffs cannot plausibly dispute that the subsequent stock price decline was the result of this new, but not fraud-revealing, information, they cannot satisfy their burden of demonstrating loss causation.  *See Dura*, 544 U.S. at 342-43 (plaintiffs must allege losses caused by fraud, not by other factors that impact stock price); *FindWhat*, 658 F.3d at 1309 (same).

## IV.   THE AMENDED COMPLAINT FAILS TO ALLEGE A CLAIM FOR CONTROL PERSON LIABILITY

Section 20(a) of the Exchange Act provides a cause of action against "control persons" of primary violators.  *See* 15 U.S.C. § 78t(a).  But where, as here, a plaintiff fails to allege a primary violation of the Act, control person liability cannot be established.  *Mizzaro*, 544 F.3d at 1237.

## V.   THE LEAD PLAINTIFFS SHOULD NOT BE GRANTED LEAVE TO AMEND

The PSLRA states that "the court *shall*, on the motion of any defendant, dismiss the complaint if the [PSLRA pleading] requirements are not met." 15 U.S.C.A. § 78u-4(b)(3) (emphasis added).  Here these requirements have not been met, cannot be cured, and allowing further amendment would be inconsistent with the PSLRA's policy of deterring frivolous strike suits.  The Lead Plaintiffs had more than five months from the filing of the original Complaint until the filing of the Amended Complaint to investigate their claims.  If they were capable of alleging a cognizable claim, they already would have done so.  Further amendment would be futile and would needlessly subject the Defendants to additional delay, expense, and prejudice. *Mizzaro*, 544 F.3d at 1255 (affirming dismissal with prejudice and noting "justice does not require district courts to waste their time on hopeless cases").

## CONCLUSION

For all these reasons, the Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

HOGAN LOVELLS US LLP
600 Brickell Avenue
Suite 2700
Miami, Florida  33131
Telephone:     (305) 459-6500
Facsimile:     (305) 459-6550


By:    /s/Mark R. Cheskin
          Daniel E. González
          Fla. Bar. No.: 780030
          Email: daniel.gonzalez@hoganlovells.com
          Mark R. Cheskin
          Fla. Bar No.: 708402
          Email: mark.cheskin@hoganlovells.com
          Clayton P. Solomon
          Fla. Bar No. 72851
          Email: clayton.solomon@hoganlovells.com
          Jason L. Mays
          Fla. Bar No. 106495
          Email: jason.mays@hoganlovells.com


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 14, 2015, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF.  Copies of the foregoing document will be served upon interested counsel either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


By:     /s/ Mark. R. Cheskin

26