## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:15-CV-21740-COOKE/TORRES

NANCY WRIGLEY, Individually and on Behalf of All Others Similarly Situated,

                    Plaintiff,

       v.

MASTEC, INC., JOSE R. MAS, and GEORGE L. PITA,

                    Defendants.

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

325171.1 MASTEC

**TABLE OF CONTENTS**

I.     INTRODUCTION ...............................................................................................................1

II.    STATEMENT OF FACTS ................................................................................................3

       A.     Background ...........................................................................................................3

       B.     Accounting Requirements for Long-Term Construction Contracts........................3

       C.     Defendants Improperly Inflated MasTec's Revenue and Net Income.....................4

       D.     MasTec Lacked Sufficient Internal Controls..........................................................4

       E.     Defendants Were Financially Motivated to Manipulate MasTec's Performance ......5

       F.     The Truth Emerges; MasTec's Shareholder Value Falls.........................................5

III.   ARGUMENT.....................................................................................................................6

       A.     Applicable Legal Standards Do Not Favor Defendants' Motion.............................6

       B.     The Complaint Alleges Material Misrepresentations and Omissions......................7

              1.     Materiality Is Sufficiently Alleged ............................................................7

                     (a)    Materiality Is a Question of Fact Not Appropriately
                            Determined at the Pleading Stage ....................................................7

                     (b)    Defendants' Misstatements Were Qualitatively Material...............9

                     (c)    Defendants' Misstatements Were Quantitatively Material............10

              2.     Defendants Find No Protection in the PSLRA Safe Harbor.....................11

                     (a)    The Statements and Omissions Were Not Forward-Looking........11

                     (b)    There Was No Meaningful Cautionary Language .........................12

       C.     The Complaint Adequately Alleges a Strong Inference of Scienter.......................13

              1.     The CWs Provided Credible Facts that Strongly Support Scienter ..........14

                     (a)    The CWs Are Reliable...................................................................14

                     (b)    The CWs Provided Particularized Facts Probative of Scienter .....15

              2.     The Core Operations Doctrine Supports an Inference of Scienter ...........16

3. Individual Defendants' Access to Information and SOX Certifications ...17

4. The Pervasiveness of the Violations and Deficient Internal Controls .......18

5. Scienter Is Alleged As to Each Defendant..................................................19

    (a) Plaintiffs Allege a Plausible Financial Motive .............................20

    (b) Mas and Pita Misrepresented MasTec's Financial Condition .......21

6. No Competing Inference Outweighs the Strong Inference of Scienter .....21

D. The Complaint Alleges Loss Causation.................................................................23

1. March 17, 2015 After Hours Press Release ...............................................23

2. May 11, 2015 After Hours Press Release ...................................................24

3. August 17, 2015 Press Release and August 18, 2015 Conference Call.....25

E. The Complaint States a Claim for Control Person Liability.................................25

IV. CONCLUSION................................................................................................................25

325171.1 MASTEC

## TABLE OF AUTHORITIES

<u>CASES</u>

*Abrams v. MiMedx Grp., Inc.*,
   37 F. Supp. 3d 1271 (N.D. Ga. 2014) ................................................................................ 24

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ................................................................................................ 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................................ 6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................ 6

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ......................................................................................... 20

*Carpenters Health & Welfare Fund of Philadelphia v. Coca-Cola Co.*,
   No. 1:00-CV-02838-WBH, 2002 WL 34089163 (N.D. Ga. Aug. 20, 2002) ..................... 20

*Chu v. Sabratek Corp.*,
   100 F. Supp. 2d 815 (N.D. Ill. 2000) ................................................................................... 8

*City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz
   Cellulose S.A.*,
   41 F. Supp. 3d 1369 (S.D. Fla. 2011) ................................................................................ 17

*Crowell v. Ionics, Inc.*,
   343 F. Supp. 2d 1 (D. Mass. 2004) ............................................................................. passim

*Druskin v. Answerthink, Inc.*,
   299 F. Supp. 2d 1307 (S.D. Fla. 2004) ................................................................................ 9

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................................................ 7

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
   595 F. Supp. 2d 1253 (M.D. Fla. 2009) ............................................................................. 18

*Edwards v. Prime Inc.*,
   602 F.3d 1276 (11th Cir. 2010) ........................................................................................... 6

*Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.*,
   343 F.3d 189 (2d Cir. 2003) ......................................................................................... 23, 25

*FindWhat Inv'r Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) .................................................................. 13, 23, 25

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) .............................................................................. 23

*Frank v. Dana Corp.*,
  547 F.3d 564 (6th Cir. 2011) .............................................................................. 20

*Fuechtman v. Mastec*, Inc.,
  390 F. Supp. 2d 1264 (S.D. Fla. 2005) .......................................................... 17, 18

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000)................................................................................. 9

*Gargiulo v. Isolagen, Inc.*,
  527 F. Supp. 2d 384 (E.D. Pa. 2007) .................................................................. 12

*Gross v. Medaphis Corp.*,
  977 F.Supp. 1463 (N.D. Ga. 1997) ...................................................................... 11

*Hoff v. Popular, Inc.*,
  727 F. Supp. 2d 77 (D.P.R. 2010)........................................................................ 12

*Holmes v. Baker*,
  166 F. Supp. 2d 1362 (S.D. Fla. 2001) ................................................................. 9

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  625 F. Supp. 2d 1267 (S.D. Fla. 2008) ............................................................... 14

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) ............................................................................ 24

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................................... 8

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005)................................................................... 9

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002)................................................................................... 8

*In re Century Aluminum Co. Sec. Litig.*,
  749 F. Supp. 2d 964 (N.D. Cal. 2010) ................................................................ 23

*In re Ebix, Inc. Sec. Litig.*,
  898 F. Supp. 2d 1325 (N.D. Ga. 2012) ................................................................. 17

*In re First Union Corp. Sec. Litig.*,
  128 F. Supp. 2d 871 (W.D.N.C 2001) .................................................................... 9

*In re Hicks*,
  79 B.R. 45 (Bankr. N.D. Ala. 1987) ..................................................................... 20

*In re Jiangbo Pharm., Inc., Sec. Litig.*,
  884 F. Supp. 2d 1243 (S.D. Fla. 2012) ................................................................. 23

*In re Monster Worldwide, Inc. Sec. Litig.*,
  251 F.R.D. 132 (S.D.N.Y. 2008) ............................................................................ 8

*In re Netbank, Inc. Sec. Litig.*,
  No. CIV.A.1:07-CV-2298-B, 2009 WL 2432359 (N.D. Ga. Jan. 29, 2009)..................... 20, 23

*In re Paincare Holdings Sec. Litig.*,
  541 F. Supp. 2d 1283 (M.D. Fla. 2008)....................................................... 18, 20, 21

*In re PSS World Med., Inc. Sec. Litig.*,
  250 F. Supp. 2d 1335 (M.D. Fla. 2002)............................................................. 20, 23

*In re Recoton Corp. Sec. Litig.*,
  358 F. Supp. 2d 1130 (M.D. Fla. 2005)................................................................. 10

*In re Spear & Jackson Sec. Litig.*,
  399 F. Supp. 2d 1350 (S.D. Fla. 2005) ...................................................... 13, 18, 19

*In re Sunbeam Sec. Litig.*,
  89 F. Supp. 2d 1326 (S.D. Fla. 1999) ................................................................... 11

*In re Telxon Corp. Sec. Litig.*,
  133 F. Supp. 2d 1010 (N.D. Ohio 2000)................................................................. 8

*In re Theragenics Corp. Sec. Litig.*,
  105 F. Supp. 2d 1342 (N.D. Ga. 2000)................................................................. 25

*In re Viropharma Inc. Sec. Litig.*,
  21 F. Supp. 3d 458 (E.D. Pa. 2014) ...................................................................... 22

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
  No. CV 10-2847-IPJ, 2011 WL 12855820  (N.D. Ala. June 7, 2011)............................. 13, 20

325171.1 MASTEC

*Manns v. City of Atlanta*,
   No. CIV.A.1:06CV0609-TWT, 2006 WL 2466836 (N.D. Ga. Aug. 23, 2006) ....................... 7

*Marrari v. Med. Staffing Network Holdings, Inc.*,
   395 F. Supp. 2d 1169 (S.D. Fla. 2005) ................................................. 14

*Maverick Fund, L.D.C. v. Lender Processing Servs. Inc.*,
   No. 3:13-CV-1585-J-32JRK, 2015 WL 5559761 (M.D. Fla. Sept. 21, 2015) ....................... 21

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .................................................... 23

*Nathanson v. Polycom*,
   No. 13-3476 SC, 2015 WL 1517777 .................................................. 24

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2002) .................................................... 7

*P Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004)........................................................ 11

*Parnes v. Gateway 2000, Inc.*,
   122 F.3d 539 (8th Cir. 1997) ..................................................... 9

*Phillips v. Scientific-Atlanta, Inc*.,
   374 F.3d 1015 (11th Cir. 2004) ................................................ 13, 20

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
   111 F. Supp. 3d 1336 (S.D. Fla. 2015) ...................................... 11, 16, 19

*Ricker v. Zoo Entm't, Inc.*,
   534 F. App'x 495 (6th Cir. 2013).................................................. 18

*Robbins v. Koger Properties, Inc.*,
   116 F.3d 1441 (11th Cir. 1997) ................................................... 24

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*,
   No. 8:07-CV-1952-T-26MAP, 2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ............... 18, 19

*S.E.C. v. BankAtlantic Bancorp, Inc.*,
   No. 12-60082-CIV, 2013 WL 5588139 (S.D. Fla. Oct. 10, 2013) ......................... 22

*S.E.C. v. Bankatlantic Bancorp, Inc.*,
   No. 12-60082-Civ., 2012 WL 1936112 (S.D. Fla. May 29, 2012)........................... 7

*S.E.C. v. City of Miami, Fla.*,
   988 F. Supp. 2d 1343 (S.D. Fla. 2013) ................................................................ 7, 10

*S.E.C. v. Merchant Capital, LLC*,
   483 F.3d 747 (11th Cir. 2007) ............................................................................ 7, 12

*Schultz v. Applica Inc.*,
   488 F. Supp. 2d 1219 (S.D. Fla. 2007) ............................................................... passim

*S.E.C. v. Kelly*,
   663 F. Supp. 2d 276 (S.D.N.Y. 2009) ...................................................................... 7

*Staehr v. Miller*,
   No. 08-20990-CIV, 2010 WL 11030716 (S.D. Fla. Mar. 31, 2010) ...................................... 22

*Takara Trust v. Molex Inc.*,
   429 F. Supp. 2d 960 (N.D. Ill. 2006) ..................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................. 6, 13, 21, 23

*Unicapital Corp. Sec. Litig.*,
   149 F. Supp. 2d 1353 (S.D. Fla. 2001) .................................................................... 12

## STATUTES

15 U.S.C. § 78u-4(b)(2) ......................................................................................... 13

15 U.S.C. § 78u–5(c)(1)(A)(i)&(B) ........................................................................... 11

## RULES

Fed. R. Civ. P 12(g) ............................................................................................... 7

## REGULATIONS

17 C.F.R. §210.4-01(a)(1) ......................................................................................... 8

325171.1 MASTEC

Lead Plaintiffs Charles T. McCarter, Charles Kitchner, and David Scrimm ("Plaintiffs"), respectfully submit this opposition to Defendants' motion to dismiss (Dkt. No. 41, "Def. Br." or the "Motion")[1] Plaintiffs' Amended Class Action Complaint (Dkt. No. 36, the "Complaint").

## I.      **INTRODUCTION**

Plaintiffs' claims arise from Defendants' material misstatements and omissions regarding MasTec's financial performance, which artificially inflated the Company's financials, and caused it to significantly miss 2015 earnings guidance as systemic accounting manipulations came to light.

As an infrastructure construction company, MasTec generates most of its revenues from long-term contracts. To value these contracts – and, ultimately, to calculate revenue and net income – MasTec utilizes the "percentage-of-completion" accounting method, which recognizes income on projects as work progresses using "cost-to-complete" estimates. Thus, as Defendants conceded in MasTec's Class Period SEC filings, reliability of cost estimates was *critical* to accurate financial reporting. Indeed, cost estimates arguably were MasTec's most important accounting metric.

In order to boost revenue and net income, however, MasTec's percentage-of-completion accounting and cost estimates were routinely and systemically manipulated during the Class Period (May 1, 2014 to August 17, 2015) by: (i) intentional underbidding to secure contracts; (ii) premature revenue recognition; and (iii) inappropriate cost shifting among projects to mask losses, all in violation of GAAP and MasTec's own internal policies. This manipulation was enabled by material weaknesses in MasTec's internal controls and flourished under its incentive compensation structure, which rewarded the securing of contracts and revenue maximization above all else. Moreover, employees who dared report such activity were either ignored or terminated.

Despite the foregoing, during the Class Period, Defendants falsely emphasized the reliability of MasTec's accounting, stating that cost estimates were reviewed by management on an ongoing basis and periodically cross-checked by the Audit Committee. Then, on February 26, 2015, Defendants announced that MasTec's 2014 10-K would be delayed to review certain cost estimates,

---

[1] Defendants are: MasTec, Inc. ("MasTec" or the "Company"); MasTec CEO, Jose R. Mas ("Mas"); and MasTec CFO, George L. Pita ("Pita").

for the purportedly limited purpose of determining whether some cost-to-complete estimates should have been recognized in the second quarter rather than the third quarter of 2014. However, Defendants continued to conceal that MasTec's accounting was infested with systemic manipulation.

On March 17, 2015, Defendants further delayed the 2014 10-K filing and uncertainty over the review caused shares to fall over 9.5%. Thus, the risks concealed by Defendants' distortion of MasTec's financial results began to materialize, even as the underlying details had yet to come out.

Then, on May 11, 2015, Defendants released abysmal Q1 2015 preliminary results, reporting significantly lower key metrics compared to Q1 2014, and informing investors that the filing of the Q1 2015 10-Q would be delayed due to the continued investigation. In response to this partial disclosure, MasTec's stock price fell over 12%. However, still obfuscating the widespread nature of the accounting manipulations, Defendants tempered the market's reaction by falsely blaming inclement weather for the disappointing financial results, touting misleadingly positive news about the Electrical Transmission ("ET") segment, and issuing misleading guidance for Q2 2015.

On July 30, 2015, Defendants admitted to material weaknesses in MasTec's internal controls, stating that "significant judgments" were made in cost estimates without rational basis or support. Defendants also admitted that the first three quarters of 2014 required restatement (the "Restatement"). *Still*, Defendants disclosed *neither* the full extent of the problems with the Company's cost accounting *nor* the effect that correcting them would have on 2015 performance.

Finally, on August 17, 2015, the market learned the full extent of the fraud when Defendants announced Q2 2015 financial results, revealing that MasTec missed (already lowered) Q2 2015 EBITDA expectations by approximately 25% and EPS estimates by 66%, as the faulty accounting was unwound. Still, rather than admit that the earnings miss was due to the manipulation of cost-to-complete estimates and other accounting shenanigans, Defendants Mas and Pita blamed the poor performance on "distraction" caused by the investigation. However, now, the jig was up and the market understood the full impact of the manipulation. Thus, on this news, MasTec's stock dropped nearly 7%, and analysts questioned the veracity of Defendants' prior disclosures. All in all, Defendants' fraud erased nearly 60% of shareholders' value during the Class Period.

325171.1 MASTEC

Despite what Defendants ultimately admitted in connection with the Restatement – that MasTec's widespread control deficiencies led to pervasive inaccuracies in its most important financial metric – Defendants now champion MasTec's purportedly "robust" control system for having uncovered the fraud. Def. Br. at 18. But this spin is belied by the facts: the Company's utter lack of controls combined with its incentive compensation structure engendered rampant accounting manipulations, necessitated the Restatement, resulted in serious underperformance and missed earnings targets, and substantially damaged shareholder value. Moreover, as discussed herein, Defendants' challenge to materiality, based solely on the relative size of the Restatement, is not properly decided on this motion to dismiss, nor have Defendants offered a *more* compelling inference against Plaintiffs' scienter allegations. The Motion should be denied in its entirety.

## II.   STATEMENT OF FACTS

### A.   Background

MasTec is an infrastructure construction company which operates in five distinct segments: Communications; Oil and Gas; ET (the third largest segment and the one at the center of this litigation); Power Generation; and Industrial. ¶¶5, 39 ("¶__" citations refer to the Complaint). As such, MasTec generates the vast majority of its revenue from long-term contracts. ¶¶3, 39, 41. CEO Mas and CFO Pita issued, signed, and/or certified MasTec's Class Period public statements, including press releases and SEC-filed financial reporting. *See, e.g.*, ¶¶166-68, 177-79,183-185.

### B.   Accounting Requirements for Long-Term Construction Contracts

MasTec typically utilized "fixed price" contracting for its long-term projects, under which MasTec estimated the total cost of the project, and agreed to complete the project for a specified price based on that estimate. ¶42. There are two generally accepted methods for recognizing revenue for fixed price contracts: the percentage-of-completion method (used by MasTec), and the completed-contract method. ¶43. In the percentage-of-completion method, a company estimates the total cost of performance relative to actual costs incurred over the contract term, reporting revenue and income based upon measurements of project completion and remaining costs (*i.e.*, "cost-to-complete" estimates). ¶¶44, 49, 51. Thus, MasTec's cost-to-complete estimates directly affected its

325171.1 MASTEC

3

revenue and net income and were thus critical to accurate financial reporting. ¶¶45, 52.[2] Indeed, MasTec was obliged to properly estimate costs under both GAAP and its own internal policies. ¶50. Under GAAP, when reasonably accurate estimates cannot be made, the "completed-contract" method is used to recognize revenue and expenses incurred upon contract completion. ¶¶44, 48 57.

### C. Defendants Improperly Inflated MasTec's Revenue and Net Income

Throughout the Class Period, Defendants employed a systematic combination of improper under-bidding to win contracts, premature recording of expenses, and inappropriate cost shifting among projects to misrepresent financial performance and defer or shift losses. Former employees confirm baseless slashing of cost estimates by superiors in order to win contracts, thereby artificially inflating revenue. ¶¶70-85. Even though bids were unrealistic, MasTec executives cared more about hitting revenue targets (¶82), masking losses incurred from the start. ¶¶130,146-148. Defendants further prematurely recognized revenue and income on contracts by manipulating cost-to-complete estimates, unduly front-loading projects with expenses, and/or shifting costs among projects to mask losses. ¶¶58, 60-76, 87-93. For example, MasTec often prematurely ordered construction materials, thereby creating the appearance, through purchase orders and invoices, that a project had progressed far more than it, in fact, had, while at the same time creating the appearance of fewer remaining costs and tasks (lowering cost-to-complete estimates) – thus enabling MasTec to inflate revenues and net income under percentage-of-completion accounting. ¶¶69, 87. MasTec also shifted "cost overruns" incurred on certain unprofitable projects to unrelated projects that could absorb the costs to mask losses. ¶73. This allowed MasTec to continue to accrue contract revenues using falsified cost estimates (*i.e.*, estimates that excluded the additional costs that would have indicated overruns). ¶86.

### D. MasTec Lacked Sufficient Internal Controls

MasTec lacked the internal controls necessary to accurately determine its percentage-of-completion costs because: (i) its accounting system was inadequate and lacked a dedicated internal audit function; (ii) employees were improperly trained and failed to accurately track costs; (iii)

---

[2] If the total estimated costs exceed the set contract price, the *entire* estimated loss must be taken as an immediate deduction from earnings rather than being deferred until contract completion. ¶¶53-57.

325171.1 MASTEC

projects were purposely underbid and full of misallocated costs; and (iv) cost-to-complete estimates were continually manipulated. ¶¶94-105. Since Defendants lacked reasonably reliable cost estimates, they should have used the completed-contract method for such projects and deferred recognizing revenue and income until the contracts were completed. ¶¶44, 48 57, 105. Instead, Defendants took advantage of these material weaknesses to further their scheme to inflate revenue and net income.

**E.**     **Defendants Were Financially Motivated to Manipulate MasTec's Performance**

Under intense pressure to hit financial goals and motivated by incentive compensation, MasTec employees routinely underbid projects (*i.e.*, "low-balled" costs) to land contracts, improperly shifted costs between projects, and otherwise manipulated cost-to-complete estimates. ¶115. This improper maximization of revenue and net income benefited MasTec (at least for awhile), and Mas and Pita, whose compensation packages were tied directly to net income. ¶¶118-120.

**F.**     **The Truth Emerges; MasTec's Shareholder Value Falls**

Defendants' falsification of financial results, particularly within the ET segment, ultimately resulted in a significant decline in MasTec's share price, which manifested over a series of partial disclosures. First, on March 17, 2015, MasTec disclosed that the Audit Committee was still investigating its cost-to-complete estimates, further delaying the 2014 10-K filing. ¶193. On this news and partial materialization of the risk, MasTec shares declined 9.5% on March 18, 2015. ¶194.

Then, on May 11, 2015, MasTec lowered Q2 2015 guidance (although it was still misleading) and announced abysmal preliminary Q1 2015 results, blaming inclement weather. ¶196. MasTec again delayed its 2014 10-K filing as well as its Q1 2015 10-Q filing, citing the ongoing investigation and possible inaccuracy of previously-filed financials. *Id*. As a result of this news and partial materialization of the risk, MasTec shares fell over 12% on May 12, 2015. ¶197.

On July 30, 2015, MasTec announced that, as a result of the investigation, it would restate its financials for the first three quarters of 2014. ¶204-10. In the Restatement, Defendants admitted to "material weakness" and "operational failure" of internal controls in the ET segment that allowed "significate judgments" in estimates "without sufficient documentation." ¶¶21, 157, 206. Mistakenly believing the full extent of the problems had been disclosed, investors were relieved. ¶¶211-213.

325171.1 MASTEC

Then, on August 17, 2015, the full impact of the fraud was revealed when Defendants announced that MasTec significantly missed earnings guidance (already reduced in May) for EBITDA by 25% (from $94-$99 million to $71 million) and EPS by 66% (from $0.27-$0.30 to $0.10), and further cut 2015 guidance. ¶¶196, 216, 219. On the earnings call, Mas and Pita admitted that the ET segment's poor performance and MasTec's missed guidance was due to the investigation that uncovered pervasive accounting violations, but they took great pains to insist that the miss was due to "distraction" caused by the investigation (¶217), refusing to admit the true cause, *i.e.*, the *effect* of necessary accounting corrections applied to underperforming projects and the inability to cook the books going forward. In response to an analyst's question about the gross margin effect to 2015 as a result of the "underperforming projects" uncovered in the ET segment, Mas admitted that "margin drag" on these projects would cause "significantly lower revenues" than projected. *Id*. With the impact of unwinding the fraud to MasTec's financials now fully disclosed, MasTec's stock dropped over 6.7% on August 18, ultimately wiping out 60% of shareholder value ¶220.

## III.    ARGUMENT

### A.    Applicable Legal Standards Do Not Favor Defendants' Motion

To avoid dismissal, a complaint need only "contain sufficient factual matter…to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[3] Plaintiffs need only plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable…." *Id.* at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (plaintiff need only allege "enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the claims.").

Even under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a court must "take[] the factual allegations in the complaint as true and construe[] them in the light most favorable to the plaintiff." *Edwards v. Prime Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010)); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The elements of a §10(b) claim are: (1) a material misrepresentation or omission of fact, (2) scienter, (3)

---

[3] Internal citations and quotations are omitted throughout unless otherwise stated.

325171.1 MASTEC

a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). While Defendants contest only materiality, scienter, and loss causation,[4] the Complaint adequately alleges all elements.

**B.      The Complaint Alleges Material Misrepresentations and Omissions**

**1.      Materiality Is Sufficiently Alleged**

First and foremost, the Restatement itself is evidence of materiality. GAAP mandates that financial statements may not be restated unless the restated amounts are material. *See S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) (under GAAP, "a restatement issues only when errors are material"); FASB Accounting Standards Codification Section ("ASC") 250 (¶¶9-10); SEC Staff Accounting Bulletin ("SAB") 99. Materiality is satisfied if there is a substantial likelihood that a reasonable investor would have viewed the information as having altered "the total mix of information." *Id*. at 232; *S.E.C. v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007). Significantly, "to be material, a fact need not be outcome-determinative – that is, it need not be important enough that it would necessarily cause a reasonable investor to change his investment decision." *S.E.C. v. City of Miami, Fla.*, 988 F. Supp. 2d 1343, 1357 (S.D. Fla. 2013).

**(a)      Materiality Is a Question of Fact Not Appropriately Determined at the Pleading Stage**

The Eleventh Circuit has held that determining materiality in securities fraud cases should be left to the trier of fact. *See Merchant Capital*, 483 F.3d at 766 (assessment of materiality is "peculiarly within the province of the trier of fact"); *see also S.E.C. v. Bankatlantic Bancorp, Inc.*, No. 12-60082-Civ., 2012 WL 1936112, at *10 (S.D. Fla. May 29, 2012) ("The trier of fact usually decides the issue of materiality."). Materiality "may only be decided as a matter of law *when it is so plain that reasonable minds could not differ*." *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1226 (S.D. Fla. 2007) (emphasis added) (citing *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002)); *City of Miami*, 988 F. Supp. 2d at 1358 (court should not dismiss based on

---

[4] Defendants concede elements not challenged in their Motion. *See* Fed. R. Civ. P 12(g); *Manns v. City of Atlanta*, No. CIV.A.1:06CV0609-TWT, 2006 WL 2466836, at *3 (N.D. Ga. Aug. 23, 2006).

immateriality "unless [statements] *are so obviously unimportant* . . . that reasonable minds could not differ….").

The Restatement and underlying violations that necessitated a major accounting review and overhaul here are material because "[a]ccurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating [a corporation's] stock." *Sekuk Global Enter. v. KVH Indus. Inc.*, No. Civ. A. 04-306ML, 2005 WL 1924202, at *9 (D.R.I. 2005) (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 35 (1st Cir. 2002); *see also Schultz*, 488 F. Supp. 2d at 1226 (even without restatement, court refused to find GAAP violations immaterial as a matter of law).

Conceding, as they must, that MasTec issued false statements during the Class Period,[5] Defendants instead argue that the alleged misstatements and omissions were immaterial *as a matter of law* because the size of the Restatement was *de minimis*. Def. Br. at 20. But pursuant to ASC 250, a company *may only restate financials if the impact is material*. ¶¶9-10. Where, as here, MasTec had to restate its financials for three quarters of 2014 based on the *manipulation of a key accounting metric*, causing a slash in 2015 guidance, it is not reasonable to conclude *on a motion to dismiss* that the misstatements and omissions underlying the Restatement were immaterial *as a matter of law*. *See In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 138 (S.D.N.Y. 2008) (a restatement "tacitly acknowledge[s] that the previous financial statements were materially misstated").[6]

Notably, none of the cases cited by Defendants to support immateriality as a matter of law even involved a restatement. *See* Def. Br. at 20. For example, *Glassman* was a Section 11 strict liability case that involved no restatement, but rather turned on a duty to disclose. *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir. 1996). The court in *Glassman* did *not* hold that a 3-9% drop in quarterly revenue was immaterial as a matter of law (Def. Br. at 20); rather, the court

---

[5] Def. Br. at 8, 18-21 (admitting Restatement demonstrates earlier figures were incorrect). *See also* SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) (financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate).

[6] *See also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) (restated financials were "materially false when made"); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1026 (N.D. Ohio 2000) ("Telxon . . . admitted its prior disclosures were materially misstated when it issued the restatements…."); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 821-22 (N.D. Ill. 2000) (restatement material even where plaintiff did not specify size).

325171.1 MASTEC

held that where a variable (such as backlog levels at issue in that case) carried "only minor predictive value," defendants did not have to disclose specific figures. *Id.* By contrast here, whether there was a "duty to disclose" is not at issue, and MasTec's cost estimates were not of only *minor predictive value*; rather, by Defendants' own admission, they were "critical" to financial reporting. ¶¶168, 179, 185. Indeed, these estimates were *a primary driver* of the ET segment's results (¶¶3, 42-59) and had a direct impact on earnings (¶216).[7] The Restatement also provides a sufficient basis for pleading that Defendants' statements in press releases, conference calls, and earnings guidance were materially false to the extent they were based upon or "reported, discussed, or analyzed figures that subsequently were restated…." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005). The Complaint identifies the press releases in which Defendants reported, discussed, and/or misleadingly characterized financial performance and gave earnings guidance based upon subsequently restated figures,[8] and explains why the statements were materially misleading.[9]

### (b)     Defendants' Misstatements Were Qualitatively Material

Moreover, the fact-intensive materiality inquiry here requires analysis of both quantitative and qualitative factors. *See Holmes v. Baker*, 166 F. Supp. 2d 1362, 1372 (S.D. Fla. 2001). Indeed, "[q]ualitative factors may cause misstatements of quantitatively small amounts to be material," particularly where, as here, "the misstatement masks a change in earnings or other trends" and "the misstatement hides a failure to meet analysts' consensus expectations for the enterprise." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 163 (2d Cir. 2000) (reversing a district court's dismissal relying on the materiality of 1.7% of revenues) (quoting SAB 99).

As such, courts routinely find materiality even where financial impact *appears* relatively

---

[7] Defendants' other cases also are inapposite. *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1328-29 (S.D. Fla. 2004) (no restatement alleged, no duty to disclose alleged "related party transactions"); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 883 (W.D.N.C 2001) (no restatement alleged, plaintiffs failed to allege *falsity* and scienter regarding impairment loss that was properly recognized on the company's financials); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (no restatement alleged, $6.8 million overstatement of assets in prospectus was immaterial where "high risk/high yield" investments had sufficient cautionary warnings).

[8] *See* Press Releases ¶166 (5/1/14), ¶177 (8/11/14), ¶183 (10/30/14), ¶¶188 & 191 (2/26/15).

[9] ¶¶169-71, 180-81, 186-87, 189-90, 192.

small. *See id.* (refusing to find 1.7% of revenues immaterial as a matter of law); *Schultz*, 488 F. Supp. 2d at 1226 (rejecting argument that revenue recognition violations were immaterial on motion to dismiss); *City of Miami*, 988 F. Supp. 2d at 1359 (refusing to deem omissions alleged to be "qualitatively material" immaterial as a matter of law); *In re Recoton Corp. Sec. Litig.*, 358 F. Supp. 2d 1130, 1142 (M.D. Fla. 2005) ("at this motion to dismiss stage, it cannot be said that a $3 to $4 million deferral in three consecutive quarters is immaterial as a matter of law" even though the amount affected, at most, 2-3% of receivables per quarter). Plaintiffs here allege qualitative materiality in that Defendants' public statements misled investors into believing that MasTec's financial health was stronger than it was (¶¶5-8, 13, 58-59), and that the utter lack of controls (¶¶94-105) enabled the manipulation of MasTec's financials by, *inter alia*: improper under-bidding (¶¶78-85); falsification of cost estimates (¶¶60-77); and improper cost-shifting between projects (¶¶86-93).

### (c)  Defendants' Misstatements Were Quantitatively Material

Defendants' argument that the Restatement and overhaul of accounting controls did not cause a material negative impact on 2014 year-end financials (Def. Br. at 20-21) ignores the fact that the overall impact of the fraud was hardly limited to the restated periods of the first three quarters of 2014; rather, the impact of the fraud was felt heavily in 2015, as the improper accounting was unwound, new accounting controls were implemented, and cost-to-complete estimates could no longer be manipulated. Indeed, to investors' shock and dismay, the accounting overhaul resulted in significant negative impact to 2Q 2015 results,[10] *see* ¶196 (reporting negative impact, although cause still concealed, in 1Q 2015); ¶¶200, 216, 219 (negative impact in 2Q 2015, $3.8 million net loss from continuing operations versus $33.7 million net income in 2Q 2014, as well as a 25% miss in continuing operations adjusted EBITDA and a 66% miss in continuing operations adjusted diluted EPS from guidance given on May 11, 2015) – and  necessitated a further downward revision in

---

[10] While 2Q 2015 revenue was on target, *significantly*, MasTec's *net* figures suffered a striking blow, missing guidance significantly. Indeed, net figures are the appropriate metrics by which to assess the impact of Defendants' fraud. *See Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 18 (D. Mass. 2004) ("The focus on revenue, an old chestnut that securities fraud defendants frequently try on judges and juries, is entirely specious. What matters most to investors is income, not revenues…").

earnings guidance for 2015. ¶¶216-20. Mas and Pita admitted that the investigation was a "huge distraction" that caused "significant disruption" to both MasTec's and the ET segment's operations. ¶¶217-19. Mas admitted that the investigation uncovered a number of ET projects experiencing cost overruns such that there would be "margin drag" causing "significantly lower revenues than…anticipat[ed] in the second half of 2015." ¶217. As a result, Mas indicated that guidance for the rest of 2015 would be lowered and MasTec would likely see "breakeven" EBITDA margins for the rest of 2015. ¶218. It simply cannot be said that this information is so obviously unimportant that reasonable minds could not differ. As such, immateriality *cannot* be established as a matter of law.

### 2. Defendants Find No Protection in the PSLRA Safe Harbor

The PSLRA "safe harbor" provides limited protection for "forward looking statements" that are accompanied by "meaningful cautionary language," and provided that the maker had no knowledge that the statement was false or misleading. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i)&(B).

### (a) The Statements and Omissions Were Not Forward-Looking

Attempting to invoke safe harbor, Defendants make much of supposed risk warnings issued during the Class Period. Def. Br. at 21-22. However, Defendants' misrepresentations and omissions of *present* and *historical* fact are *not* protected by safe harbor. *See Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1473 (N.D. Ga. 1997) (no safe harbor for misstatement of "hard" figures or "current or past conditions").[11] Nor are MasTec's financial statements, which were false and misleading when issued, "forward-looking." *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1339 (S.D. Fla. 1999) (PSLRA "expressly excludes from the safe harbor statements that are 'included in a financial statement prepared in accordance with generally accepted accounting principles.'"). Further, *omissions* are *not* covered by the safe harbor. *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 974 (N.D. Ill. 2006) ("it is axiomatic that the failure to make a statement cannot be forward-looking").

Plaintiffs allege that Defendants made material misrepresentations and omissions relating to

---

[11] *See also P Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) ("misrepresentation of present or historical facts cannot be cured by cautionary language"); *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1358 (S.D. Fla. 2015) ("set financial figures, such as revenue and net income" are not forward-looking).

MasTec's then-current financial state during the Class Period, its accounting controls (or lack thereof), and its widespread accounting manipulations. ¶¶5-8, 60-114. Defendants made material misstatements regarding MasTec's income and earnings (hard numbers) as well as the reliability of the Company's cost-to-complete estimates. Such statements and omissions relating to then-current facts and financial figures are not "forward-looking" within the meaning of the safe harbor.

### (b)      There Was No Meaningful Cautionary Language

Even if the challenged statements *were* forward-looking, they lacked the requisite *meaningful* cautionary language. "To qualify as 'meaningful cautionary' language, a statement's warning must advise investors of 'risks of a significance similar to that actually realized.'" *Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, at 1373-74 (S.D. Fla. 2001) ("generic, boilerplate language" will not suffice); *Merchant Capital*, 483 F.3d at 767 (same). Moreover, if the "the maker of the statement had actual knowledge that it was false or misleading" then cautionary language is not meaningful. *Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 95 (D.P.R. 2010); *Gargiulo v. Isolagen, Inc.*, 527 F. Supp. 2d 384, 389 (E.D. Pa. 2007) (no safe harbor where plaintiffs allege knowledge of falsity because "well-pleaded allegations in the complaint [must be accepted] as true").

Defendants' supposed cautionary language relating to cost estimates (Def. Br. at 22) is generic to all estimates and fails to disclose the specific risks at issue here, *i.e.*, that the estimates *were not reliable* due to rampant manipulations and failure to follow GAAP and internal policies. The cautionary language is further meaningless where Defendants knew and failed to disclose that MasTec systematically distorted its financial results throughout the Class Period  by underbidding contracts, manipulating cost estimates, and shifting projects costs to avoid booking known losses.[12]

---

[12]  *See* Sec. III.C *infra* (scienter). As the Eleventh Circuit made clear in *Merchant Capital*, no safe harbor protection exists where, as here, despite cautionary warnings, "unfavorable events had already occurred" which would render statements misleading. 483 F.3d at 769. Thus, at minimum, statements relating to 2015 earnings (particularly those in February and May 2015) are not cured by cautionary language because at the time made, Defendants were aware of "specific negative events" that were not yet disclosed (*i.e.*, the pervasiveness of the manipulations, the unwinding of faulty accounting, and the effect of changes in accounting) that rendered guidance misleading. *Id*. at 768.

C.       **The Complaint Adequately Alleges a Strong Inference of Scienter**

To plead scienter, a complaint must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Scienter encompasses recklessness, and in this Circuit scienter is sufficiently alleged by facts demonstrating "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1299-1300 (11th Cir. 2011).

An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as any plausible opposing inference.*" *Tellabs*, 551 U.S. at 324, 328 (emphasis in original). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. When competing yet equally compelling inferences are shown, the tie goes to the plaintiff. *Id.* The relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310, 322 (emphasis in original).[13]

Courts in this Circuit look to the following non-required elements to assess scienter: (1) a lack of internal controls; (2) the significance of the transactions or contracts to the company's core operations; (3) the existence of GAAP violations and whether the violations also ran afoul of the company's policies; (4) incentive compensation or other financial motive; (5) the signing of false SOX certifications; (6) access to internal reports or other facts that should have alerted defendants to fraud, including awareness of events contradicting public statements; (7) the need to restate financials; and (8) the obvious or glaring nature of irregularities or fraud, as well as allegations of ignoring red flags.[14] These factors support a strong inference of scienter here.

_____

[13] *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004) (PSLRA permits the "aggregation of facts to infer scienter"); *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1358 (S.D. Fla. 2005) ("the inference of scienter can arise from an aggregation of particularized facts, even if each individual fact standing alone does not create a sufficiently strong inference.").

[14] *See, e.g.*, *Spear*, 399 F. Supp. 2d at 1358 (allegations that defendants were alerted to accounting problems and ignored "red flags", financial restatements, auditor resignations, timing of stock trade or profits, and significant price declines following disclosures, together, supported scienter); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, No. CV 10-2847-IPJ,

### 1. The CWs Provided Credible Facts that Strongly Support Scienter

### (a) The CWs Are Reliable

The confidential witnesses ("CWs") provide corroborative facts supporting a strong inference of scienter in this case. Defendants do not appear to challenge the reliability of the CWs, but instead claim that the Complaint fails to identify specific interactions with the Individual Defendants. *See* Def. Br. at 12.[15] But no such direct contact is required to support scienter. Rather, CWs "may be used to sustain complaints under the PSLRA so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1188 (S.D. Fla. 2005). CW allegations are sufficient where, as here, they "fully describe[] the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Mizzaro*, 544 F.3d at 1240.

By cherry-picking from ten pages of detailed CW accounts which adequately provide each CW's basis for knowledge, Defendants ignore specific allegations of concerns raised to various identified managers, directors, and/or executives, and the fact that many of the CWs attributed their termination to retaliation for repeatedly voicing their concerns. *See* ¶¶107-111, 113. The aggregation of these CW accounts – all of whom corroborate each other despite working in various offices around the country, including headquarters – together raise a strong inference of scienter.[16]

---

2011 WL 12855820, at *8-*9 (N.D. Ala. June 7, 2011) (incentive compensation tied to company performance, access to internal reports and contradictory information, magnitude of irregularities, and false SOX certifications together supported strong inference of scienter).

[15] In *Mizzaro*, relied upon by Defendants, confidential sources were low-level store employees, there was no indication that their concerns were reported to upper management, the fraud was easily concealed as legitimate returns, and there was no other evidence that corporate-level management orchestrated, knew, or could have even detected the fraud. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1249-50 (11th Cir. 2008). By contrast here, the CWs elevated concerns to local and corporate management, Defendants admitted to a material weakness in internal controls which allowed manipulation of a key accounting metric, and the fraud was easily detectable due to obvious errors in monthly reports and severe cost overruns on unprofitable projects. ¶¶66-115, 205.

[16] This is in stark contrast to *Hubbard* (*see* Def. Br. at 13), where the CW allegations lacked any supporting foundation. The court further noted the lack of "red flags" – such as a restatement – that should have alerted defendants to the fraud. *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1284, 1291 (S.D. Fla. 2008).

325171.1 MASTEC

Case 1:15-cv-21740-MGC Document 51 Entered on FLSD Docket 02/12/2016 Page 23 of 36

**(b)        The CWs Provided Particularized Facts Probative of Scienter**

CW1, an ET Project Management ("PM") director from 2013 until July 2015 who prepared monthly cost-to-complete estimates, routinely observed cost estimates manipulated with unrealistic figures. ¶¶61-62, 65, 67, 90. CW1 stated that projects, including two subject of the Restatement, often had cost estimates slashed to win bids, and after the projects began, the timing of revenues and income was accelerated by frontloading purchases to appear more fully completed. ¶¶62-63, 66-67, 87-93. CW1 frequently complained to CW1's managers about these issues and in February 2014, told ET executives SVP Rick Woolstenhulme, Executive Director of PM Mike Pickering ("Pickering"), and COO William Wright that cost-to-complete estimates for the Utah project were already $24 million over budget.  ¶¶61, 66, 70, 107. MasTec corporate officers were also informed. ¶¶67, 106-09. CW1 attributes CW1's termination to reporting the fraud.  ¶110.

CW2, a MasTec financial analyst in Maryland until August 2014 and responsible for reviewing project costs, verifying budgets, and recording project margins and revenue, similarly described the Company's poor internal controls, improper accounting, and manipulation of cost estimates that were ultimately rolled up into MasTec's quarterly financial reporting. ¶¶96-100.

CW3, a senior estimator in the ET segment who drafted at least 40-50 project estimates, routinely saw CW3's ET segment SVPs slash estimates by hundreds of thousands of dollars in order to win bids. ¶¶79-82. CW3 believed they were motivated to slash cost estimates in order to win bids to reach revenue targets for bonus eligibility, even though they knew the jobs would ultimately lose money. ¶82. CW3 was terminated after raising too many questions about the estimate cuts. ¶111.

CW4, a MasTec Senior Program Manager from 2012 until June 2015 who reviewed project bids, reported that projects often were "set up for failure" from being "grossly" underbid. ¶¶83-84. CW4 believed that pressure to meet quarterly targets and bonuses motivated this practice. ¶85. CW4 believed that all of CW4's region – Delaware, D.C., West Virginia, Maryland and Virginia – had inaccurate revenue projections. ¶101. In January 2014, CW4 raised concerns about underbidding practices to MasTec SVP of Operations, Bruce Budagher, who said it was too late to resolve. ¶112.

CW5, a Manager of Project Control in the ET segment from 2012 until December 2014, who

325171.1 MASTEC

15

reported to Pickering and later, to EVP Rick Roton, corroborates CW 1's account of pervasive cost-shifting and cost estimate alterations. ¶¶70-75.  CW5 said that executives in Houston and at MasTec's headquarters received monthly cost reports, and were aware of the alterations in the reports, which were obviously incorrect and easily detected. ¶¶72, 75-77. CW5 routinely raised concerns with CW5's superiors, who in turn, informed ET executives of the alterations. ¶113.

CW6, an Accounts Payable specialist at headquarters, said that MasTec lacked adequate internal controls, such that purchase orders routinely did not match vendor invoices, causing improper cost recording. ¶¶102-04. CW6 routinely complained about this to CW6's supervisor to no avail. ¶114. While these control deficiencies were raised during a 2013 meeting at headquarters with high-ranking MasTec officials, no remedial action was taken during CW6's tenure. ¶114.

Given these detailed accounts of widespread knowledge of poor internal controls and intentional accounting manipulations among employees and management in the ET segment, other MasTec offices, and MasTec headquarters, *at minimum*, there is "at least a fifty-fifty chance" it was severely reckless for Mas and Pita to not know of the alleged fraud. *Walter*, 111 F. Supp. 3d at 1373. Accordingly, the aggregation of CW allegations strengthen the inference of scienter here.

### 2.     The Core Operations Doctrine Supports an Inference of Scienter

The fact that accurate cost estimates were critical to MasTec's core operations and accurate financial reporting supports a finding that Defendants either knew, or recklessly ignored, the faulty accounting. *See Schultz*, 488 F. Supp. 2d at 1226 n.3 ("Where accounting irregularities are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in day-to-day operation of the company."); *Walter*, 111 F. Supp. 3d at 1376 ("knowledge of [a subsidiary]'s compliance issues can be imputed" to individual defendants where subsidiary was a core operation).

The ET segment was the third largest of MasTec's core operating segments, and Defendants themselves stated that accurate cost-to-complete estimates were *critical* to financial reporting:

> We believe that **our accounting estimates pertaining to: revenues and costs derived from fixed price contracts under the percentage-of-completion method . . . are the most critical** in the preparation of our consolidated financial statements

as they are **important to the portrayal of our financial condition**…. **We frequently review our accounting policies and critical accounting measurements** with the Audit Committee of the Board of Directors.

¶¶167-68 (Q1 2014 10-Q), ¶¶178-79 (Q2 2014 10-Q), ¶¶184-85 (Q3 2014 10-Q) (emphasis added).

Defendants' admission of the critical nature of cost-to-complete estimates to accurate financial reporting, and their supposed close review and scrutiny of the same, combined with CW allegations that MasTec executives were both informed by employees and via monthly reports of the manipulations, yet did nothing about it, supports a strong inference of scienter in this case. *Fuechtman v. Mastec*, Inc., 390 F. Supp. 2d 1264, 1266-68 (S.D. Fla. 2005)[17] (rejecting the MasTec defendants' argument that revenue was based on estimates "subject to change," the court found scienter based on allegations of revenue overstatement while defendants ignored employee concerns, inappropriately accounted for change orders as corroborated by CWs, and other GAAP violations).[18]

### 3. Individual Defendants' Access to Information and SOX Certifications

SOX certifications are probative of scienter where "the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1345 (N.D. Ga. 2012). Given their proclaimed focus on cost estimates, Mas and Pita were severely reckless in signing SOX certifications while ignoring widespread underbidding on projects, glaring accounting errors in cost-to-complete estimates that often resulted in cost overruns, and inappropriate cost-shifting among projects. Had Mas and Pita done as they certified and "frequently review[ed]" MasTec's "accounting policies and critical

---

[17] In a striking bout of déjà vu, in this prior lawsuit against MasTec and officers (including Mas' brother, current Chairman and co-founder, Jorge Mas), MasTec allegedly "would intentionally underbid a project and then once it received the project, MasTec would try to increase its revenue by submitting a change order" and "reported the change order amounts as revenue even though it knew that those orders would never be paid." *Id.* at 1266. Even though the conduct took place in a foreign subsidiary, the court held that scienter was alleged where MasTec controlled the subsidiary's accounts, such that the inference could be drawn that defendants "condoned, or at the very least disregarded, the [subsidiary's] misconduct…." *Id.* Defendant Mas was a MasTec EVP at the time.

[18] *See also City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1397 (S.D. Fla. 2011) (fact that Finance Committee "closely supervised and monitored" the subject transactions and that the committee "was responsible for reporting such information to the Board of Directors" supported scienter of CFO and company).

accounting measurements," they should have discovered – or were severely reckless in having missed or ignored – these pervasive manipulations and the utter lack of supporting documentation, which the CWs corroborate were rampant prior to and throughout 2014.[19]

### 4. The Pervasiveness of the Violations and Deficient Internal Controls

GAAP violations, restatements of financials, and other accounting violations accompanied by "red flags" further support a strong inference of scienter here. *Schultz*, 488 F. Supp. 2d at 1225 (whether GAAP violations also violated internal policies and the importance of the contracts were among factors establishing scienter); *Fuechtman*, 390 F. Supp. 2d at 1267 ("violating GAAP may provide some evidence that MasTec acted with severe recklessness and departed from the standards of ordinary care."); *Spear*, 399 F. Supp. 2d at 1358-59 (inaction in the face of "suspicious accounting problems" supported scienter). Indeed, "'[w]hen a corporation's own internal investigation leads to the announcement of a restatement of historical financial results, this 'establish[es] a strong inference that the company itself believes that fraud' occurred." *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, No. 8:07-CV-1952-T-26MAP, 2009 WL 3853592, at *6 (M.D. Fla. Mar. 30, 2009).[20]

The GAAP violations at the center of this case are further bolstered by numerous "red flags" relating to MasTec's accounting, including: (1) a lack of internal controls; (2) tip-offs from employees; (3) the significance of the contracts and the importance of the financial metrics at issue; (4) the fact that the GAAP violations also violated the company's supposed internal policies; and (5)

---

[19] *See Spear*, 399 F. Supp. 2d at 1358-59 (even if CEO was not intentionally directing the fraud, when errors were "too obvious to ignore", as CEO, he should "bec[o]me suspicious looking over the financial statements before he signed them"); *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008) (the "implicit assertion that a Company can ignore the elephant in the room, as long as no one *told* them it was there does not negate recklessness") (emphasis in original).

*Ricker v. Zoo Entm't, Inc.*, 534 F. App'x 495, 500 (6th Cir. 2013), Def. Br. at 14, is inapposite. Far from the systemic and pervasive fraud alleged here, the company in *Ricker* miscalculated revenues *for a single account*, and the allegations *did not point to any red flags* to alert the company of fraud.

[20] Defendants' reliance on *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253 (M.D. Fla. 2009) aff'd, 594 F.3d 783 (11th Cir. 2010) is misplaced. *See* Def. Br. at 15. *Jabil* merely states that without any evidence that accounting errors were intentional, a restatement alone does not support scienter. *Id.* at 1272. Here, by stark contrast, Plaintiffs allege numerous facts showing that the accounting manipulations were widespread and intentional.

325171.1 MASTEC

the obvious or basic nature of the fraud.[21] Moreover, Defendants issued misleading earnings guidance in May 2015 while *knowing*, yet failing to disclose, the pervasiveness of the accounting manipulations and control problems. ¶¶196-200. That they finally admitted on July 30, 2015, to "material weakness in [the Company's] internal control over financial reporting" (¶¶20, 205), and specifically noted that estimates were made "without sufficient documentation" in violation of company policy (¶¶20, 205), yet still failed to disclose the impact that these issues would have on 2015 earnings, only further reinforces the inference of scienter here.

Indeed, the CWs confirmed that what was eventually revealed – *i.e.*, deliberate underbidding and manipulation of cost estimates without any support – was known and notorious within the Company long before it was revealed to the market.[22] *See* ¶¶60-77. To be sure, the Individual Defendants knew or recklessly disregarded that their financial reporting was  inaccurate. Having been provided with cost estimate reports that contained obvious errors and alterations, and which lacked supporting documentation, and in light of the fact that (as Defendants concede), cost-to-complete estimates were *the most critical* accounting metric, it is reasonable to infer that "it is at least likely as not" that these high-ranking Individual Defendants "either orchestrated the alleged fraud (and thus always knew about it), learned about the alleged fraud, or were otherwise severely reckless in not learning of [it]." *Walter*, 111 F. Supp. 3d at 1359 (citing *Mizzaro*, 544 F.3d at 1247).

### 5.      Scienter Is Alleged As to Each Defendant

Contrary to Defendants' claims, Plaintiffs' allegations *do* collectively give rise to a strong

---

[21] *See Wellcare*, 2009 WL 3853592, at *5 (practice of entering into contracts promising premiums above established fee schedules created "an inadequate system of internal controls which fostered complete disregard for regulatory compliance" and was indicative of each defendants' scienter); *Schultz*, 488 F. Supp. 2d at 1225-26  ("violation of the company's internal policy" was a factor that "supports an inference of scienter as to this alleged GAAP violation"); *Crowell*, 343 F. Supp. 2d at 20 (the desire "to hide [] fraudulent conduct would provide an obvious motive to maintain minimal internal controls"); *Spear*, 399 F. Supp. 2d at 1362-63; *Local 703*, 2011 WL 12855820, at *2, *4.

[22] These amounts were not *de minimus*. While CW3 reported unsubstantiated budget slashing in the hundreds of thousands of dollars, projects were often underbid by millions. ¶81. The Utah project, for example, was originally estimated at over $174 million, baselessly slashed to $150 million to win the bid, and ultimately cost over $180 million. ¶90.

inference of scienter as to each Defendant.[23] The factors discussed above, which are corroborated by CW allegations (¶¶66-121), are considered by courts to *impute* scienter to individuals.[24] Regardless, additional facts add to a strong inference of scienter as to each Mas and Pita.

### (a)      Plaintiffs Allege a Plausible Financial Motive

Greed may be "ubiquitous" (Def. Br. at 15), but that does not change the fact that motive and opportunity allegations are "often highly relevant" to the scienter inquiry. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1286 (11th Cir. 1999); *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1344 (M.D. Fla. 2002) (allegations that company "cooked its books" to achieve the necessary reporting results to inflate its stock price was specific motive to infer scienter). Indeed, a strong inference of scienter is supported where, as here, plaintiffs allege a "motive by defendants for incentive compensation by making the company appear more financially healthy than it was…."[25] *Local 703*, 2011 WL 12855820, at *8 (citing *Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2011)).

Here, MasTec's employees were incentivized to underbid projects because they were under pressure to meet performance metrics for quarterly targets and bonuses. ¶115. Both Mas and Pita stood to benefit from ignoring the fraud because their bonuses were tied to EBITDA, a metric derived from net income, which was misstated for the first three quarters of 2014, and overestimated for 2015. ¶120, 116. This incentive compensation structure further supports a strong inference of scienter. *Crowell*, 343 F. Supp. 2d at 20 (relying on employees whose compensation was tied

---

[23] Defendants incorrectly attempt to frame the Complaint as necessarily relying on the group pleading doctrine, and that the Complaint must be dismissed as a result. Def. Br. at 11. While Plaintiffs do not rely on group pleading here, the Eleventh Circuit has not ruled that group pleading is impermissible under the PSLRA, *see Phillips*, 374 F.3d at 1018-19 (so stating), and courts within this Circuit have continued to apply the doctrine. *See In re Netbank, Inc. Sec. Litig.*, No. CIV.A.1:07-CV-2298-B, 2009 WL 2432359, at *15 (N.D. Ga. Jan. 29, 2009) (collecting cases).

[24] *Cf. In re Hicks*, 79 B.R. 45, 49 (Bankr. N.D. Ala. 1987) (noting that fraud is "by its nature, covert and surreptitious. Indeed, intent is rarely the object of direct proof, and must be inferred from the evidence in the case…. The court, upon its review of the evidence, must determine whether the circumstances, when all are taken together, are consistent with an honest intent.")

[25] *Carpenters Health & Welfare Fund of Philadelphia v. Coca-Cola Co.*, No. 1:00-CV-02838-WBH, 2002 WL 34089163, at *14 (N.D. Ga. Aug. 20, 2002) (scienter strengthened where compensation scheme benefitted defendants in a "concrete and personal way" because it was tied to "shipments, case volume sales and reported revenues," which is not "common to all insiders"); *Paincare*, 541 F. Supp. 2d at 1293 (CEO and CFO bonuses "tied to the Company's earnings" supported scienter).

325171.1 MASTEC

directly to contracts created a "formula for systematic revenue misstatement").

### (b)    Mas and Pita Misrepresented MasTec's Financial Condition

Throughout the Class Period, Mas and Pita made misleading positive statements about the ET segment's financial health, and falsely blamed inclement weather for lower results that did occur, misleading analysts and the market.[26] By February and May 2015, amidst the ongoing investigation into the ET segment's accounting (and even earlier, as alleged and discussed above), Mas and Pita must have known (even if not the full extent) of these serious accounting problems, but represented the ET segment as a Q4 2014 and Q1 2015 growth standout with a positive outlook and falsely blamed lower overall results on the weather. ¶¶188, 196, 201. *See Maverick Fund, L.D.C. v. Lender Processing Servs. Inc.*, No. 3:13-CV-1585-J-32JRK, 2015 WL 5559761, at *10-*12 (M.D. Fla. Sept. 21, 2015) (scienter alleged where defendants painted an "inaccurate picture" of situation by minimizing scope and impact of alleged problems). Even when the full impact of the fraud was eventually revealed in August 2015, both Mas and Pita falsely and repeatedly attributed MasTec's poor performance to mere "distraction" caused by the investigation and adverse weather. ¶¶217-19.

### 6.    No Competing Inference Outweighs the Strong Inference of Scienter

Taking the allegations as true and viewing them holistically, Plaintiffs allege a strong inference of scienter that is at least as compelling as any opposing inference offered by Defendants. *See Tellabs*, 551 U.S. at 326, 127.[27] For their part, Defendants offer no compelling, non-culpable

---

[26] *See e.g.*,  ¶¶166, 171-73 (Q1 2014, analysts note a solid quarter, with 32% net income inflation, given Mas and Pita's discussion of weather issues), ¶177 (Q2 2014, Mas noted ET segment growth opportunities and 2015's expected revenue growth and profit margin expansion), ¶183 (Q3 2014, Mas discussed the quarter's double-digit growth and opportunities in ET segment), ¶188 (Q4 2014, MasTec cited increased revenues for ET segment, Mas discussed ET segment opportunities for 2015); ¶¶196, 201-03 (Q1 2015, MasTec cited increased revenues for the ET segment, blamed weather and investigation costs for early weaknesses in 2015 but announced increasing opportunities in the ET segment; thus, analysts look at ET segment for strength despite weather issues); ¶¶204, 211-13 (analysts misled by Mas and Pita expressed relief that the audit review seemed minor).

[27] *See also Paincare*, 541 F. Supp. 2d at 1293 (inference that CEO and CFO knew financials were false based on their "positions," "access to insider information," experience and knowledge of GAAP standards, "bonuses…tied to the Company's earnings," and "knowledge of GAAP violations prior to informing the public" was "at least as cogent and compelling as the inference that they were unaware of anything amiss in an area clearly within their expertise and authority"); *Crowell*, 343 F. Supp. 2d at 16 ("The way in which the allegedly fraudulent acts fit together and reinforce one another strongly suggests a conscious course of conduct. Fraudulent contract accounting, failure to

325171.1 MASTEC

inference regarding the significant accounting manipulations that necessitated the Restatement and negatively impacted earnings into 2015. Instead, Defendants incredibly claim that MasTec had a "robust system" to identify accounting issues and pat themselves on the back for having remedied the fraud. Def. Br. at 18. Given their Class Period admissions, this explanation is hardly compelling.

Defendants further argue that the Individual Defendants made no stock sales and that MasTec repurchased shares during the Class Period (*id.* at 16), but neither fact negates scienter. Since recklessness, by definition, does not require a motive, a lack of stock sales does not negate scienter, particularly where, as here, Defendants had sufficient motive in incentive compensation. *See S.E.C. v. BankAtlantic Bancorp, Inc.*, No. 12-60082-CIV, 2013 WL 5588139, at *17 (S.D. Fla. Oct. 10, 2013) ("stock sales are not necessary to create a strong inference of scienter") (citing *Mizzaro*, 544 F.3d at 1253 n.3). Moreover, MasTec's stock repurchase occurred in Q1 2015, after its stock had already fallen over 50% from the start of the Class Period due to the partial revelation of the fraud. *See* Motion Ex. A at 27. Amidst Plaintiffs' allegations of recklessness and intentional acts, this stock "repurchasing plan weighs neither in favor of nor against an inference of scienter." *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 n.23 (E.D. Pa. 2014); *BankAtlantic*, 2013 WL 5588139, at *17 (defendant's acquisition of company stock during the class period did not negate scienter).[28]

Finally, the allegedly small Restatement size does not negate scienter (Def. Br. at 17) where, as here, the market's reaction to the revelation of the fraud is hardly limited to the restated amount. ¶25. Rather, 2015 was clearly affected (*see* ¶¶216-220), and whether the negative impact felt in Q2 2015 was due to "distraction" (as Defendants insist), or to unwinding the fraud and the necessary change in accounting going forward (as alleged), it clearly flowed from the same facts that underlies the Restatement. Moreover, "[t]he ultimate profitability of a course of conduct is not conclusive of intent. Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by

---

maintain adequate internal controls, and shifting of Ionics' costs between different entities (or failing to report such costs at all) all combine to inflate Ionics' profits artificially.")

[28] Defendants' citation to *Staehr* is inapposite: As a "derivative Rule 10b–5 claim … based on a corporation's stock repurchase plan" plaintiffs had to show that the defendant must have the intent to deceive the shareholders through the stock repurchase plan itself." *Staehr v. Miller*, No. 08-20990-CIV, 2010 WL 11030716, at *6 (S.D. Fla. Mar. 31, 2010). No such requirement applies here.

hindsight because the alleged misdeeds did not pay off." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001). In sum, no alternative inference proffered is "more compelling" than the allegations supporting scienter at this stage. *Tellabs*, 551 U.S. at 322, 324.

### D.      The Complaint Alleges Loss Causation

To allege loss causation, Plaintiffs need only allege "a short and plain statement" providing "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura*, 544 U.S. at 356. This is "not meant to impose a great burden upon a plaintiff." *Id.* at 347.  While negative market reaction to a corrective disclosure is one way to plead loss causation (*FindWhat*, 658 F.3d at 1312), a corrective disclosure is "not required." *In re Jiangbo Pharm., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1264-65 (S.D. Fla. 2012). In fact, "[i]t is sufficient to show that a risk defendants allegedly concealed materialized and arguably caused the plaintiffs' losses." *Id.* Thus, Plaintiffs "need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace through a series of partial disclosures." *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013). Finally, competing theories of loss causation should not be resolved on a motion to dismiss. *Netbank*, 2009 WL 2432359, at *14 (quoting *PSS*, 250 F. Supp. 2d at 1351).[29]

Defendants mistakenly contend that loss causation is negated because: (1) MasTec's stock price did not drop on July 31; (2) the March 17 and May 11 releases did not reveal "fraud regarding cost-to-complete estimates, internal controls or any other matters"; (3) the August 17 disclosure did not reveal anything new about the Restatement; and (4) other news from the May 11 and August 17 disclosures caused the stock to decline. Def. Br. at 24-25. These arguments do not warrant dismissal.

### 1.      March 17, 2015 After Hours Press Release

A corrective disclosure need not "mirror" misrepresentations; it need only "relate back to the misrepresentation" or reveal "part of the relevant truth." *Meyer*, 710 F.3d at 1197; *Jiangbo*, 884 F.

---

[29] *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 975 (N.D. Cal. 2010) ("Whether the stock drop was due to other factors[] is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage."); *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds.").

325171.1 MASTEC

Supp. 2d at 1264-65. Whereas the market was not overly concerned by the February 26, 2015, announcement of a three-week filing delay that also touted an 11% ET segment revenue increase, the March 17 press release revealed that MasTec *still* could not file its 2014 10-K, thus revealing that the investigation was more extensive than previously represented. ¶¶191-94. News outlets explicitly noted investors' growing concerns, noting the 20% stock decline since February, and stating that the market was "clearly spooked" by the further delay. ¶195. Thus, the concealed risk from Defendants' lack of internal controls and accounting manipulations partially materialized on March 17, 2015, causing the stock to drop over 9.5% on March 18. ¶194.[30]

### 2. May 11, 2015 After Hours Press Release

To satisfy loss causation, "a plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value," only that is it was a "substantial" or "significant contributing cause." *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).[31] The May 11 release announced further delay to the 2014 10-K filing, and that the Q1 2015 10-Q also would be delayed. ¶196. Concerned about the lengthy investigation and further delayed filings, MasTec shares fell over 12% on May 12, 2015. ¶197. Defendants further concealed the extent of the fraud, however, by releasing false positive news and misleadingly blaming weather for the poor results. ¶198. Analysts reiterated Defendants' misrepresentations about the weather impact, and looked to the ET segment as a bright spot. ¶¶201-02. By feeding the market false positive news and

---

[30] Defendants suggest that price rebound following the March 17 and May 11 disclosures negates loss causation. It is unclear how Ex. F, which lists only six dates and closing prices, supports a claim that MasTec shares "rebounded." See Ex. F; Def. Br. at 24. MasTec shares declined nearly 60% from the start of the Class Period ($40.23, May 1, 2014) to the last partial disclosure ($16.24, August 18, 2015). From the time MasTec first disclosed the accounting review after hours ($20.53, February 26, 2015) through the drop associated with each partial disclosure, the stock did not rebound: March 17, 2015 (over 13% decline), May 11 (over 21% decline), August 17-18 (nearly 21% decline).

In any event, Defendants conflate causation with damages: price rebound does not negate loss causation. *See Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1276-77 (N.D. Ga. 2014) (loss causation alleged where stock rebounded to pre-disclosure price); *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 36 (2d Cir. 2012) (same); *Nathanson v. Polycom*, No. 13-3476 SC, 2015 WL 1517777, at *13 (loss causation *not* negated where "stock price recovered significant amounts of its lost value within two months of the alleged corrective disclosure.").

[31] *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (plaintiff need only show that "the misrepresentation touches upon the reasons for the investment's decline in value").

325171.1 MASTEC

24

falsely attributing the Company's lower Q1 2015 results to weather issues, Defendants' statements helped to slow the rate of MasTec's inevitable stock drop. *See FindWhat*, 658 F.3d at 1314-15.

### 3. August 17, 2015 Press Release and August 18, 2015 Conference Call

Over August 17-18, 2015, MasTec announced Q2 2015 results and the full extent of concealed risks from the accounting manipulations and lack of internal controls materialized. ¶216.[32] Defendants repeatedly attributed most of the Q2 2015 earnings miss to the investigation's drain on resources and "distraction" to MasTec and the ET segment and the uncovering of underperforming projects, further lowering guidance. ¶216-17. In light of their explicit admissions that the investigation caused much of MasTec's reduced 2015 guidance and disappointing earnings, Defendants cannot seriously contend that none of the stock decline can be attributed to the accounting improprieties. In any event, where Defendants assert an intervening event as a defense to loss causation, it "is a matter of proof at trial and not to be decided on a Rule12(b)(6) motion to dismiss." *Stonepath*, 343 F.3d at 197. Whether the weather or the fraud caused the drop is a question of fact; Plaintiffs need not address every possible reason for price decline at the pleading stage.

### E. The Complaint States a Claim for Control Person Liability

Conceding that CEO Mas and CFO Pita are "control" persons under the PSLRA, Defendants' sole argument against control person liability under §20(a) failure to plead a primary violation of §10(b). Def. Br. at 25. As demonstrated above, Plaintiffs have adequately alleged a primary violation for securities fraud, and, therefore, have stated §20(a) claims against Mas and Pita.

## IV. CONCLUSION

The Court should deny Defendants' Motion in its entirety. Alternatively, if the Court grants any portion of the Motion, Plaintiffs respectfully request leave to amend. *In re Theragenics Corp. Sec. Litig.*, 105 F. Supp. 2d 1342, 1362 (N.D. Ga. 2000).

---

[32] The July 30 disclosure of the Restatement is irrelevant is it disclosed *neither* the full extent of the manipulations *nor* the effect that correcting them would have on 2015 performance. Mistakenly believing that the full extent of the problems had been disclosed, investors were relieved. "Fraudulent statements that *prevent* a stock price from falling can cause harm by *prolonging* the period during which the stock is traded at inflated prices." *FindWhat*, 658 F.3d at 1314-15 (false statements may "propel the stock's price upward" or "slow the rate of fall") (emphasis in original).

325171.1 MASTEC

Respectfully submitted,

DATED:  February 12, 2016

**SAXENA WHITE P.A.**

By:  *s/ Lester R. Hooker*
Joseph E. White III
Lester R. Hooker
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

*Liaison Counsel for Lead Plaintiffs and the Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Kara M. Wolke
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
rprongay@glancylaw.com
kwolke@glancylaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
Mark Bryan Goldstein
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com
lsmollar@pomlaw.com
mbgoldstein@pomlaw.com

**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
migross@pomlaw.com
jalieberman@pomlaw.com

325171.1 MASTEC

**POMERANTZ LLP**
Jayne A. Goldstein
Florida Bar No. 144088
1792 Bell Tower Lane, Suite 203
Weston, FL 33326
Telephone: (954) 315-3454
Facsimile: (954) 315-3455
jagoldstein@pomlaw.com

**THE ROSEN LAW FIRM**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
pkim@rosenlegal.com

*Lead Counsel for Lead Plaintiffs and the Class*

325171.1 MASTEC

27

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 12, 2016.

*/s/Lester R. Hooker*