1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No.:  15-21740-CV-COOKE

NANCY WRIGLEY, individually and on     )
behalf of all others similarly         )
situated,                              )
                                       )
                Plaintiffs,            )
                                       )  Miami, Florida
          -v-                          )  September 28, 2016
                                       )  11:32 AM - 12:18 PM
MASTEC, INC., JOSE R. MAS, and         )  Pages:  1-29
GEORGE L. PITA,                        )
                                       )
                Defendants.            )


**MOTION HEARING**
BEFORE THE HONORABLE MARCIA G. COOKE
UNITED STATES DISTRICT COURT JUDGE



APPEARANCES:

For the Plaintiffs          **LEIGH H. SMOLLAR, ESQUIRE**
                            **PATRICK V. DAHLSTROM, ESQUIRE**
                            Pomerantz, LLP
                            10 South LaSalle Street
                            Suite 3505
                            Chicago, Illinois 60603
                            312.377.1181
                            lsmollar@pomlaw.com
                            pdahlstrom@pomlaw.com

                            **KARA M. WOLKE, ESQUIRE**
                            Glancy Prongay & Murray, LLP
                            1925 Century Park East
                            Suite 2100
                            Los Angeles, California 90067
                            kwolke@glancylaw.com

APPEARANCES CONTINUED:

For the Plaintiffs          **LESTER R. HOOKER, ESQUIRE**
                            Saxena White
                            5200 Town Center Circle
                            Suite 601
                            Boca Raton, Florida 33486
                            561.206.6708
                            lhooker@saxenawhite.com

For the Defendants          **MARK R. CHESKIN, ESQUIRE**
                            **DANIEL E. GONZALEZ, ESQUIRE**
                            **YARA LORENZO, ESQUIRE**
                            Hogan Lovells US LLP
                            600 Brickell Avenue
                            Suite 2700
                            Miami, Florida 33131
                            305.459.6500
                            mark.cheskin@hoganlovells.com
                            scott.haiber@hoganlovells.com
                            yara.lorenzo@hoganlovells.com

                            **SCOTT R. HAIBER, ESQUIRE**
                            Hogan Lovells US LLP
                            100 International Drive
                            Suite 2000
                            Baltimore, Maryland 21202
                            scott.haiber@hoganlovells.com

STENOGRAPHICALLY            **TAMRA K. PIDERIT, RDR, CRR**
REPORTED BY:                Official Court Reporter to the
                            Honorable Marcia G. Cooke
                            400 North Miami Avenue
                            Suite 11S03
                            Miami, Florida 33128
                            305.523.5158
                            tamra_piderit@flsd.uscourts.gov

**P R O C E E D I N G S**

(Court called to order at 11:31 AM.)

**THE COURT:**  We are on the record in *Wrigley v. MasTec, Jose Mas and George Pita*.

Appearing for the Plaintiff.

MS. SMOLLAR:  Good morning, Your Honor.  Leigh Smollar from Pomerantz, LLP on behalf of lead Plaintiffs.  With me today I have Kara Wolke from Glancy also on behalf of the Plaintiffs, Patrick Dahlstrom from Pomerantz, and Lester Hooker from Saxena White.

**THE COURT:**  And appearing on behalf of -- counsel on behalf of Defendants MasTec, Mas, and Pita.

MR. CHESKIN:  Good morning, Your Honor.  My name is Mark Cheskin, I'm a partner at Hogan Lovells.  With me are my colleagues Scott Haiber, Daniel Gonzalez, and Yara Lorenzo.

**THE COURT:**  All right.  Counsel for Defendants, this is your motion, docket entry number 41, to dismiss.  You may proceed.

Counsel for Plaintiffs, you may take a seat at this time.

MR. CHESKIN:  Your Honor, we have moved to dismiss on three grounds:  1) lack of sufficient allegations of scienter; 2) lack of sufficient allegations of a material misstatement; and 3) lack of sufficient allegations of causation.  All three of them are independent grounds that warrant dismissal here.

4

Before we get to the legal standards, there is an 87-page, 250-count complaint, kind of what I would call the spaghetti-against-the-wall sort of thing.  So I thought it would be helpful to go through some of what we believe to be the material facts.

The Plaintiffs' allegations of fraud are based on the fact that in July of 2015, the company filed a restatement of its 2014 earnings in which the company adjusted revenue amount pertaining to two projects.  There are no allegations in the complaint that Mr. Mas or Mr. Pita were ever provided any information that would have caused them to believe that the company's public disclosures were false.

**THE COURT:**  Isn't there some allegations about this confidential -- I'm going to say informants, but you know who I'm talking about -- like employees who knew what was going on?

MR. CHESKIN:  Your Honor, there are six identified confidential witnesses in the amended complaint.  Five of them never worked anywhere near Coral Gables, based on their own allegations where the company is headquartered.  And what they said was, well, I told a supervisor that I disagreed with how things were being priced, and the supervisor, I believe, talked to some executives, without actually ever naming any sort of chain of command specifically up to Mr. Mas or Mr. Pita.

There is no, as the case law requires, not when something was said, where it was said, what exactly what was

said.  The case law is very clear on this, Your Honor, the Eleventh Circuit and actually other circuits, that there has got to be specific allegations before scienter, and they are simply wholly lacking here.

Now, the sixth confidential witness, a little bit entrusting, because she is -- I believe a she -- she is the only one who is actually in Coral Gables.  She was, according to the allegations, an accounts payable clerk.  She says, well, there was some marketing invoices I think didn't match up.  Nothing to do with the allegations of the complaint otherwise.

Probably most telling, confidential witness six, by their own allegations, she worked from May to December 2013 before, before any of the allegations that are relevant -- actually relevant to the complaint relating to the accounting allegations.

To put that in context, Your Honor, MasTec is a publicly held corporation with approximately 15,500 employees spread over 460 locations as of December 31, 2014.  They operate through five different business segments:  Communications, oil and gas, power generation industrial, others, which includes construction services and wireless, and the fifth being the electrical transmission segment.  The electrical transmission segment, which is just one of five segments.

I mention that because the two projects at issue that led to the restatement are under the electrical transmission

segment which accounts

for -- the entire segment counts for only 10 percent of MasTec's revenues.

**THE COURT:**  Does that make a different?

MR. CHESKIN:  Well, it does, Your Honor, to show how immaterial and small the alleged accounting errors were.  It does matter in the sense that there was nothing material here. There was, according to the public disclosures, which are attached to the complaint, amended complaint, the net effect of the restatement was .0025 percent, .0025 percent of net income.

We cite in our papers, Your Honor, four other cases that -- two from Circuit Court of Appeals that show even .67 percent, which would be more, was immaterial, that 1½ percent was immaterial, that 2 percent was immaterial, even 3 and 9 percent.  So, actually, it is material, Your Honor, to the amount of restatement.

In fact, the amount of the restatement was so small the next day the stock price went up.  One of the analysts, who is quoted by the Plaintiffs in their amended complaint, said, in effect, it's much ado about nothing.

So what happened here, Your Honor, is that, you know, subsequently the stock ends up falling for other reasons, all in the public disclosures attached to the amended complaint of weather, bad weather -- I mean, this is an infrastructure construction company -- bad weather, they can't do the

construction, through a project in Canada that was going much worse than expected, which has absolutely nothing to do with the fraud allegations, and management being distracted from the internal investigation, which the company was extremely transparent about.

As soon as through the internal reporting it became a concern over the way the company was doing accounting, the cost of completion method, which goes, you know, they spend pages and pages in the amended complaint discussing, what it basically is, you know, construction projects are often long-term projects, maybe many months, maybe even many years.  And so there has got to be some judgment calls made along the way by the people out in the field deciding well, should we book this cost, and we have already paid for it, but do we book it in this quarter or do we book it in that quarter?  For revenues, do we book it here, do we book it there?

A concern was raised for the one segment, and immediately the company told the public, look, this has come to our attention, we believe that the impact is going to be between zero and $13 million.  This is all in the amended complaint.

**THE COURT:**  Does it matter when the disclosure is made? I mean, in terms of them, "them" meaning the Plaintiffs, and meeting the requirement of sufficiently pleading what was going on?  Do they have -- I suppose my issue would be when do they have enough.  Because it's almost as if, if I'm reading your

papers, you don't just need the smoking gun, you need to show someone buying the gun, purchasing the bullets, and then bringing it to the crime scene.  Not saying there was any crime here.

MR. CHESKIN:  Right.

**THE COURT:**  This is merely only analogy for purposes of discussion.

MR. CHESKIN:  A very graphic analogy, Your Honor.

I want to say yes.  I mean it's, obviously, an extreme analogy that you just gave.  But in the Private Securities Litigation Reform Act of 1995, the PSLRA, Congress made very clear there is a heightened standard here.  There is a heightened standard for scienter.  The usual notice pleading doesn't apply.  It has to be met, but it's higher than that.

Incredibly, and I don't want to say incredibly, but what Congress did at the time that was somewhat incredible, even the 9(b), Rule 9(b) fraud where it has to be with particularity the fraud, which surely isn't met here, that's really not in the allegations, but it's an even heightened standard under the PSLRA of what was said, where it was said, what emails, what reports.  Wholly lacking here.  Completely vague allegations.

You know, scienter under the PSLRA requires intent to deceive, manipulate, or defraud.  An intent to deceive, manipulate, or defraud, or severe recklessness.  This is from the *Mizzaro* case, Eleventh Circuit Court of Appeals.  And as the

Plaintiffs' correctly noted in their opposition paper, an inference of scienter is strong if it is cogent and compelling and is at least as likely as any plausible opposing reference.

So how do they try to get to the intent to deceive here? Often in these kind of cases, people talk about motive or greed. Here, you know, suspicious fact transactions. Here the company actually bought back its stock during the relevant time period, not selling it.

So what do Plaintiffs then try to do? They say, well, Mr. Mas and Mr. Pita had incentive of compensation, so did executives. And they say in paragraph 115 of their amended complaint that MasTec was under pressure to meet performance metrics for quarterly targets and bonuses, and that's right under the big heading that says "Motive."

Well, when I went back and reread paragraph 115 of the amended complaint, it says absolutely nothing about bonuses and certainly not quarterly bonuses. You know, if you dig through very deeply into the attachments, there is some discussion about bonuses based on yearly, yearly performance of the company. The allegations in the complaint here relate to how accounting was done from one quarter to the next in two projects out of hundreds of projects of this large company, had a net effect, you know, of .0025 percent by the end of the year. There is no factual allegations that Mr. Pok (phonetic), Mr. Mas, or Mr. Pita financially were motivated, financially gained, because

they weren't.

Now, as the severe recklessness, there is a case from Judge Ungaro in 2015 in *Thorpe v. Walter Investment Management Corp.*, 111 F.Supp 3d 1336.  And at pages 1359 to 60, the Court helpfully collected a lot cases on the sort of allegations needed.  What the Court there held is that the PSLRA requires Plaintiffs to allege what each Defendant knew, how the Defendant knew that information, and when each Defendant knew or should have known the information.

I remember when I was a younger lawyer, and I used to go into a deposition, and I would write at the top of my pages, every one, who, what, where, when, why, how, who, what, where, when, why, how.  It's totally lacking here.  What they say seven different times in their amended complaint is Defendants knew or turned a blind eye.  Seven times they say that.  Well, they must have known.  They must have known that some, you know, projects that were in Arizona and Utah, two projects, Arizona and Utah, that at the end of the day there was going to be the way things were booked would make a difference from the first, second, and third quarters of 2014, it was a net effect of $1.5 million difference as to how the things should have been booked.

Well, Your Honor, the one and a half million dollars was in favor of the company.  It would have been more.  It would have been more net income, not less.  And then when the fourth

quarter was included prior to the restatement, it was .0025 percent.

THE COURT:  Now, this restatement occurs how long after the alleged bad thing happened?

MR. CHESKIN:  The restatement was in July of 2015, and the accounting practices for those two projects were in the first three-quarters of 2014.

THE COURT:  Now, when the announcement was made that your client had to make this adjustment, there was an initial drop in stock, wasn't there?

MR. CHESKIN:  It actually went up, Your Honor.  The stock went up.

THE COURT:  So over time this loss, or slight loss you talk about, was a normal stock correction, and there is no indication from the complaint that these two things are tied together.

MR. CHESKIN:  Absolutely, Your Honor.  You know, from 2014 to 2015, you know, the world goes on.  And as the company announces, it went along.  There was weather issues, there was a Canadian project completely unrelated to this case or the allegations here that was suffering a $16 million loss that was reported, earnings were not as good as expected, and the stock then went down.  The stock went down.

And on kind of a balancing test that's required under the PSLRA, those are more, you know, more compelling reasons for

the stock drop as compared to two isolated projects, Arizona and Utah, that had a net impact of .0025 percent year-end or a billion and a half dollars in favor of the company.  The analysts got it right.  They said much ado about nothing.

So what the Plaintiffs are doing in their amended complaint, or in their response brief, is they are saying well, what really happened here, what really happened, they allege, is that the company had stopped cooking the books, actually used the language "cooking the books."  So, therefore, when the full extent of the so-called accounting fraud came to light, that's when the earnings were reported down.

There is not an allegation in the amended complaint to support that conclusory statement that Mr. Mas or Mr. Pita or anyone else at MasTec had cooked the books or had stopped cooking the books to cause the stock to drop.  That's the sort of conclusory allegation that Congress and the Courts have clearly stated are not going to get you past the motion to dismiss.

**THE COURT:**  Counsel, let me hear from the Plaintiffs on this issue.

Before I let you sit down, I do have a question.  This is the second amended complaint.  They get to do this by right.  Is there a method that you see that would allow these inadequacies under the statute to be corrected?

MR. CHESKIN:  I did not, Your Honor.  We do not.  We

think under Eleventh Circuit precedent when it's the *Rosenberg v. Gould* case, 554 F.3d 962, Eleventh Circuit 2009, makes clear that even making the request, here embedded at the very end of the reply brief is a request in the amended complaint. In that case they make clear that that's not enough. You can't amend a complaint based on that.

And, in fact, the Court went on to say they didn't even attach or attempt to attach what the amended pleadings would be.

But, you know, more telling here is, I think, the *Mizzaro* case, which we cite quite often in our brief, Your Honor. The *Mizzaro* case, where the Courts said, "In sum, the amended complaint fails to surmount the pleading hurdles that Congress has imposed on private securities fraud class actions. Fearing that these types of lawsuits were 'injuring the entire U.S. economy' by rewarding 'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent.'"

The Court goes on to say, "Congress decided to open the courthouse doors only to those plaintiffs whose complaints raised a 'strong inference' that the defendants they sought to hold responsible for their losses acted with required bad intent."

As the Court says, "The Supreme Court has unambiguously explained to us that the 'strong inference' requirement, though

not insurmountable, is difficult to meet - the inference must be cogent and at least as compelling as any opposing inference. We are constrained to conclude that the allegations in the amended complaint do not pass Congress's stringent test."

And in *Mizzaro*, the Court upheld, upheld the lower Court's refusal to allow a further amendment.

Your Honor, the facts are not going to change here. The facts are not going to change, the allegations should not be -- should not change as a result. And telling Your Honor, telling Your Honor -- tellingly, sorry, tellingly, Your Honor, it's the top of page 2 of the complaint, of the amended complaint, Plaintiffs' state top of the page, "Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery."

They got it backwards, Your Honor. Discovery doesn't allow you to get to sufficient allegations. Congress and the Courts have made that clear.

We think having had a lot of time between the initial complaint, the amended complaint, even until today, no request saying we should amend the complaint for these reasons, that's enough that under the PSLRA not only should this case be dismissed, but it should be dismissed without leave to amend.

**THE COURT:** Thank you very much.

Counsel for Plaintiffs, please.

MS. SMOLLAR:  May I approach, Your Honor, the podium?

**THE COURT:**  Yes.

MS. SMOLLAR:  Good morning, Your Honor.

Counsel for Defendants omitted some of the most important facts in this case, the first being that the rampant accounting manipulations in this case resulted in a restatement under both --

**THE COURT:**  What evidence is there in the complaint specifically?  You just used the word "rampant" where you indicate that there was not only -- you not only have to indicate "rampant abuse," which is your word, you have to show that people who could have done something knew about a manipulation, failed to do it, and I don't see that in this complaint.

MS. SMOLLAR:  Your Honor, the evidence or the allegations in the complaint, the standard for scienter here for extreme recklessness is that the Defendants knew or should have known that these accounting manipulations were going on.

In this case, where you have the company's most critical accounting metric that was admitted by the company, in every disclosure they say cost-to-complete estimates are the most critical estimates we have.  It's the only way that we can portray our profitability.  You have the filings with the SEC state that the officers of the company review these accounting metrics on a regular basis.  They analyze them, they go over

them with the accounting department and the board of directors.

In this case, you have rampant accounting manipulations which the CEO and CFO were aware, or if they weren't aware, they should have been aware because this is their core operation. Their most critical financial metric was manipulated. And the way --

**THE COURT:** This was for two businesses out of all of the businesses that MasTec runs. And if I understand what the Defendants just said, this was -- can you give me that number again, the percentage?

MR. CHESKIN: The restatement was .0025 percent in favor of the company year-end on net income. And for the three quarters for those two projects, it was a million and a half dollars in favor of the company on a 14 -- a four and a half billion dollar company, Your Honor.

**THE COURT:** So let's say that somehow the people with knowledge see that there is an issue, they not only go forward and do the restatement, if it was this rampant manipulation, and it was becoming in their favor, and somehow this shows fraudulent conduct, why restate? It seems as if they took all of the precautions necessary when they found or it came to their attention, whoops, we did something wrong here.

If they wanted to hide stuff, it's to their favor, it didn't overall affect the stock. On the day that this announcement is made, the stock price actually rises, and then

somewhere way down the line there is an adjustment of the stock price.

MS. SMOLLAR:  Your Honor, your question about the restatement is exactly right, because under the accounting laws, a company cannot restate unless the amounts are material.  That is the law.  That is the accounting law.  And we allege that in our complaint.

So Defendants' counsel will have Your Honor believe this only happened with two projects, and it didn't matter in the financials.  The fact of the matter is a restatement is an admission by the company that the financial statements were materially misstated.  And that's the law.

**THE COURT:**  But doesn't the law require if you see that, that in and of itself is not the violation.  Because that's what good companies are supposed to do, right?  They are supposed to look at, and this is what a CFO is supposed to do, we looked at stuff, and I thought it was A and B, and I now see that it should have been C, and fixed it.  It's only if the initial conduct was somehow violative.  We don't have that here.  And/or they ignored it in order to create something else.  There is no allegation of that here.

Isn't that what -- and I sort of remember this time when this statute was changed it was somehow thought we are leaving investors in the dust, and they won't be able to go after executives who they believe somehow did something wrong in

manipulating their company such that it affected investors.  But they did want -- what Congress wanted to show was management had to have knowledge and manipulated it in this bad way.

There is nothing, except mere allegations, in saying they should have known because this was important or they should have known because this was a core business.  There is nothing to indicate that anyone took this action in order to deceive, defraud, manipulate.

MS. SMOLLAR:  Your Honor, respectfully, I believe the complaint does allege that management did know or was extremely reckless in not knowing.  If you will let me just, I can go through real quickly --

THE COURT:  Please.

MS. SMOLLAR:  -- and tell you where that is.

Okay.  So you have a situation here where you have the restatement, and the Plaintiffs' allegations don't allege the restatement alone is evidence of a fraud.  This must be done holistically.  And if we look at it the way Defendants' counsel looked at it and rip apart each individual allegation saying, well, the restatement alone doesn't do it, and this alone, these two projects alone, but here when you look at the holistic allegations that's required by the Supreme Court, we have scienter.

You have a company that admitted that its senior management regularly reviews the cost-to-complete estimates.

19

You have confidential informants. And contrary to what Defendants' counsel stated on the record, the allegations in the complaint do state specific time, dates, meetings, and places that each confidential witness informed, not that they disagreed with the cost-to-complete estimates, that the cost-to-complete estimates were being rampantly manipulated.

You have CW1 who sent these models and percentages of the cost-to-complete estimates. CW1 said that they were routinely changed by supervisors. You have CW1 specifically laying out meetings and discussions with upper management in headquarters about the altering and manipulation of the cost to complete estimates, which started in 2014, continued all the way through the class period.

You have other CWs corroborating this information. You have all the CWs saying that they believed that upper management was manipulating cost-to-complete estimates in order to manage earnings.

You have the GAAP violations, which Defendants don't dispute. You have Mas and Pita's signing of the Sarbanes-Oxley certifications in a case where they were on notice, not only because of all the CWs who reported up the chain, but this exact scenario happened to these Defendants ten years ago.

There was a case that Plaintiffs alleged that the Defendants were manipulating cost-to-complete estimates, albeit in a different way because now ten years later they are

attempting to do it by underbidding projects as opposed to making various cost overruns.  But ten years ago, same officers of the company, you have the Mas family, who was on board, same allegations, the Court upheld the motion to dismiss, and the case ultimately settled for $10 million.

So this company and these officials were on notice that officers, executives of the company, manipulate cost-to-complete estimates to manage earnings.  And in light of all the CWs, the restatement, the admitted GAAP violations, you have -- then you have the incentive compensation that Defendants Mas and Pita their incentive compensation was tied directly to EBITDA, which was the very metric that was manipulated in this case.  It went from positive to negative.  In the first quarter of 2014 went from positive to negative, and for missed earnings in 2015, it went from positive to neutral.  This is very similar to the *Pain Care* case.

And on top of all of these allegations, what's really important here, Your Honor, is that this is the company's core operation.  As Judge Posner said in *Tellabs*, and I'm going to quote him because it's very relevant to this case, "And at the top of the corporate pyramid sat the CEO.  These were his company's key products.  Almost all the false statements that we quoted emanated directly from him.  Is it conceivable that he was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives?  Sure,

21

it's conceivable, but it is exceedingly unlikely."

THE COURT:  But doesn't, and I am assuming that you are quoting *Tellabs v. Makor Issues & Rights*, which is 551 U.S. 308.

MS. SMOLLAR:  That was actually a quote from the Seventh Circuit case, *Makor v. Tellabs*.

THE COURT:  Okay.  But doesn't *Tellabs v. Makor* say that Rule 9(b) in PSLRA requires Plaintiffs to allege what each Defendant knew, how the Defendant knew the information, and when each Defendant knew or should have known, and what's indicated in your complaint that would meet that standard that's annunciated in 2007.

MS. SMOLLAR:  Your Honor, the complaint, I believe, does meet that standard because it alleges with core operations, which Courts around the country hold Defendants can be held to scienter with core operations, you have the confidential informants giving times, dates, meetings with upper management.

The evidence that Defendants' counsel are searching for, the exact meeting where Defendant Mas sat with one of the confidential informants and was directly told, that's the smoking gun that's not required by *Tellabs*.  Almost no securities case has that smoking gun.

All that's required is holistically when you view these allegations, and there are a lot of allegations of scienter that I have recited, along with the restatement, GAAP violations, confidential informants talking about the rampant manipulations

throughout the company, throughout various offices in the company.

The fact that the Defendants themselves stated that they regularly review and monitor these cost-to-complete estimates, and the fact that this accounting fraud could go on under their noses when they are reviewing this particular metric establishes scienter. I have, I mean, this is, you know, similar to many of the other cases in the circuit.

So I believe that scienter has been adequately pled in terms of loss causation. I believe that Defendants' counsel, again, misstated the record. It wasn't just that the restatement was announced and there was no drop in the stock price.

Plaintiffs allege that the partial disclosure, and this is a case where there was a series of leakage. And, again, when you look at the holistic review from the first leakage to the end, it shows that the fraud was --

**THE COURT:** What would be the fraudulent intent here? What would be the thing that the Plaintiffs would have to be compromising by their bad conduct? I mean, there is some indicia like we want to manipulate stocks in some way, we are trying to hide a drop in something else. What would be the why why here? What's the why?

MS. SMOLLAR: Well, Your Honor --

**THE COURT:** What's the intent of the fraud?

MS. SMOLLAR:  I don't think Plaintiffs need to show motive in order to establish scienter, especially when Plaintiffs have established recklessness.  Nobody knows why Defendants ever, you know, commit a fraud.  But here it was tied to --

THE COURT:  Doesn't the recklessness have to be tied to some sort of intent to accomplish something else?

MS. SMOLLAR:  It does.

THE COURT:  So if I'm just a bad businessman, which I think the reason why this statute was amended, if I am just a bad businessman, and I just mess things up, I'm not saying this happened, I don't want the Defendants to think that I think their client is necessarily engaged in bad business practices, but I'm just a bad businessman, I mess things up, I don't do things right, my company fails, there is a loss, whatever. That's not the liability that would be imposed here.

So even though they don't have to show motive, I have to show more or you have to show more in order for me to find that your complaint meets the statutory standards.  You have to show more than just it was bad business or they should have done it better.

MS. SMOLLAR:  Well, I think, Your Honor, here we do. We do state that the manipulation of the financials allowed the company to meet Wall Street expectations.  And in the second quarter of 2015 when the company made the final disclosure about

the true impact of the fraud, those financial forecasts that the company had previously made were missed by 66 percent for earnings per share and 33 percent, I think, for net income. And also Defendants Mas and Pita's compensation was directly tied to the metrics that the company was manipulating here.

So, you know, this isn't just a case of bad business judgment. This is a case of intentional manipulation of the most important metric that this company had. And it went on throughout the company in various offices of the company and caused a restatement, which is an admission of a material misstatement.

And so I think the Plaintiff has met its burden in terms of scienter, in terms of extreme recklessness. When you look at the allegations holistically, you know, they admitted that these amounts were material because you cannot restate without a material amount. You have witnesses stating how officials were underbidding contracts, manipulating estimates, shifting costs between projects to avoid losses. This isn't just a case of bad business judgment.

And you also had the situation where the SEC filings state specifically that they are monitoring these cost-to-complete estimates. This isn't something where you have a random financial error. This is the most important, critical metric the company has to show profitability, and the company admits it. And the company further admits in its own code of

business that the CEO and CFO are responsible for authorizing the release of the information, that they review the cost-to-complete estimates because they are concerned about how they show investors profitability.  Those are the very metrics that were manipulated here.

The intentional, widespread manipulation of the financials is at least as cogent and compelling as a -- the Defendants don't have a nonfraudulent inference.  All they say is someone reported it to us, and we investigated, and we are heroes.

Well, that's not the case.  This had been going on for quite some time, and an investigation is a matter of a factual matter that's better suited for summary judgment or trial because nobody knows here when the investigation started, how long it went on, what it involved.

Again, Defendants' counsel says, well, this only happened with two projects.  And then upon the final disclosure in August, you have the CEO stating that this was a detailed review of accounting adjustments, estimates, and entries over a multi-year period across the balance of the company's segments in order to assess the reliability of our previously issued financial statements.  This has been an exhaustive, time-consuming, and detailed process for our company.

When you look at all of these allegations holistically, it simply defies logic that a CEO or CFO shouldn't have known

about these rampant violations.

THE COURT:  Thank you.

Any follow-up before I proceed?  Counsel for Defendants, this is your motion.

MR. CHESKIN:  Just very -- I'm always nervous when I say "very quickly," Your Honor.

THE COURT:  Because it's rarely that.

MR. CHESKIN:  That's right.

Your Honor, in the amended complaint, paragraph 63, the Plaintiffs state, and I'm going to quote, "The Utah and Arizona projects were the two projects that were the subject of the restatement announced by the company."

Those are the only two projects identified in the amended complaint that were at issue in the restatement.  And this sort of notion of holistic, I think paragraph 77 is very telling, and I could go on and on.  In 77 the amended complaint says, "CW5 stated that the financial information was shared with top executives."

That's not the specific sort of allegations that's needed here.  Very vague.

Otherwise I will be repeating myself, so I thank you for your attention.

THE COURT:  Thank you very much.

MS. SMOLLAR:  Your Honor, may I add one quick --

THE COURT:  One quick thing.

MS. SMOLLAR:  -- response?

Your Honor, what Defendant keeps referring to is the materiality.  And, again, when a company restates, it's admitted that the prior financial statements were materially misstated.  And all of the cases cited by Defendants in their brief that talks about low percentages and immateriality, none of those cases involve a restatement because a restatement is an admitted material amount.

**THE COURT:**  Thank you very much, Counsel.

MS. SMOLLAR:  Thank you.

**THE COURT:**  As I said when I questioned counsel for the Plaintiff, the PSLRA statute is -- has language of specificity for a reason.  And the reason is is that even though the company is run for the good of the shareholders, there also has to be leeway for a company to make business judgments and business decisions without always having hanging over their head the specter of fraud if for some reason the business judgment or decisions don't work out, which is why the statute makes these claims or makes the requirement that there be claims of specificity.  Show me, tell me, how did our business decisions go outside or off the railroad tracks to show fraud.

There is no inference from this complaint that the Defendants acted with fraudulent intent.  There is no evidence of suspicious stock sales or of anything like that.

A more plausible explanation of these events exists,

and that is that the Defendants discovered a problem, made a correction, and announced it.

Let's go to the issue about these confidential witnesses and that somehow they can give the Court the indicia of confidence that there is some specificity here.

They don't identify a single instance where an individual Defendant received information or made private statements contradicting what was going on in the public.  And the other thing that the Plaintiff cites have been rejected by the Courts in showing this idea of fraudulent intent.

Also, any alleged misstatements were not material to the MasTec investors.  The stock went up, corrections that had occurred later were just that, normal stock corrections.  And there is also no evidence of some loss or connection to loss. The stock price decline was not based upon a fraudulent revelation, as I said before, but from other things going on in the MasTec business and could reasonably infer from that.

So the Defendants' motion, docket entry ECF number 41, is granted, and the complaint is dismissed.

Now, because I recognize that maybe Plaintiffs have one more idea that it's out there, I will go on -- I am dismissing without prejudice at this time.  Maybe there is a way for you to make out a complaint that would meet the allegations that is required by the statute.

So I am not going to dismiss with prejudice here, but,

remember, the next time will be your third time.  And after that Courts are whoa to allow you to continue prosecution at that point.

Thank you very much, Counsel.

For the record, the Plaintiffs' [verbatim] motion, docket entry ECF 41, is granted.

MS. SMOLLAR:  Thank you, Your Honor.

MR. CHESKIN:  Thank you, Your Honor.

(Thereupon, the proceedings were concluded at 12:18 PM.)

* * * * *

**C E R T I F I C A T E**

I, Tamra K. Piderit, Certified Realtime Reporter and Registered Diplomate Reporter, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated this 4th day of October, 2016.

/s/ **Tamra K. Piderit**

Certified Realtime Reporter
Registered Diplomate Reporter